**NO. 25-7653**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

CENTRAL COPTERS, INC., et al.
*Plaintiff-Appellee*,

v.

KAMAN AEROSPACE CORPORATION
*Defendant – Appellant.*

---

On Appeal from the United States District Court for the District of Montana, Helena Division; The Honorable Brian Morris; Case No. 2:21-cv-00071-BMM

---

**APPELLANT'S OPENING BRIEF**

---


| | |
|---|---|
| Steven D. Sanfelippo<br>Cunningham Swaim, LLP<br>4015 Main Street, Suite 200<br>Dallas, TX 75226<br>214.646.1495<br>ssanfelippo@cunninghamswaim.com<br><br>Mark S. Williams<br>Williams Law Firm, P.C.<br>235 E. Pine<br>P.O. Box 9440<br>Missoula, MT 59807<br>406.721.4350<br>mark@wmslaw.com | Kevin M. Smith<br>Robyn E. Gallagher<br>Colleen Kozikowski<br>Wiggin and Dana LLP<br>265 Church Street<br>New Haven, CT 06510<br>203.498.4400<br>ksmith@wiggin.com<br>rgallagher@wiggin.com<br>ckozikowski@wiggin.com |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... vi

STATEMENT OF JURISDICTION .......... 1

INTRODUCTION .......... 2

STATEMENT OF ISSUES .......... 3

STATEMENT OF REVIEWABILITY AND STANDARD OF REVIEW .......... 5

STATEMENT OF THE CASE .......... 7

A. Kaman manufactures the K-MAX helicopter. Central is a sophisticated commercial helicopter operator with a long history of purchasing helicopters from Kaman and others. .......... 7

B. In October 2015, Central purchases a set of replacement blades from Kaman. As with the parties' previous transactions, the sales agreement included choice of law and consequential damage limitation provisions. .......... 8

C. On August 24, 2020, the helicopter on which the replacement blades were installed crashes. Central continues to operate its remaining K-MAX helicopters for another year before deciding to transition to Black Hawk helicopters. .......... 10

D. Central files suit against Kaman in Montana, alleging defects in the servo flap on one of the replacement blades caused the accident. Central seeks consequential damages in contravention of the consequential damage limitation in the Replacement Blade Agreement. .......... 11

E. The jury returns a verdict finding the Accident Helicopter contained a manufacturing defect and awarding Central a total of $22 million in damages—$16 million of which were consequential damages. .......... 13

F. Even though Central's appraisal expert testified that the fair market value of the Non-Accident Helicopters increased after

the accident and its economists admitted their future lost profits opinions were based upon incorrect facts, the district court denies Kaman's renewed motion for judgment as a matter of law. The district court also awards Central prejudgment interest despite the fact that values of the Accident and Non-Accident Helicopters were uncertain. ....................14

SUMMARY OF ARGUMENT....................16

ARGUMENT ....................18

I. The district court erred by refusing to enforce the clear and unambiguous terms of the parties' agreement to apply Connecticut law and limit recoverable damages. The Judgment should therefore be reversed as to all consequential damages, including value of the Non-Accident Helicopters and past and future lost profits. ....................18

A. The district court erred by refusing to apply Connecticut law and conclude that consequential damages are barred thereunder. ......19

1. The choice-of-law provision was valid and enforceable............19

2. Central's consequential damages claims were barred under Connecticut law....................22

B. The district court also erred in concluding the consequential damages limitation waiver was unenforceable under Montana law....................23

C. The parties' agreement was not unconscionable. ....................27

D. Two other district courts have held that an identical consequential damage limitation barred purchasers of K-MAX products from recovering consequential damages. ....................28

II. The evidence is insufficient to support the award of $6 million for lost value of Central's three Non-Accident Helicopters. ....................32

A. The evidence is insufficient to support a finding that any lost value of the Non-Accident Helicopters was caused by a manufacturing defect or negligence. ....................32

B. There are several other reasons why the $6 million Non-Accident Helicopter lost value award should be reversed. ................36

1. There is no evidence to support a finding as to the fair market value of any of the three Non-Accident Helicopters immediately following the accident. ........................................36

2. Even if the lack of fair market value evidence is ignored, the evidence is still insufficient to support the $6 million lost value award. ..................................................................41

III. The evidence is insufficient to support the $6 million future lost profits award. ..................................................................................46

A. Unreliable expert testimony is insufficient to support a verdict. ........46

B. Abbott and Kober's testimony was not based upon a reliable methodology. As a result, it cannot support the lost future profit award. ................................................................................47

IV. The district court's award of prejudgment interest should be reversed because, as a matter of law, Central was not entitled to recover prejudgment interest. ..................................................................53

A. Under Montana law, an award of prejudgment interest "is inappropriate" if the underlying damages are uncertain or disputed. ..............................................................................54

B. The lost value of the Accident and Non-Accident helicopters was uncertain and disputed. As a result, the district court erred in awarding prejudgment interest. ..................................................55

1. Central was not entitled to prejudgment interest on the Accident Helicopter. .............................................................55

2. The award of prejudgment interest on the Non-Accident Helicopters was also erroneous. ................................................60

CONCLUSION ..................................................................................62

CERTIFICATE OF COMPLIANCE ................................................................63

CERTIFICATE OF SERVICE....................................................................63

# TABLE OF AUTHORITIES

## Cases

*All-States Leasing Co. v. Top Hat Lounge, Inc.*,
649 P.2d 1250 (Mont. 1982) ....................27

*American Beverage Ass'n v. City and County of San Francisco*,
916 F.3d 749 (9th Cir. 2019) (en banc)....................53

*American Music Co. v. Higbee*,
103 P.3d 518 (Mont. 2004) ....................57

*Barber v. Bradford Aquatic Grp. LLC*,
414 Mont. 170 (2023) ....................19, 24

*Black Tusk Helicopters v. Kaman Aerospace Corp.*,
No. 24 Civ. 4259 (JHR), 2026 WL 607690
(S.D. N.Y. March 4, 2026)....................30, 31, 32

*Brandenburger v. Toyota Motor Sales, U.S.A, Inc.*,
513 P2d 268 (Mont. 1973) ....................24

*Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)....................46, 47

*Bucy v. Edward Jones & Co., L.P.*,
445 P.3d 812 (Mont. 2019) ....................27

*Burnett v. Ala Moana Pan Shop*,
3 F.3d 1261 (9th Cir. 1993)....................44

*California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
29 F.4th 468 (9th Cir. 2022)....................54

*Carriger v. Ballenger*,
628 P.2d 1106 (Mont. 1981) ....................54, 56, 62

*Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC*,
816 F.3d 1208 (9th Cir. 2016)....................5

*Casun Invest, A.G. v. Ponder*,
119 F.4th 637 (9th Cir. 2024)....................19

*Champion Produce, Inc. v. Ruby Robinson Co., Inc.*,
342 F.3d 1016 (9th Cir. 2004)....................53

*Chisholm Bros. Farm Equip. Co. v. International Harvester Co.*,
498 F.2d 1137 (9th Cir.), *cert. denied*, 419 U.S. 1023 (1974) ......................32

*Conn. Gen. Life Ins. Co. v. Grodsky Serv., Inc.*,
781 F. Supp. 897 (D. Conn. 1991) ..............................................................22

*Cooper v. Brown*,
510 F.3d 870 (9th Cir. 2007)......................................................................46

*Covey v. Brishka*,
445 P.3d 785 (Mont. 2019) ..........................................36, 37, 39, 43, 44, 45

*Custom Homes By Via, LLC v. Bank of Oklahoma, NA*,
F. App'x 356 (9th Cir. 2016) .....................................................................53

*Denton v. First Interstate Bank of Commerce*,
142 P.3d 797 (Mont. 2006) .........................................................................27

*DiMarzio v. Crazy Mountain Constr., Inc.*,
243 P.3d 718 (Mont. 2010) .........................................................................59

*DiTienne v. Sandrock*,
431 P.3d 12 (Mont. 2018) .........................................................52, 55, 57, 62

*Doe I v. Wal-Mart Stores, Inc.*,
F.3d 677 (9th Cir. 2009)...............................................................................5

*Dunlap v. Liberty Nat. Prod., Inc.*,
878 F.3d 794 (9th Cir. 2017).....................................................................5, 6

*Dunluck v. Assicurazioni Generali S.P.A.-UK Branch*,
F.Supp.3d 1283 (D. Mont. 2022) ................................................................21

*Education Logistics, Inc. v. Laidlaw Transit, Inc.*,
CV 07-06-M-DWM, 2012 WL 761950 (D. Mont. Mar. 8, 2012) ................50

*First Nat'l Prop, LLC v. Joel D. Hillstead Trust*,
472 P.3d 1234 (Mont. 2020) .......................................................................59

*Five U's, Inc. v. Burger King Corp.*,
962 P.2d 1218 (Mont. 1998) .......................................................................26

*Grosvold v. Neely*,
568 P.3d 525 (Mont. 2025) .......................................................54, 55, 58, 62

*Hatfield v. Halifax, PLC*,
564 F.3d 1177 (9th Cir. 2009)....................................................................19

*Highway Specialties, Inc. v. Department of Transp.*,
215 P.3d 667 (Mont. 2009) ....................................................................28

*Hoenstine v. Rose*,
312 P.2d 514 (Mont. 1957) ..............................................37, 39, 43, 44, 45

*Hoffman v. Geico Ins. Co.*,
2008 WL 11417041 (D. Mt. Jun. 25, 2008)................................................59

*In re McElroy*,
210 B.R. 833 (Br. D. Or. 1997)....................................................................44

*Jim's Excavating Serv., Inc. v. HKM Assocs.*,
878 P.2d 248 (Mont. 1994) ..........................................................................25

*Keeney Constr. v. James Talcott Constr. Co.*,
45 P.3d 19 (Mont. 2002) ..............................................................................26

*King v. Geico Ins. Co.*,
No. CV 12-92-BLG-RWA, 2014 WL 12591875
(D. Mont. Ap. 15, 2014)......................................................................54, 58

*Kraft v. High Country Motors, Inc.*,
276 P.3d 908 (Mont. 2012) ..........................................................................59

*Landes Const. Co. v. Royal Bank of Canada*,
833 F.2d 1365 (9th Cir. 1987)......................................................................32

*Lust v. Merrell Dow Pharm., Inc.*,
89 F.3d 594 (9th Cir. 1996) ..........................................................................46

*Masters Group Int'l, Inc. v. Comerica Bank*,
352 P.3d 1101 (Mont. 2015) ..............................................................19, 20, 21

*McCray v. Westrock Servs., LLC*,
No. 21-9853-DMG (RAOX), 2024 WL 4579108
(C.D. Cal. Sept. 10, 2024)............................................................................48

*McGlinchy v. Shell Chem. Co.*,
845 F.2d 802 (9th Cir. 1988)........................................................................50

*Meyer v. Creative Nail Design, Inc.*,
975 P.2d, 1264 (Mont. 1999) ......................................................................33

*Milhouse v. Travelers Comm. Ins. Co.*,
641 Fed. App'x 714 (9th Cir. 2016)............................................................53

*Mountain West Helicopter, LLC v. Kaman Aerospace Corp.*,
No. 3:01-cv-1746 (AVC), 2005 WL 8167155 (D. Conn. Apr. 7, 2005).......23

*Negrete v. Allianz Life Ins. Co. of N. Am.*,
523 F.3d 1091 (9th Cir. 2008).....................................................................54

*New Hope Lutheran Ministry v. Faith Lutheran Church of Great Falls, Inc.*,
328 P.3d 586 (Mont. 2014) ...........................................................57, 58, 61

*Northern Mont. Hosp. v. Knight*,
811 P.2d 1276 (Mont. 1991) .........................................................55, 60, 62

*Olson v. Parchen*,
816 P.2d 423 (Mont. 1991) ..........................................................................52

*Pavao v. Pagay*,
3047 F.3d 915 (9th Cir. 2002).......................................................................32

*Polzin v. Appleway Equip. Leasing, Inc.*,
191 P.3d 476 (Mont. 2008) ....................................................................20, 21

*Riley v. American Honda Motor Co., Inc.*,
856 P.2d 196 (Mont. 1993) ..........................................................................33

*Ryffel Family P'ship, Ltd. v. Alpine Country Constr., Inc.*,
386 P.3d 971 (Mont. 2016) ....................................................................55, 62

*Santa Clarita Valley Water Agency v. Whittaker Corp.*,
99 F.4th 458 (9th Cir. 2024)............................................................................7

*Semenza v. Bowman*,
885 P.2d 451 (Mont. 1994) ..........................................................................38

*Spackman v. Ralph M. Parsons Co.*,
414 P.2d 918 (Mont. 1966) ..........................................................................43

*Strain v. Strackhouse*,
920 F.2d 1135 (3d Cir. 1990).........................................................................49

*Streich v. Hilton-Davis, a Div. of Sterling Drug, Inc.*,
692 P.2d 440 (Mont. 1984) ..........................................................................25

*Sunburst School Dist. No. 2 v. Texaco, Inc.*,
165 P.3d 1079 (Mont. 2007) ........................................................................39

*Thompson v. Nebraska Mobile Homes, Corp.*,
647 P.2d 334 (Mont. 1982) ....................................................................24, 25

*Wallace v. City of San Diego*,
479 F.3d 616 (9th Cir. 2007)....................................................................6

*Weisgram v. Marley Co.*,
528 U.S. 440 (2000)..............................................................................47

*Winslow v. Lewis-Shepard*,
562 A.2d 517 (Conn. 1989)....................................................................22

*Woody Contracting, Inc. v. Kaman Corporation*,
Case No. 3:12-cv-1010-AVC,
United States District Court, District of Connecticut........................29, 30, 32

*Zirkelbach Constr., Inc. v. DOWL, LLC*,
402 P.3d 1244 (Mont. 2017)...................................................................26

**Statutes**

Conn. Gen. Stat. § 42a-2-719(3)..............................................................23

Conn. Gen. Stat. § 52-572n(a)..................................................................22

Connecticut Product Liability Act.....................................................12, 19, 22

MCA § 30-2-719(3)..................................................................................21

MCA §§ 27-1-210, 27-1-222...............................................................54, 58

Mont. Code Ann. § 27-1-210...................................................................60

Montana Code Section 27-1-211..............................................................54

Uniform Commercial Code.......................................................................24

**Other Authorities**

Montana Pattern Jury Instructions....................................................40, 43

Montana Pattern Jury Instructions 25.40..................................................40

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction based upon diversity of citizenship pursuant to 28 U.S.C. Sections 1332(a) and 1441. This Court has jurisdiction pursuant to 28 U.S.C. Section 1291, because it involves the appeal of a final judgment and various final decisions of a district court of the United States.

Appellant's motion to dismiss or transfer was denied on March 10, 2022. (1-ER-96). Appellant's motion for partial summary judgment was denied, and Appellee's motion for partial summary judgment was granted, on April 3, 2025. (1-ER-71, 80). A clerk's judgment and amended clerk's judgment were entered on May 8, 2025. (1-ER-64, 66). On November 7, 2025, the district court entered orders: (1) approving the May 8, 2025 clerk's judgment (1-ER-38), (2) denying Appellant's renewed motion for judgment as a matter of law. (1-ER-2, 39), and (3) granting in part and denying in part Appellee's motion to modify the judgment. (1-ER-25).

Kaman filed its notice of appeal on December 4, 2025. (14-ER-3151). Kaman's notice of appeal is timely pursuant to Federal Rule of Appellate Procedure 4(a)(4)(A)(i) and (iv) because: (1) Kaman timely filed a renewed motion for judgment as a matter of law and Central timely filed a motion to alter the judgment, and (2) Kaman filed its notice of appeal within 30 days after the orders denying both motions were entered. (14-ER-3151, 2-ER-224, 345).

# INTRODUCTION

This is a commercial dispute between two sophisticated businesses. Appellant Kaman Aerospace Corporation ("Kaman") manufacturers helicopters. Appellee Central Copters, Inc. ("Central") provides highly specialized commercial helicopter services, including firefighting operations for the United States Forest Department. The parties began doing business together in 1997 when Central purchased its first helicopter from Kaman. Central subsequently acquired several more Kaman helicopters.

In 2016, Central purchased a set of replacement rotor blades from Kaman. As part of the sale, the parties agreed that Connecticut law would apply to any dispute, and that Kaman would not be liable for consequential damages, expressly including lost profits and diminished value damages.

In 2021, Central filed suit against Kaman after the helicopter on which the replacement blades were installed crashed. Central sought to recover damages for the accident helicopter, and also sought consequential damages for alleged lost value of three other Kaman helicopters it owned that were not involved in the accident ("Non-Accident Helicopters"). It also sought lost profits.

Before and after trial, Kaman attempted to enforce the parties' agreement to apply Connecticut law and prohibit the recovery of consequential damages. But the district court refused to do so. After the jury returned a verdict finding the accident

was caused by a manufacturing defect, the district court entered judgment awarding Central $22 million in damages. Of that amount, $16 million encompassed consequential damages unequivocally barred by the parties' agreement: $6 million for the purported lost value of the three Non-Accident Helicopters, $4 million for past lost profits, and $6 million for future lost profits. The district court's refusal to enforce the parties' clear and unambiguous agreement was erroneous, and for that reason alone the $16 million consequential damages award should be reversed.

The $6 million lost value award for the Non-Accident Helicopters and $6 million future lost profits awards should also be reversed for independent reasons, including the fact that they are not supported by substantial evidence. And the district court's award of discretionary prejudgment interest should be reversed, because it is legally improper and factually unsupported.

## STATEMENT OF ISSUES

**Issue One:** Whether the district court erred by denying Kaman's motions for summary judgment and judgment as a matter of law on all of Central's consequential damages claims based upon Connecticut law and the consequential damages limitation in the parties' agreement, and as a result the portions of the Judgment awarding Central $6 million for lost value of the Non-Accident

Helicopters, $4 million for past lost profits, and $6 million for future lost profits should be reversed.

**Issue Two:** Whether the $6 million award for purported lost value of the Non-Accident Helicopters should be reversed because, as a matter of law, a party cannot recover lost value of an undamaged product based upon a manufacturing defect in a different product, and in any event the award is not supported by substantial evidence.

**Issue Three:** Whether the $6 million future lost profits award should be reversed because the only supporting evidence came from Central's experts, who admitted, among other things: (1) their calculations were based upon facts that were contrary to the actual undisputed facts, (2) they actually overstated Central's alleged losses by an increasing amount every year, and (3) they failed to account for numerous other causes that affected Central's net income.

**Issue Four:** Whether the district court erred by awarding Central prejudgment interest on the Accident Helicopter and Non-Accident Helicopter lost value awards, given that the alleged damage was neither certain nor capable of being made certain by calculation.

## STATEMENT OF REVIEWABILITY AND STANDARD OF REVIEW

**Issue One**: Prior to trial, Kaman filed a motion for partial summary judgment raising the issue that Central's consequential damages were barred by: (1) Connecticut law, which is applicable pursuant to a choice of law provision in the governing terms and conditions, and (2) a contractual damages limitation to which the parties agreed regardless of whether Connecticut or Montana law applied. (12-ER-2863). Kaman again raised the issue in its Federal Rule of Civil Procedure 50(a) and 50(b) motions. (2-ER-220-21, 225; 3-ER-435-36, 440). The district court denied Kaman's motions. (1-ER-2, 39, 62, 80). The issue was also raised in Central's motion for partial summary judgment, which Kaman opposed. (11-ER-2536-48, 2620). The district court denied Kaman's motions and granted Central's motion. (1-ER-2, 39, 62, 71, 80).

The district court's rulings on a motion for summary judgment and motion for judgment as a matter of law are reviewed de novo. *Dunlap v. Liberty Nat. Prod., Inc.*, 878 F.3d 794, 797 (9th Cir. 2017). A district court's conclusions as to enforceability and interpretation of a contract are also reviewed de novo. *Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC*, 816 F.3d 1208, 1211 (9th Cir. 2016); *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 681 (9th Cir. 2009).

**Issue Two:** Kaman raised the issue regarding insufficiency of the evidence to support the award for the purported lost value of Central's three other K-Max

helicopters that were not involved in the accident in its motion and renewed motion for judgment as a matter of law pursuant to Federal Rules of Civil Procedure 50(a) and 50(b). (2-ER-206-14, 225; 3-ER-414-17, 440). The district court denied Kaman's motions. (1-ER-2, 39).

The denial of a motion for judgment as a matter of law is reviewed de novo. *Dunlap*, 878 F.3d at 797. The sufficiency of the evidence to support a jury's verdict is reviewed under the substantial evidence standard. *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007).

**Issue Three:** Kaman raised the issue regarding insufficiency of the evidence to support the lost future profits awards in its Federal Rule of Civil Procedure 50(a) and 50(b) motions. (2-ER-214-20, 225; 3-ER-421-426, 440). The district court denied Kaman's motions. (1-ER-2, 39). In addition, Kaman raised the issue that Central's experts' testimony was unreliable and insufficient to support an award of lost profits in its motion in limine to exclude their testimony, which the district court denied. (11-ER-2574-85, 2617; 11-ER-2498).

The denial of a motion for judgment as a matter of law is reviewed de novo. *Dunlap*, 878 F.3d at 797. The sufficiency of the evidence to support a jury's verdict is reviewed under the substantial evidence standard. *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007).

**Issue Four**: Kaman raised the issue of Central's lack of entitlement to prejudgment interest in its response to Central's "Rule 59(e) Motion to Modify Judgment to Include Prejudgment and Post Judgment Interest and Costs." (2-ER-119-33; 2-ER-230-35, 346). A district court's award of prejudgment interest is reviewed under the abuse of discretion standard. *Santa Clarita Valley Water Agency v. Whittaker Corp.*, 99 F.4th 458, 484 (9th Cir. 2024).

## STATEMENT OF THE CASE

### A. Kaman manufactures the K-MAX helicopter. Central is a sophisticated commercial helicopter operator with a long history of purchasing helicopters from Kaman and others.

Kaman is in the business of designing, manufacturing and selling helicopters, including the K-1200 K-MAX ("K-MAX"). The K-MAX is considered an "aerial truck," and is specifically designed for tasks that require repetitive heavy lifting "in some of the most demanding and dangerous operations [in which] helicopters can perform," including logging and aerial firefighting. (7-ER-1445; 6-ER-1071).

Central is in the business of providing highly specialized commercial helicopter services in exactly the type of "dangerous terrain and environments" in which the K-MAX was designed to operate. (6-ER-1058-1059;7-ER-1445). Central's "niche" is in utilizing its helicopters to move "anything that needs to get moved that can't be done economically otherwise," including "firefighting

equipment or construction equipment or concreate for ski lifts or power lines or rooftop work." (6-ER-1059). Central also provides aerial firefighting services pursuant to contracts with the United States Forest Service. (6-ER-1061,1189).

Central has been in the commercial helicopter business since 1984. (6-ER-1056). In 1997, Central purchased its first K-MAX from Kaman. (12-ER-2629). Central chose the K-MAX because it was designed for repetitive lifting of heavy loads, and "that niche fit with what [Central] did." In 2006, Central purchased its second K-MAX from Kaman. (12-ER-2668, 2677). Central purchased three additional K-MAX helicopters from others. (12-ER-2889).

In addition to the K-MAX, Central has purchased helicopters manufactured by Sikorsky, Eurocopter, Robinson and Bell. (7-ER-1366; 6-ER-1121-24). Central has also purchased numerous fixed-wing aircraft that it operates in another segment of its business operations. (6-ER-1123-24; 8-ER-1766).

### B. In October 2015, Central purchases a set of replacement blades from Kaman. As with the parties' previous transactions, the sales agreement included choice of law and consequential damage limitation provisions.

On October 22, 2015, Central entered into a revised sales agreement with Kaman for the purchase of two replacement rotor blade sets, serial numbers 470A/B and 473A/B ("Replacement Blade Agreement"). (13-ER-3100; 12-ER-2694). The agreement was "subject to Kaman Aerospace Corporation's terms and

conditions of sale, a copy of which [Central] received as part of the Kaman 2015 Commercial Price Catalog." (12-ER-2694).

The Replacement Blade Agreement also included a limitation of liability provision stating in relevant part that Kaman would not be liable for "indirect, incidental, consequential [or] special" damages:

> IN NO EVENT SHALL KAMAN BE LIABLE TO CUSTOMER OR ANY OTHER PERSON OR ORGANIZATION FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, OR EXEMPLARY DAMAGES, ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE AIRCRAFT OR ANY K-MAX PRODUCT PURCHASED HEREUNDER, INCLUDING WITHOUT LIMITATION, ANY DAMAGES FOR DIMINUTION OF MARKET VALUE, LOSS OF USE OF THE AIRCRAFT OR ANY K-MAX PRODUCT, LOSS OF PROFITS OR OTHER FINANCIAL OR ECONOMIC LOSS, OR FOR ANY INTERRUPTION IN CUSTOMER'S BUSINESS OCCASIONED BY ITS INABILITY TO USE THE AIRCRAFT FOR ANY REASON WHATSOEVER …

(12-ER-2718).

The Replacement Blade Agreement was also subject to a "governing law" provision requiring the application of Connecticut law to the agreement, and also requiring that the parties submit to exclusive jurisdiction in Connecticut. (12-ER-2723).

The inclusion of the choice of law and consequential damage limitations in the Replacement Blade Agreement could not have been unexpected. Central

entered into numerous agreements with Kaman subject to the same terms and conditions, including the 2006 Aircraft Sales Agreement. 12-ER-2668; 12-ER-2672-74). In fact, Central included choice of law and liability waivers in the contracts governing its sale of helicopters and parts to others. (13-ER-3102; 13-ER-3106-3107).

### C. On August 24, 2020, the helicopter on which the replacement blades were installed crashes. Central continues to operate its remaining K-MAX helicopters for another year before deciding to transition to Black Hawk helicopters.

Central subsequently installed the replacement blades on a K-MAX helicopter Central had purchased in 2007 ("Accident Helicopter"). (7-ER-1568-69). On August 24, 2020, the Accident Helicopter crashed while conducting firefighting operations in a remote area of Mount Hood in Oregon. (11-ER-2396, 2419; 9-ER-1883). At the time of the accident, Mark Duffy's son, Thomas Duffy, was piloting the Accident Helicopter. (11-ER-2396). As a result of the accident, Thomas Duffy was killed and the Accident Helicopter was destroyed. (11-ER-2396).

Although the FAA investigated the accident, it did not ground the K-MAX helicopter, nor did it revoke Kaman's type-certificate for the K-MAX. (7-ER-1489). As a result, Central continued to fly its other three K-MAX Non-Accident Helicopters for approximately one year after the accident. (6-ER-1097-98). Central did not stop operating the Non-Accident Helicopters until July 2021, when it made

the voluntary business decision to transition to Black Hawk helicopters. (7-ER-1382-83, 1392; 9-ER-1946).

After Central made the decision to stop flying the Non-Accident Helicopters, Mark Duffy had "many companies contact him right away" about purchasing them, including one company that "wanted to buy them all." (6-ER-1143-1144). However, Central chose not to sell any of them at that time. (6-ER-1144). When Central did finally decide to sell its other K-MAX helicopters, it sold one to a Swiss company and one to a South Korean company that "just begged [Duffy] to buy one." (6-ER-1134-1136,1144-1145). Central chose to sell the two helicopters at below-market prices for financial reasons. (9-ER-2086; 6-ER-1144). As of the time of trial, Central still owned the third Non-Accident Helicopter. (6-ER-1121).

### D. Central files suit against Kaman in Montana, alleging defects in the servo flap on one of the replacement blades caused the accident. Central seeks consequential damages in contravention of the consequential damage limitation in the Replacement Blade Agreement.

On August 25, 2021, Central filed suit against Kaman in Montana state court.[1] (13-ER-2939). On September 17, 2021, Kaman removed the case to the United States District Court for the District of Montana, and subsequently moved to dismiss or transfer the case to Connecticut per the contractual forum selection

---

[1]Thomas Duffy's estate (the "Estate") also asserted personal injury claims. (13-ER-2939). Prior to trial, the Estate's claims were resolved through its acceptance of Kaman's offer of stipulated judgment. (11-ER-2468).

clause. (13-ER-2929,2933). On March 10, 2022, the district court denied the motion. (1-ER-96).

On April 4, 2022, Central filed its First Amended Complaint, alleging a "defectively designed, manufactured, and marketed servo flap on the blades of [the Accident Helicopter] caused the crash." (12-ER-2865,2872). Central also alleged the servo flaps on its remaining three K-MAX helicopters contained design, manufacturing and marketing defects. (12-ER-2871-2872). Central sought to recover damages for, among other things, "the value of the K-MAX and the value of Central Copters' 3 remaining K-MAX helicopters [and] loss of income". (12-ER-2873). It also sought punitive damages. (12-ER-2874).

On February 14, 2025, Kaman moved for partial summary judgment as to damages, arguing among other things that Central's consequential damage claims were barred by the Connecticut Product Liability Act ("CPLA"), which applied pursuant to the choice of law provision in Replacement Blade Agreement, and also by the consequential damages limitation in that agreement. (12-ER-2837-49). On that same day, Plaintiffs filed a motion for partial summary judgment on several of Kaman's affirmative defenses, including its CPLA and consequential damages limitation defenses. (11-ER-2620-2621).

On April 3, 2025, the district court denied Kaman's motion and granted Central's motion, thereby refusing to apply Connecticut law or enforce the consequential damages limitation. (1-ER-80; 1-ER-71).

### E. The jury returns a verdict finding the Accident Helicopter contained a manufacturing defect and awarding Central a total of $22 million in damages—$16 million of which were consequential damages.

The case proceeded to trial on April 28, 2025. (11-ER-2356). Prior to submission of the case to the jury, Central abandoned any claim of defect with respect to the three Non-Accident Helicopters. (4-ER-606-07). Nevertheless, Central still sought to recover the purported lost value of those helicopters, claiming it was an element of damages based upon defects in the Accident Helicopter. Kaman objected that lost value of the Non-Accident Helicopters was not a proper damages element, but the district court overruled the objection and submitted the issue to the jury. (1-ER-70; 4-ER-618-19).

At the close of evidence, Kaman moved for judgment as a matter of law on several issues, including lost value of the Non-Accident Helicopters and past and future lost profits. (3-ER-439; 3-ER-399). The trial court deferred ruling on the motion. (4-ER-611).

On May 8, 2025, the jury returned a verdict finding the August 24, 2020 crash was caused by a manufacturing defect in "the servo flap of the K-MAX helicopter". (1-ER-68). The jury awarded Central a total of $22 million in

damages: $6 million in property damage for loss of the Accident Helicopter, and an additional $16 million of consequential damages (*Id.*). The consequential damages award was comprised of $6 million for lost value of the three Non-Accident Helicopters, $4 million for past lost earnings and profits, and $6 million for future lost business earnings and profits. (*Id.*)

The jury also found that the Accident Helicopter did not contain design or warning defects. (1-ER-68-69). It also refused to award Central punitive damages. (1-ER-70).

**F. Even though Central's appraisal expert testified that the fair market value of the Non-Accident Helicopters increased after the accident and its economists admitted their future lost profits opinions were based upon incorrect facts, the district court denies Kaman's renewed motion for judgment as a matter of law. The district court also awards Central prejudgment interest despite the fact that values of the Accident and Non-Accident Helicopters were uncertain.**

On May 8, 2025, a clerk's judgment was entered based upon the verdict. (1-ER-64-67). On June 5, 2025, Central filed a motion to alter the judgment, seeking an award of prejudgment and post judgment interest and costs. (2-ER-345).

On June 6, 2025, Kaman filed a renewed motion for judgment as a matter of law. (2-ER-198-225). Among other things, Kaman argued it was entitled to judgment on all consequential damages for a variety of reasons, including but not limited to the facts that: (1) the $6 million award for lost value of the Non-Accident Helicopters was unsupported by the evidence and contrary to Central's

own expert's admission that the fair market value of the helicopters <u>increased</u> after the accident, and (2) the future lost profit award was unsupported in light of Central's economist's admission that his calculations were based upon facts that were contrary to the actual undisputed facts. (2-ER-206-20).

On November 7, 2025, the district court issued an order denying Kaman's renewed motion for judgment as a matter of law. (1-ER-39). That same day, it also issued an order granting Central's motion to alter in part and awarding it prejudgment interest on the lost value damage awards for the Accident and Non-Accident Helicopters, despite the fact that those amounts were not ascertainable prior to judgment. (1-ER-36-37). On December 4, 2025, Kaman timely filed its notice of appeal. (14-ER-3151).

## SUMMARY OF ARGUMENT

The portions of the Judgment awarding Central $6 million for lost value of the Non-Accident Helicopters, $4 million for past lost profits, and $6 million for future lost profits should be reversed for numerous reasons. First, Kaman was entitled to judgment as a matter of law on all of Central's consequential damages claims under Connecticut law. The choice of law provision in the Replacement Blade Agreement required application of Connecticut law. The CPLA bars commercial parties such as Central from recovering consequential damages. Even under Montana law, the consequential damages limitation should have been enforced. As a result, the trial court erred by denying Kaman's motions for summary judgment and judgment as a matter of law on all of Central's consequential damages claims, and by granting Central summary judgment on Kaman's contract defenses.

The Non-Accident Helicopter lost value and future lost profits awards should be reversed for additional reasons. With respect to the lost value award, there is no precedent to support the lost value of a product based upon a manufacturing defect in a different product. Even if there were, the evidence is insufficient to support such an award in this case because: (1) there is no evidence to support the finding of a causal connection between the manufacturing defect in the Accident Helicopter and any purported lost value of the Non-Accident

Helicopters, (2) Central failed to offer evidence of the fair market value helicopters immediately after the accident as it was required to do, (3) Central's expert admitted the fair market value of the Non-Accident Helicopters increased after the accident.

There is also no competent evidence to support the future lost profits award. Among other things, Central's experts admitted: (1) there calculations were based upon facts that were contrary to the actual undisputed facts, (2) they actually overstated Central's alleged losses at an increasing amount every year, and (3) they failed to account for numerous other causes that effected Central's net income, including the COVID-19 pandemic, industry and environmental factors, and the impact of Central's other product lines had on its profitability.

The district court also erred in awarding Central prejudgment interest on the awards for lost value of the Accident Helicopter and Non-Accident Helicopters. Under clearly established Montana law, a party cannot recover prejudgment interest where the alleged damages are cannot be ascertained with certainty—as is the case with helicopters.

For these and other reasons explained below, the Judgment should be reversed and rendered in Kaman's favor as to the awards for lost value of the Non-Accident Helicopters and past and future lost profits.

# ARGUMENT

## I. The district court erred by refusing to enforce the clear and unambiguous terms of the parties' agreement to apply Connecticut law and limit recoverable damages. The Judgment should therefore be reversed as to all consequential damages, including value of the Non-Accident Helicopters and past and future lost profits.

At the time Central purchased the replacement rotor blades that were on the Accident Helicopter, it expressly agreed that: (1) Connecticut law would apply to any dispute, and (2) Kaman would not be liable for "any indirect, incidental, consequential, special or exemplary damages arising out of or related to" the agreement or the blades, "including without limitation, any damages for diminution of market value, loss of use… loss of profits or other financial or economic loss or for any interruption in [Central's] business". (12-ER-2718 at § 7).

Despite the parties' clear and unambiguous bargained-for agreement, the district court refused to apply Connecticut law or the consequential damages limitation. As a result, in addition to $6 million for the value of the Accident Helicopter, Central was able to secure a judgment awarding it <u>$16 million</u> in consequential damages to which it had contractually agreed it was not entitled: $6 million for lost value of the Non-Accident Helicopters and $10 million for past and future lost profits. (1-ER-64-65). The district court's erroneous refusal to enforce the parties' agreement should be reversed.

### A. The district court erred by refusing to apply Connecticut law and conclude that consequential damages are barred thereunder.

To determine the enforceability of a choice of law provision in a diversity action, federal courts apply the choice of law rules of the forum state. *Hatfield v. Halifax, PLC*, 564 F.3d 1177, 1182 (9th Cir. 2009). Montana courts look to the Restatement (Second) of Conflicts of Laws ("Restatement") to determine the validity of a choice-of-law provision. *Barber v. Bradford*, 539 P.3d 648, 651 (Mont. 2023); *see also Masters Group Int'l, Inc. v. Comerica Bank*, 352 P.3d 1101, 1113 (Mont. 2015).

This Court "review[s] de novo choice of law questions and the district court's interpretation of state law," and "appl[ies] the clearly erroneous standard to factual findings that underlie the choice of law determination." *Casun Invest, A.G. v. Ponder*, 119 F.4th 637, 642 (9th Cir. 2024). Applying that standard here leads to but one conclusion: the district court erred by refusing to apply Connecticut law and conclude that Kaman was entitled to judgment as a matter of law on all of Central's consequential damage claims.

#### 1. The choice-of-law provision was valid and enforceable.

In its order granting Central summary judgment, the district court stated that it "ha[d] already addressed the issue" of whether Connecticut law and the CPLA applied "in its order regarding Kaman's summary judgment motion" and would

"not repeat its analysis regarding whether Montana or Connecticut law applies. Connecticut law does not apply. Montana law applies." (1-ER-74-75).

Contrary to the district court's statement, however, it did not analyze in its order on Kaman's motion the issue of whether Connecticut or Montana law applies—it simply recited the general rule that "federal courts sitting in diversity apply state substantive and federal procedural law." (1-ER-84) (internal quot. omitted). The court never analyzed which state's substantive law applied. If it had, the only conclusion to be reached was that Connecticut law applied per the parties' agreement.

Under Montana law, the law of the state chosen by the parties to govern their contractual rights will be applied unless the following three factors are met: (1) but for the choice of law provision, Montana law would apply under Restatement Section 188, (2) Montana has a materially greater interest in the particular issue than the parties' chosen state, and (3) application of the chosen state's law would contravene a Montana fundamental public policy. *Masters Group Int'l*, 352 P.3d at 1113; *see also Polzin v. Appleway Equip. Leasing, Inc.*, 191 P.3d 476, 512 (Mont. 2008).

"All three conditions must be met," and "if a clear choice of law provision does not violate Montana public policy, there is no reason to analyze factors (1) and (2)". *Masters Group Int'l*, 352 P.3d at 1113. That is precisely the case here.

A contract contravenes Montana fundamental public policy only "when its application would occasion a result that is clearly forbidden by Montana law." *Dunluck v. Assicurazioni Generali S.P.A.-UK Branch*, 590 F.Supp.3d 1283, 1301-02 (D. Mont. 2022). Application of the choice of law provision here would result in Central being limited to recovering only for its property damage (the fair market value of the lost Accident Helicopter), and barred from recovering consequential damages. Such a result is <u>expressly authorized</u> by Montana law:

> Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer good is prima facie unconscionable but limitation of damages where the loss is commercial is not.

MCA § 30-2-719(3). Thus, application of the choice of law provision would not violate fundamental public policy, and for that reason alone the district court erred in refusing to enforce it and apply Connecticut law.

Although unnecessary, factors (1) and (2) were also not met. *Masters Group Int'l*, 352 P.3d at 1113. Factor (1) is not met because the "place of performance" of the contract was Connecticut—not Montana. (12-ER-2716-17 at §§ 4, 5) (stating delivery is "FOB Bloomfield, Connecticut," and allocating "risk of loss" to seller upon delivery by Kaman "to the carrier or the FOB point"); *Polzin*, 191 P.3d at 480-81 (finding factor 1 not met because under Montana law the contract is to be interpreted according to the law of the place where it is to be performed).

Factor 2 is also not met. Although Central is a Montana resident, Kaman is a Connecticut resident. As a result, Montana does not have a materially greater interest in this commercial dispute than that of Connecticut. The choice of law provision was therefore enforceable, and the district court erred in concluding otherwise.

#### 2. Central's consequential damages claims were barred under Connecticut law.

Central alleged product liability claims against Kaman, and under Connecticut law the CPLA is the exclusive avenue through which "[a] product liability claim may be asserted and shall be in lieu of all other claims against a product seller, including actions of negligence, strict liability, and warranty, for harm caused by a product." Conn. Gen. Stat. § 52-572n(a); *see also Winslow v. Lewis-Shepard*, 562 A.2d 517, 518 (Conn. 1989) (explaining the CPLA "provides the exclusive remedy for a claim falling within its scope, thereby denying a claimant the option of bringing common law causes of action for the same claim").

The CPLA unequivocally prohibits commercial parties from recovering "commercial loss" caused by a product: "[a]s between commercial parties, commercial loss caused by a product is not harm and may not be recovered by a commercial claimant in a product liability claim." Conn. Gen. Stat. § 52-572n(a). "Commercial loss" includes "consequential damages." *Conn. Gen. Life Ins. Co. v. Grodsky Serv., Inc.*, 781 F. Supp. 897, 901 (D. Conn. 1991); *Mountain West*

*Helicopter, LLC v. Kaman Aerospace Corp.*, No. 3:01-cv-1746 (AVC), 2005 WL 8167155, at *6 (D. Conn. Apr. 7, 2005).

Under Connecticut law, consequential damages limitations are also enforceable unless the limitation is unconscionable. Conn. Gen. Stat. § 42a-2-719(3). As explained in Section I(C) below, the limitation at issue here is not unconscionable.

As a result, the district court's erroneous refusal to apply Connecticut law constitutes harmful error: but for its refusal Kaman was entitled to judgment as a matter of law as to Central's consequential damages claims for lost value of the Non-Accident Helicopters and past and future lost profits. The Judgment awarding those elements of damages should therefore be reversed.

### B. The district court also erred in concluding the consequential damages limitation waiver was unenforceable under Montana law.

Even if the district court were correct that Connecticut law did not apply, the Judgment should still be reversed because the district court erred by refusing to apply the clear and unambiguous contractual damages limitation to which both parties expressly agreed. That provision clearly and unambiguously excludes the recovery of consequential damages.

The district court denied Kaman's motions based upon its conclusion that under Montana law contractual damage limitations do not apply to tort claims:

"Montana's law clearly applies tort remedies to plaintiffs regardless of the existence of contract and has explicitly rejected the application of the UCC in strict liability cases." (1-ER-88). The district court's conclusion is contrary to Montana law.

"In Montana, parties enjoy a broad freedom to contract around the terms of their private dealings so long as their agreements do not conflict with public policy." *Barber v. Bradford Aquatic Grp. LLC*, 414 Mont. 170, 175 (2023). As part of this "broad freedom," "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." MCA 30-2-719(2). Consequential damage limitations "for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not." MCA 30-2-719(3).

In reaching its erroneous conclusion, the district court relied upon four Montana Supreme Court cases to hold that "Montana law unequivocally rejects the application of the Uniform Commercial Code ("UCC") and economic loss rules in product liability actions." (1-ER-84-86). In *Brandenburger v. Toyota Motor Sales, U.S.A., Inc.*, the Montana Supreme Court adopted the doctrine of strict liability. *Brandenburger v. Toyota Motor Sales, U.S.A, Inc.*, 513 P2d 268, 271-74 (Mont. 1973). In *Thompson v. Nebraska Mobile Homes, Corp.*, the court held that strict product liability applies even if the only damage is to the product itself. *Thompson*

*v. Nebraska Mobile Homes, Corp.*, 647 P.2d 334, 337-38 (Mont. 1982). In *Streich v. Hilton-Davis*, the court held a commercial entity could bring a strict liability claim. *Streich v. Hilton-Davis, a Div. of Sterling Drug, Inc.*, 692 P.2d 440, 444-45 (Mont. 1984). In *Jim's Excavating v. HKM Associates*, the court held that a party can maintain a tort action to recover purely economic damage even in the absence of contractual privity. *Jim's Excavating Serv., Inc. v. HKM Assocs.*, 878 P.2d 248, 502-504 (Mont. 1994).

While these cases embody the evolution of strict product liability in Montana, none contain a blanket prohibition against contractual damage limitations or exclusions in commercial contracts between sophisticated businesses. That is because Montana law contains no such blanket prohibition. Under Montana law, the only types of provisions that are prohibited are those which seek to wholly exempt a party from "responsibility":

> [A]ll contracts that have for their object, directly or indirectly, to exempt anyone from responsibility for the person's own fraud, for willful injury to the person or property of another, or for violation of law, whether willful or negligent, are against the policy of the law.

MCA 28-2-702.

As the Montana Supreme Court has explained, contract provisions that merely limit remedies and do not seek to completely exculpate a party from all liability are enforceable:

> [W]e have interpreted § 28-2-702, MCA, to prevent parties from contracting away all liability. Here, Zirkelbach and DOWL entered into an Agreement containing a limitation of liability clause that capped damages at $50,000. … [T]he limitation of liability clause does not exempt Zirkelbach from all liability, only limits liability to the amount agreed upon by the parties. And although Zirkelbach asserts this limitation acts as an exculpatory clause, it does not exempt DOWL from liability under the Agreement. Therefore, we conclude that the limitation of liability clause does not exempt Zirkelbach from all liability and thus, § 28-2-702, MCA, is not violated.

*Zirkelbach Constr., Inc. v. DOWL, LLC*, 402 P.3d 1244, 1247 (Mont. 2017); *see also Keeney Constr. v. James Talcott Constr. Co.*, 45 P.3d 19, 23-24 (Mont. 2002) (concluding contractual waiver of delay damages enforceable because it did not "exculpate Talcott from all liability"); *Five U's, Inc. v. Burger King Corp.*, 962 P.2d 1218, 1222 (Mont. 1998) (holding damage limitation clause enforceable because "the contract does not seek to exculpate KBCK from all liability").

Like the provisions in *Zirkelbach*, *Keeney*, and *Five U's*, the provision at issue here does not seek to exculpate Kaman from all liability, but simply bars the recovery of certain types of damages. (12-ER-2718 at § 7). "When the language of a legal contract is clear and unambiguous on its face, it is the duty of the courts to enforce the contract as the parties intended." *Five U's*, 962 P.2d at 1222. The district court erred in refusing to do so here. Accordingly, the award of damages for lost value of the Non-Accident Helicopters and past and future lost profits should therefore be reversed.

### C. The parties' agreement was not unconscionable.

Although the district court did not address the issue in its summary judgment order, the choice of law provision nor the consequential damages waiver were not unconscionable. A contract or included term is unconscionable if (1) the contract or term is a contract or term of adhesion and (2) unreasonably favors the stronger party or is unduly oppressive to the weaker party. *Bucy v. Edward Jones & Co., L.P.*, 445 P.3d 812, 825 (Mont. 2019); *see also All-States Leasing Co. v. Top Hat Lounge, Inc.*, 649 P.2d 1250, 1252-53 (Mont. 1982).

In its order denying Kaman's motion to dismiss, the district court concluded the forum selection clause in the parties' agreement was a contract of adhesion. (1-ER-114). To the extent that order is even relevant to the consequential damage award, the district court's finding was clearly erroneous.

"A contract of adhesion is a contract whose terms are dictated by one contracting party to another who has no voice in its formulation." *Denton v. First Interstate Bank of Commerce*, 142 P.3d 797, 803 (Mont. 2006). Central is the epitome of a sophisticated entity. Mark Duffy testified Central had "spent almost $40 million [Kaman] buying blades and transmissions and parts". (6-ER-1108).

But even if the agreement was an adhesion contract, it still should have been enforced. Even terms in adhesion contracts are enforceable unless they are "unreasonably favorable to the drafter, which is generally determined by whether

the provision was within the reasonable expectations of, or unduly oppressive to, the weaker party." *Highway Specialties, Inc. v. Department of Transp.*, 215 P.3d 667, 671 (Mont. 2009). It is beyond doubt that the existence of choice of law and consequential damage provisions was within Central's reasonable expectations. Central had entered into numerous agreements with Kaman containing those provisions. (12-ER-2671, 2673, 12-ER-2774-76). And even more dispositive—when Central sold two of the Non-Accident Helicopters it included choice of law provisions in those contracts. (13-ER-3101-02; 13-ER-3106-07). The agreements were unquestionably enforceable, and the district court erred in concluding otherwise.

### D. Two other district courts have held that an identical consequential damage limitation barred purchasers of K-MAX products from recovering consequential damages.

At trial, the district court allowed Central's witnesses to repeatedly reference two other accidents involving different K-MAX helicopters. Notably, in both lawsuits arising out of those accidents, the district courts held that the same contractual damages limitation provision at issue in this case barred the recovery of consequential damages.

In *Woody Contracting*, Woody filed suit against Kaman after a servo flap on the replacement blades it had purchased from Kaman allegedly failed. *Woody Contracting, Inc. v. Kaman Corporation*, Case No. 3:12-cv-1010-AVC, United

States District Court, District of Connecticut. Among other things, *Woody* sought to recover "incidental and consequential damages due to the loss of use of the aircraft." (*Woody* Doc. 69 at 3).

On June 6, 2014, a district court issued an order granting Kaman's motion for partial summary judgment and concluding Woody's lost profits damages were barred by the contractual damages limitation provision in Kaman's Commercial Price Catalog:

> Woody and Kaman are both sophisticated commercial parties. Prior to the sale in question, Woody, on more than one occasion, purchased products from Kaman's parts catalogue, which contained the Standard Terms Agreement. Woody claims that the terms were unreasonably unfavorable to Woody because the extensive losses resulting from a defect were not reasonably foreseeable. However, the Standard Terms Agreement explicitly addressed lost profits resulting from "the loss of use of the aircraft." Woody knew that the K-1200 was its only helicopter and that it was a significant income-generating asset. Woody was in the better position to reasonably foresee the effect of the loss of its only aircraft in the event of an accident. Kaman had no way of knowing that Woody had limited its operations to a single revenue-generating asset.

(*Id.* at 6).

The court further explained exactly why it is important to enforce consequential damages limitations in commercial contexts: because "the potential liability for consequentially damages in commercial contexts is enormous in comparison to the contract price of the goods." (*Id.* at 6) (internal quot. omitted). "[P]rotection from that liability allows sellers to lower their prices for buyers, like Woody." (*Id.*).

In *Black Tusk*, another district court reached the same conclusion under similar circumstances. Black Tusk filed suit after a helicopter it had purchased from Kaman crashed. *Black Tusk Helicopters v. Kaman Aerospace Corp.*, No. 24 Civ. 4259 (JHR), 2026 WL 607690, at *1 (S.D.N.Y. March 4, 2026). Among other things, Black Tusk sought to recover damages for alleged lost profits. *Id.* at *2. Kaman moved to dismiss Black Tusk's claim for lost profits based upon a consequential damages limitation identical to the ones at issue in *Woody* and in this case. *Id.* at **1-2.

On March 4, 2026, the district court issued an order granting Kaman's motion and dismissing Black Tusk's claim for lost profits. *Black Tusk Helicopters v. Kaman Aerospace Corp.*, No. 24 Civ. 4259 (JHR), 2026 WL 607690, at *1 (S.D. N.Y. March 4, 2026). In reaching its conclusion, the court rejected the argument that enforcement of the contractual damages limitation would be unconscionable:

> The Agreement is not procedurally or substantively unconscionable. The transaction is indisputably commercial in nature: two sophisticated business entities negotiated the sale of a specialized, heavy-duty, multi-million dollar aircraft meant to be used in Black Tusk's heli-logging and wildfire suppression business. The majority of the Agreement is formatted in sentence case, but the sections disclaiming warranties and consequential damages are in conspicuous capital letters. Black Tusk makes no claim Kaman exercised a monopoly on commercial helicopter sales.
>
> The exclusion of consequential damages does not unreasonably favor Kaman or deprive Black Tusk of the substantial value of the bargain. If Black Tusk can establish Kaman's liability it will receive exactly what it contracted for: the value of a K-MAX Helicopter. The Agreement's terms are not unconscionable, and Black Tusk's claims for consequential damages and breach of implied warranty of fitness and merchantability are dismissed.

*Id*. at *3 (internal quotation omitted).

The reasons for enforcing the parties' agreed-to consequential damages limitation is even more compelling in this case. Central is a highly sophisticated entity that purchased helicopters manufactured by virtually every major manufacturer in the industry. In addition, Central had made numerous purchases from Kaman and should have been well aware of the terms and conditions applicable to those purchases. (12-ER-2671, 2673; 12-ER-2774-76). Moreover, unlike Woody Contracting, the Accident Helicopter was not Central's only K-MAX—it had three others that it continued to operate for a year after the accident. (6-ER-1097-98).

Suffice it to say, the contractual damages limitation was enforceable in this case as it was in *Woody* and *Black Tusk*. The district court erred in concluding otherwise.

## II. The evidence is insufficient to support the award of $6 million for lost value of Central's three Non-Accident Helicopters.

The $6 million award for alleged lost value of the Non-Accident Helicopters should also be reversed for a second, independent reason: it is not supported by substantial evidence. "Substantial evidence is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987). "Substantial evidence is more than a mere scintilla." *Chisholm Bros. Farm Equip. Co. v. International Harvester Co.*, 498 F.2d 1137, 1140 (9th Cir.), *cert. denied*, 419 U.S. 1023 (1974). A judgment must be reversed "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 3047 F.3d 915, 918 (9th Cir. 2002). That is precisely the case here.

### A. The evidence is insufficient to support a finding that any lost value of the Non-Accident Helicopters was <u>caused by</u> a manufacturing defect or negligence.

Critically here, Central abandoned its attempt to prove the Non-Accident Helicopters were defective prior to submission of the case to the jury. (4-ER-606-

07). In addition, the jury expressly rejected Central's claim that the K-MAX was defectively designed. (1-ER-68). As a result, Central could only recover the alleged lost value of the Non-Accident Helicopters if it proved the diminished value was caused by the manufacturing defect in, or any negligence with respect to, the Accident Helicopter. *See Riley v. American Honda Motor Co., Inc.*, 856 P.2d 196, 199 (Mont. 1993) (holding plaintiff must establish "a causal relationship" between the alleged defect and the injury); *see also Meyer v. Creative Nail Design, Inc.*, 975 P.2d, 1264, 1268 (Mont. 1999). The evidence is insufficient to support causation.

The record conclusively establishes that the Non-Accident Helicopters did not lose value at all, let alone as a result of any defect or negligence with respect to the Accident Helicopter. Central's expert David Crick admitted that based upon his own calculations the aggregate fair market value of the Non-Accident Helicopters increased after the accident. (9-ER-2085-86; 13-ER-3047).

Crick could only conjure up a "loss" with respect to the Non-Accident Helicopters by reducing his own fair market value calculation by "30 to 40 percent." (1-ER-51; 9-ER-2083-84). Accordingly, Crick's testimony did not support any lost value of the Non-Accident Helicopters. He simply provided calculations as to how far under market value Central would sell the Non-Accident Helicopters.

In addition, the amounts Crick calculated were not caused by any defect or negligence with respect to the Accident Helicopter, but from Central's own voluntary decisions. The accident occurred on August 24, 2020. Central continued to fly the Non-Accident Helicopters for another year. (6-ER-1097-98). It did not stop operating them until it allegedly discovered two alleged "anomalies" in servo flaps on two of the Non-Accident Helicopters. (*Id.*).[2] Mark Duffy further admitted the decision to stop operating them was voluntary. (6-ER-1097-98). Central's other witnesses confirmed that Central's decision was voluntary and not the result of a defect in the Accident Helicopter:

- Central's Director of Maintenance at the time testified that Central made the decision to ground the Non-Accident Helicopters in 2021. (9-ER-1946);
- Central's bookkeeper testified that Mark Duffy made the decision to voluntarily ground Central's Non-Accident Helicopters and transition to Black Hawk helicopters in July 2021. (7-ER-1382-83).

---

[2] Central abandoned its attempt to claim these "anomalies" constituted defects, and did not secure a finding that any of the Non-Accident Helicopters were defective. (1-ER-68; 4-ER-606-07).

- Pamela Duffy, Mark Duffy's wife and co-owner of Central, confirmed that Mark Duffy made the voluntary decision to ground Central's K-MAX helicopters. (7-ER-1392).

In fact, Mark Duffy admitted that Central's voluntary decision to ground the Non-Accident Helicopters was unpopular with Central's own pilots—they were begging him to continue flying them. (6-ER-1099).

More importantly, Duffy testified that after Central made the decision to stop flying the Non-Accident Helicopters, he had "many companies contact him right away" about purchasing them, including one company, Rotex, that "wanted to buy them all." (6-ER-1143-44). Central simply chose not to sell them at that time. (6-ER-1144). When Central did finally decide to sell its other K-MAX helicopters, Rotex bought one and a South Korean company bought the other. (6-ER-1135). According to Duffy, "the South Koreans just begged [him] to buy one." (6-ER-1144-45). As of the time of trial, Central still owned the third Non-Accident Helicopter. (6-ER-1121).

Duffy also testified that Central ultimately chose to sell the Non-Accident Helicopters because it was "running out of money, basically." (6-ER-1144). The record contains numerous reasons why Central was running out of money. Central was "losing 1.3 million a year" as the result of its voluntary decision to convert to "Black Hawks alone". (6-ER-1144-45). Duffy and his wife also admitted they took

out millions of dollars of "actual cash out of the company as personal loans." (6-ER-1126). As of June 2023, the Duffys had taken $6,653,630 out of Central in the form of loans. (8-ER-1821-22). The loans the Duffys made to themselves were interest-free, and as of the time of trial had not been paid back at all. (8-ER-1823-24).

There is not a shred of evidence in the record to support any award of lost value for the Non-Accident Helicopters, let alone $6 million. Any losses Central suffered were the result of its own voluntary business decisions—not a manufacturing defect or negligence with respect to the Accident Helicopter.

Contrary to the district court's conclusion, resolution of this issue does not require "weigh[ing] the evidence and mak[ing] credibility determinations." (1-ER-59). It turns on the undisputed evidence, all of which came from Central's own witnesses. As a result, the award to Central of $6 million in lost value of the Non-Accident Helicopters should be reversed.

**B. There are several other reasons why the $6 million Non-Accident Helicopter lost value award should be reversed.**

**1. There is no evidence to support a finding as to the fair market value of any of the three Non-Accident Helicopters immediately following the accident.**

Central had the burden of proving any lost value of the three Non-Accident Helicopters by a preponderance of the evidence. (2-ER-388); *see also Covey v. Brishka*, 445 P.3d 785, 796 (Mont. 2019); *Hoenstine v. Rose*, 312 P.2d 514, 518

(Mont. 1957). To meet its burden, Central had to prove "the difference between the fair market value of [the Non-Accident Helicopters] immediately before and [their] fair market value immediately [after]" the accident. (2-ER-382); *see also* (2-ER-383) (instructing the jury that "reasonable compensation for damage to business property…is either (a) the cost of repair, or (b) the difference in the value of the property immediately before and immediately after the damage, whichever is less")); *Covey*, 445 P.3d at 796; *Hoenstine*, 312 P.2d at 518.

As stated above, Central attempted to meet its burden through the testimony of expert witness David Crick. Although Crick testified as to the fair market value of the Non-Accident Helicopters immediately before the accident, he did not offer any testimony as to their fair market value immediately after the accident. (9-ER-2079-82; 13-ER-3047). Instead, Crick testified as to what he claimed the fair market value of the three Non-Accident Helicopters was as of September 30, 2024. (9-ER-2079-82; 13-ER-3047). Crick randomly chose that date because it happened to be the date on which he did his fair market value calculation. (9-ER-2071-72). There is no other evidence in the record to support such a finding as to any of the three Non-Accident helicopters. As a result, Kaman was entitled to judgment as a matter of law as to the Non-Accident Helicopter lost value award.

The district court acknowledged that "[t]here is no particular significance of the date of September 30, 2024, it is simply the date Crick completed the

calculation." (1-ER-50). Nevertheless, it offered a variety of reasons why the lost value award was proper, all of which are unsupported by the law or the record.

The district court based its decision on the Montana Supreme Court's decision in *Semenza v. Bowman*, 885 P.2d 451 (Mont. 1994). But *Semenza* is inapplicable for several reasons. First, it involved damage to crops caused by a crop sprayer's negligence. *Semenza*, 885 P.2d at 453. As the Montana Supreme Court explained, "Montana law provides that the measure of damages *in a crop loss claim* is the net value of the crops lost, in other words, the amount the crops are sold for, less the expenses incurred to harvest and market them." *Id*. (emphasis added).

Second, the damages sought were for the property that was damaged—not to a different property. As a result, there was no causation issue as there is here.

Third, as the *Semenza* court explained, there was evidence it "was common practice to delay selling crops for weeks or months [after harvest] *to enable farmers to achieve a higher price for their crop*." *Semenza*, 885 P.2d at 456 (emphasis added). The court affirmed use of the sale price instead of the harvest price because the evidence established the plaintiffs "follow this practice whether or not their crop is damaged," so use of the sale price "*was not done to enhance their damages*." *Id*. No such evidence exists in this case. Thus, *Semenza* does not support the district court's conclusion.

As Kaman pointed out to the district court, the more instructive cases are *Hoenstine v. Rose*, 312 P.2d 514 (Mont. 1957), and *Covey v. Brishka*, 445 P.3d 785 (Mont. 2019). In *Hoenstine*, the Montana Supreme Court held that "the basic measure" of damages for a damaged automobile is "the amount of the difference between the reasonable market value of the automobile immediately before the injury and its reasonable market value immediately after the injury." *Hoenstine*, 312 P.2d at 318. In *Covey*, the court held that the "diminution of property value is the difference between the value of the property before and after the injury". *Covey*, 445 P.3d at 796 (internal quot. omitted); *see also Sunburst School Dist. No. 2 v. Texaco, Inc.*, 165 P.3d 1079, 1088 (Mont. 2007) (recognizing "the difference between the value of the property before and after the injury, or the diminution in value, generally constitutes the appropriate measure of damages").

The district court attempted to distinguish these cases because *Covey* and *Sunburst* did not use the word "immediately" before "after," and it claimed *Hoenstine* "interchangeably" used the terms "before and after" and "immediately before and immediately after." (1-ER-47). But *Hoenstine* <u>unequivocally states</u> that the proper calculation is "the amount of the difference between the reasonable market value…immediately before the injury and its reasonable market value immediately after the injury." *Hoenstine*, 312 P.2d at 318.

Moreover, as the district court acknowledged, the jury was instructed that its damage calculation "may include reasonable compensation for damage to business property that is either (a) the cost of repair, or (b) the difference in the value of the property immediately before and immediately after the damage, whichever is less." (2-ER-383; 1-ER-45). The district court recognized "that this instruction comports with the Montana Pattern Jury Instructions." (1-ER-45); *see also* MPI 25.40. The jury was further instructed that the calculation of damages for diminished value was "[t]he difference between the fair market value of any damaged property immediately before the occurrence and its fair market value immediately thereafter." (1-ER-48; 2-ER-382).

Thus, contrary to the district court's conclusion, Central was required to prove the fair market value of the Non-Accident Helicopters immediately after the date of the accident: August 24, 2020. Central failed to do so, and the evidence is therefore insufficient to support the award of any damages for alleged lost value of the Non-Accident Helicopters.

The district court also stated "[n]o evidence exists that Central waited to sell the Non-Accident Helicopters to enhance their potential damages," and that "Central needed to operate its business and respond to the devastating loss of the owner's son and a pilot who was a key man in Central's operation." (1-ER-49). Even if that were true, it has no legal relevance to this specific damage element.

The only issue is to the extent to which the Non-Accident Helicopters lost fair market value. Central's reasons for eventually selling them is irrelevant to that determination.

Finally, the district court stated it was "unreasonable to assert that the only way for Central to recover damages for the eventual sale of the Non-Accident Helicopters at a loss would have been to sell the helicopters immediately." (1-ER-50) (emphasis added). But Kaman had made no such assertion. Central did not have to sell the helicopters immediately after the accident—it simply had to offer evidence at trial as to their fair market value immediately after the accident. It failed to do so. The Judgment awarding Central $6 million for lost value of the Non-Accident Helicopters should be reversed.

**2. Even if the lack of fair market value evidence is ignored, the evidence is still insufficient to support the $6 million lost value award.**

Even if Central did not have to prove the fair market value of the Non-Accident Helicopters immediately after the accident, its alleged "proof" of the later fair market values of those helicopters demonstrates why the lost value award would still have to be reversed. As Central's own expert Crick admitted, the combined fair market value of the three Non-Accident Helicopters increased. (9-ER-2085-86). The following is a summary of Crick's fair market value calculations:

| MSN | YOM | Reg | AFTT | Total % TTR in 2024 | FMV 24 Aug 2020 | FMV 30 Sept 2024 |
|---|---|---|---|---|---|---|
| A94-0032 | 2001 | N314 | 5,187.3 | 64.7% | $6,037,500 | Not Assessed |
| A94-0038 | 2004 | N4147 | 7,017.7 | 48.4% | $5,550,000 | $5,375,000 |
| A94-0027 | 2000 | N1152 | 7,407.8 | 55.2% | $4,825,000 | $5,225,000 |
| A94-0005 | 1994 | N1162 | 13,732.4 | 69.6% | $5,600,000 | $5,975,000 |

(13-ER-3047).

As this illustrates, even under Crick's calculation, the fair market value of Helicopter 3 (N1152) increased from $4,825,000 to $5,225,000, and the fair market value of Helicopter 4 (N1162) increased from $5,600,000 to $5,975,000. (9-ER-2083-84; 13-ER-3047). The only helicopter that Crick claimed decreased in value was Helicopter 2 (N4147)—and it only decreased from $5,550,000 to $5,375,000. (9-ER-2081; 13-ER-3047). Accordingly, even under Crick's analysis the total fair market value of the three Non-Accident Helicopters increased by $600,000. As a result, there is no evidence whatsoever to support an award of any damages to Central for lost value of the three Non-Accident Helicopters.

The district court disregarded this fatal flaw, sanctioning Central's use of a "30 to 40 percent" discount rate to the fair market values Crick calculated. (1-ER-51). It stated, "Kaman cites no case law supporting its claim that the difference in

fair market value represents the only proper measure for damage as compared to using fair market value and sale value." (1-ER-51-52). Actually, Kaman did cite to such authority: *Covey*, *Hoenstine*, the Montana Pattern Jury Instructions, and the instructions the jury was given in this case. (2-ER-207).

Moreover, the district court recognized that under Montana law damages for items having a "readily ascertainable market value" are measured by considering "the fair market value of the items at the time closest to destruction." (1-ER-56) (citing *Spackman v. Ralph M. Parsons Co.*, 414 P.2d 918, 921 (Mont. 1966). The court also admitted that "a typical helicopter likely has a readily ascertainable fair market value." (*Id.*). Nevertheless, the court concluded it was "reasonable for the jury to rely upon the sales value rather than the alleged fair market values of the Non-Accident Helicopters" because of their "unique design and special use." (*Id.*). But Montana law does not support use of a distressed sale price, and even if it did the jury was not instructed that such use was a proper measure of diminished value damages. As a result, the district court's attempt to distinguish the governing law was erroneous.

In any event, Crick's "discount rate" adjustment to the fair market value of the Non-Accident Helicopters is insufficient to support the lost value damage award for several other reasons. Crick based this discount rate upon the fact that more than a year after the accident Central sold Helicopter 2 (N4147) for

$3,700,000 and Helicopter 4 (N1162) for $3,580,000 million—amounts far below their fair market value. (9-ER-2083). First, it is based upon the sales price of helicopters sold more than a year after the accident. But Central was only entitled to recover the difference between the fair market values of the Non-Accident Helicopters before and after the accident—not the difference between their fair market values and what Central voluntarily chose to sell them for more than a year after the accident. (2-ER-382-83); *Covey*, 445 P.3d at 796; *Hoenstine*, 312 P.2d at 518.

Second, Crick admitted the helicopter sales he relied upon were <u>distressed sales</u>—not <u>fair market value</u> sales. (9-ER-2086). As Crick acknowledged, a distressed sale is "where one party has compulsion to sell or compulsion to purchase." (*Id.*) Crick opined that a distressed sale <u>does not reflect the fair market value</u>. (*Id.*). Crick further admitted that Central chose to engage in those transactions because it "needed the funds more than it needed to wait for a higher price." (9-ER-2087). That is the antithesis of fair market value. *See, e.g., Burnett v. Ala Moana Pan Shop*, 3 F.3d 1261, 1263 (9th Cir. 1993) (holding that transaction entered into based upon one party's "need for cash" did not reflect "the fair market value of his property"); *see also In re McElroy*, 210 B.R. 833, 835 (Br. D. Or. 1997) (explaining "[t]he term 'fair market value' reflects the cash price that a

willing buyer would pay a willing seller in an arms-length transaction, free of any compulsion or duress”).

Moreover, the evidence established that Central’s distressed sales were entered into voluntarily—not by necessity. Mark Duffy admitted he turned away numerous willing buyers after the accident, and instead waited three years until Central “needed the funds” to sell any of them. (6-ER-1135, 1143-44).

But as the evidence established, Central “needed the funds more than it needed to wait for a higher price” because the Duffys had been taking substantial amounts of money out of Central for their own personal use. Among other things, they: (1) increased the amount of Director’s Fees they were paying themselves (6-ER-1200-01, 1209-10) and (2) gave themselves millions of dollars in <u>interest free</u> loans from Central. (8-ER-1821-24). Having allowed them to do so, Central should not have been entitled to recoup from Kaman the difference between the <u>undisputed</u> fair market value of the Non-Accident Helicopters and the discounted amounts Central chose to sell them for.

In sum, Crick’s distressed sale-based analysis does not reflect the proper measure of damages and cannot support the $6 million lost value damage award. *Covey*, 445 P.3d at 796; *Hoenstine*, 312 P.2d at 518. Even the district court recognized that Central failed to provide any lost <u>value</u> evidence. (1-ER-44) (stating the jury’s award is based upon “the sales of [the Non-Accident

Helicopters] at significantly lower prices than fair market values") (emphasis added). The Non-Accident Helicopter lost value damage award should therefore be reversed.

## III. The evidence is insufficient to support the $6 million future lost profits award.

The award of $6 million for lost future profits was based entirely upon the testimony of expert witnesses Douglas Abbott and Timothy Kober. As a matter of law, however, their testimony is insufficient to support the award.

### A. Unreliable expert testimony is insufficient to support a verdict.

The district court had the duty to act "as a 'gatekeeper' to exclude expert testimony that does not meet the relevancy and reliability threshold requirements." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007). Central had the duty to prove: Abbott and Kober were qualified, (2) their testimony was reliable, and (3) their testimony was relevant. *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). Moreover, "[w]hen an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).

The record establishes that Abbott's and Kober's testimony failed to meet the admissibility standards, and as a result they should not even have been allowed

to testify. Therefore, the district court erred in denying Kaman's motion to exclude their testimony. (11-ER-2498, 2616). In any event, their testimony—which is the only evidence in the record to support the lost future profits award—is insufficient to support the verdict. That portion of the Judgment should therefore be reversed. *Brooke Group, Ltd.*, 509 U.S. at 242; *see also Weisgram v. Marley Co.*, 528 U.S. 440, 456 (2000) (holding that "the authority of courts of appeals to direct the entry of judgment as a matter of law extends to cases in which, on excision of testimony erroneously admitted, there remains insufficient evidence to support the jury's verdict").

**B. Abbott and Kober's testimony was not based upon a reliable methodology. As a result, it cannot support the lost future profit award.**

The only evidence Central offered in support of their alleged lost future profit damages was the testimony of economics professors Abbott and Kober. Kober assisted Abbott "with the accounting that went along with the analysis of the numbers" Abbott calculated. (8-ER-1721). Abbott opined that Central had future lost income of between $9,344,656 and $18,290,386. (8-ER-1762). Kober agreed. (8-ER-1791).

Abbott and Kober reached their damage calculations by applying a "holistic" methodology, in which they "looked at tax documents for Central" from which they came up with numbers…to be used to help predict accounting income in the

future." (8-ER-1728). They then calculated a "range of numbers" to give the jury that were allegedly "plausible" based on "the testimony of others." (8-ER-1728-29).

Abbott's and Kober's "holistic" methodology was unreliable and inadmissible for numerous reasons. Among other things, their calculations were based upon assumptions Abbott <u>admitted</u> were contrary to the actual undisputed facts. Their alleged "range of future lost profits" was compiled by first attempting to calculate Central's alleged losses in 2024 which they claimed was $2.3 million, <u>and then projecting that same $2.3 million loss every year for up to fifteen years into the future</u>. (8-ER-1743). But Abbott admitted this assumption was <u>contrary to the actual undisputed fact</u> that, even under his calculations, Central's losses had <u>decreased</u> every year since 2021. (8-ER-1773-74).

Abbott also admitted that based upon this trend his calculations actually overstated Central's alleged losses at an increasing amount every year. (8-ER-1774). Abbott's admissions alone render his and Kober's testimony insufficient as a matter of law to support the lost future profits award. *See, e.g., McCray v. Westrock Servs., LLC*, No. 21-9853-DMG (RAOX), 2024 WL 4579108, at *7–8 (C.D. Cal. Sept. 10, 2024) (explaining that "[i]f the expert's opinion is not based on facts otherwise proved or if the opinion assumes facts contrary to the evidence, it

cannot rise to the dignity of substantial evidence" (internal quotation omitted)); *see also Strain v. Strackhouse*, 920 F.2d 1135, 1142 (3d Cir. 1990).

Abbott's and Kober's "holistic" methodology was also unreliable because it was based upon unsupported assumptions. They did not conduct any analysis as to why Central's net income decreased. Instead, they simply assumed all such losses were related solely to Central's decision to transition from Kaman to Black Hawk helicopters as a result of the accident. Among other things, Abbott and Kober did not consider any factors unrelated to the accident that could have accounted for Central's decrease in net income, including:

- the effect of the COVID-19 pandemic;
- the effect of industry factors unrelated to the accident that negatively impacted Central's business, such as a U.S. Forest Service contract protest which caused Central to reduce its daily rate on those contracts from $24,500 to $15,000 – a 40% drop;
- the effect of environmental factors, such as the impact of wildfires on Central's revenue; and
- the impact that factors related to Central's other product lines such as the tourism and fixed wing portions of Central's business had on Central's profitability.

(8-ER-1764-66, 1808-1811, 1839-40).

Abbott and Kober also admitted they did not perform any specific profitability analysis for either the K-MAX or Black Hawk helicopters. (8-ER-1764, 1788). Expert testimony that fails to account for other factors that could have contributed to a decline in profits is not competent evidence and cannot support a lost profit damage award. *See, e.g., McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 806-807 (9th Cir. 1988) (excluding expert's "before and after" assessment of lost profits because expert "attributed all of the future lost profits to acts of [defendant]" but admitted "the cause of the decline in sales theoretically could have been anything"); *see also Education Logistics, Inc. v. Laidlaw Transit, Inc.*, No. CV 07-06-M-DWM, 2012 WL 761950, at *8 (D. Mont. Mar. 8, 2012) (granting summary judgment on lost profits claim because expert "did not consider any factors—other than [defendant's] misconduct—that might have caused the decline").

Abbott and Kober also failed to offer any opinions as to how far into the future Central's alleged losses would continue. (8-ER-1745, 1772). Abbott explained that he was relying on other witnesses to provide that evidence, but no witness ever did. (8-ER-1771-72).

The witness most likely to supply the missing evidence would have likely been Central's bookkeeper. But she admitted that she did not know how long into the future the losses may continue:

Q. And you don't know how long it will take for Central to become profitable operating the Black Hawks, do you?

A. No, I do not.

Q. It could be five years; right?

A. I do not know.

Q. It could be two years; correct?

A. I do not know.

(7-ER-1374).

There is simply no evidence to support a finding as to how far into the future Central would sustain damages caused by the accident—if at all. In the absence of such evidence, the award of future lost business earnings and profits is pure speculation.

There also was no evidence from which the jury could have determined an appropriate discount rate to apply. Although Abbott and Kober provided the jury with three discount rates, they did not opine as to which would be appropriate. (8-ER-1747). Abbott testified regarding a number of the factors that could be considered in determining a discount rate, such as strength of the balance sheet, industry information, the size of the business, customer concentration, and earnings volatility, but he provided no guidance as to how any of those factors pertain to Central. (8-ER-1747-49). In the absence of a discount rate opinion from Central's

experts, the jurors were left with no choice but to speculate as to an appropriate discount rate.

Finally, any lost future profits resulted from Central's business decision to transition from Kaman helicopters to Black Hawk helicopters. As explained above, that decision was made because Central discovered two alleged "anomalies" in servo flaps on two of the Non-Accident Helicopters. (6-ER-1097-98). Thus, any future lost business earnings were not caused by a manufacturing defect in, or negligence with respect to, the Accident Helicopter.

It is well settled that lost profits may only be awarded if they are the natural and direct result of the defendant's act and the loss is not speculative. *DiTienne v. Sandrock*, 431 P.3d 12, 17 (Mont. 2018); *see also Olson v. Parchen*, 816 P.2d 423, 427 (Mont. 1991). Where, as here, it is uncertain whether any alleged loss was a result of the defendant's wrong or whether the claimed profit would have been derived at all, any alleged lost profits are purely speculative. *DiTienne*, 431 P.3d at 17; *Olson*, 816 P.2d at 427.

In sum, Abbott's and Kober's unreliable testimony should not even have been admitted, and in any event, it is insufficient as a matter of law to support the lost future profit damage award. The portion of the judgment awarding Central $6 million in lost future business earning and profits should therefore be reversed.

## IV. The district court's award of prejudgment interest should be reversed because, as a matter of law, Central was not entitled to recover prejudgment interest.

The district court partially granted Central's motion to alter and awarded it: (1) prejudgment interest from August 24, 2020 to October 5, 2025…on the amount of the $6,000,000 for the [Accident Helicopter]"; and (2) prejudgment interest from the date of the sale of the final grounded helicopter to October 5, 2025…on the amount of the $6,000,000 for the loss in value of the three grounded helicopters." (1-ER-36-37).

This court reviews a district court's decision to grant or deny prejudgment interest under the abuse-of-discretion standard. *Milhouse v. Travelers Comm. Ins. Co.*, 641 Fed. App'x 714, 717 (9th Cir. 2016); *see also Custom Homes By Via, LLC v. Bank of Oklahoma, NA*, 637 F. App'x 356, 357 (9th Cir. 2016); *Champion Produce, Inc. v. Ruby Robinson Co., Inc.*, 342 F.3d 1016, 1020 (9th Cir. 2004). The district court abuses its discretion if it rests its decision on an erroneous legal standard or on clearly erroneous factual findings. *American Beverage Ass'n v. City and County of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019) (en banc). A district court's decision is based on an erroneous legal standard if: (1) the court did not employ the appropriate legal standards that govern the issuance of a preliminary injunction; or (2) in applying the appropriate standards, the court misapprehended the law with respect to the underlying issues in the litigation.

*California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 475 (9th Cir. 2022); *see also Negrete v. Allianz Life Ins. Co. of N. Am.*, 523 F.3d 1091, 1096 (9th Cir. 2008).

As explained below, the district court's award of prejudgment interest constitutes an abuse of discretion for several reasons.

### A. Under Montana law, an award of prejudgment interest "is inappropriate" if the underlying damages are uncertain or disputed.

Central sought prejudgment interest pursuant to Montana Code Section 27-1-211. (2-ER-346; 2-ER-231-235). In its order, the district court claimed Central sought to obtain prejudgment interest through Montana Code Section 27-210, which sets out when prejudgment interest can be awarded on tort claims. (1-ER-28). Under either statute, prejudgment interest may only be awarded if: (1) an underlying monetary obligation exists, (2) the amount of recovery is certain or capable of being made certain by calculation; and (3) the right to recover vests on a particular day. *See* MCA §§ 27-1-210, 27-1-222; *Grosvold v. Neely*, 568 P.3d 525, 551 (Mont. 2025); *King v. Geico Ins. Co.*, No. CV 12-92-BLG-RWA, 2014 WL 12591875, at *2 (D. Mont. Ap. 15, 2014).

It is well settled under Montana law that "[n]o interest can run until a fixed amount of damages has been arrived at, either by agreement, appraisal, or judgment." *Carriger v. Ballenger*, 628 P.2d 1106, 1110 (Mont. 1981); *see also*

*Grosvold*, 568 P.3d at 551 (explaining "when a factfinder is not bound by a particular amount and could decide on nearly any award beyond or below that claim, prejudgment interest is not appropriate"); *DeTienne v. Sandrock*, 431 P.3d 12, 20-21 (Mont. 2018) (reversing award of prejudgment interest because the damages were disputed and required a factual determination at trial); *Ryffel Family P'ship, Ltd. v. Alpine Country Constr., Inc.*, 386 P.3d 971, 981 (Mont. 2016) (holding "[u]ncertainty over…damages meant the amount of Alpine's recovery was not certain or capable of being made certain by calculation); *Northern Mont. Hosp. v. Knight*, 811 P.2d 1276, 1282 (Mont. 1991) (holding prejudgment interest was not awardable because "the right to recover interest vested only on the date of the jury verdict and not on an earlier particular date").

### B. The lost value of the Accident and Non-Accident helicopters was uncertain and disputed. As a result, the district court erred in awarding prejudgment interest.

#### 1. Central was not entitled to prejudgment interest on the Accident Helicopter.

The district court concluded the amount of lost value of the Accident Helicopter was "certain or capable of being made certain by calculation" because "Kaman did not dispute the helicopter's value." (1-ER-29-30). The district court's decision constitutes an abuse of discretion for several reasons.

First, the factual finding upon which it is based, that Kaman did not dispute the helicopter's value, is clearly erroneous. While Kaman made the strategic

decision at trial not to offer the jury a different valuation for the Accident Helicopter, it unequivocally "disputed the helicopter's value" throughout the case leading up to trial. As the Final Pretrial Order reflects, as of April 21, 2025, Kaman expressly "denie[d] that Central is entitled to the damages sought, including over $100M in general damages, special damages and punitive damages." (11-ER-2488). The joint pretrial also does not contain an agreement as to the value of the Accident Helicopter, which further supports the fact that the value of the Accident Helicopter was disputed up to the time of trial. (11-ER-2482-2483).

Second, district court also failed to apply the appropriate legal standard. As stated above, under Montana law "[n]o interest can run until a fixed amount of damages has been arrived at, either by agreement, appraisal, or judgment." *Carriger*, 628 P.2d at 1110. The parties did not agree to the value of the Accident Helicopter. (11-ER-2482-2483). The only thing that could even arguably be considered an appraisal is Crick's report, which was not even prepared until <u>September 2024</u>. (9-ER-2071-2072, 2074-2075).

Even then, Crick merely provided an <u>estimate</u> of the Accident Helicopter's fair market value, <u>which the jury did not accept</u>. Crick estimated that the fair market value was $6,037,500, and the jury awarded $37,500 less than that amount. (13-ER-3047; 9-ER-2075). The Montana Supreme Court has consistently "declined to allow an award of prejudgment interest in cases where the judgment

awarded is less than the claimant sought in damages and was not the result of a readily calculable offset." *American Music Co. v. Higbee*, 103 P.3d 518, 524 (Mont. 2004); *see also DiTienne*, 431 P.3d at 20-21 (reversing award of prejudgment interest on lost profits awards because they "were not based upon a previously agreed amount or a sum certain balance" and as a result "the amount of recovery was not readily ascertainable until determined by the trial court").

The district court disregarded this precedent and instead relied upon *New Hope Lutheran Ministry v. Faith Lutheran Church of Great Falls, Inc.*, 328 P.3d 586 (Mont. 2014). Far from supporting the district court's conclusion, however, *New Hope* actually illustrates why the prejudgment interest award should be reversed.

In *New Hope*, the trial court granted New Hope's request for declaration that it was entitled to certain cash accounts and real property as of May 2, 2010, but refused to award it prejudgment interest. *Id.* at 591-92, 602-03. As the district court recognized, the Montana Supreme Court reversed the trial court's decision as to prejudgment interest, concluding the "amount in [the] financial accounts as of May 2, 2010, is undisputed to be $95,744.00, thus the amount of recovery is certain." *Id.* at 602-03; (1-ER-29).

What the district court did not recognize, however, was that "New Hope [did] not contend that it [was] entitled to prejudgment interest on the value of the

real property, merely on the monetary amounts held in bank accounts or certificates of deposit" to which it was entitled. *Id*. at 602. Unlike the estimated fair market value of the Accident Helicopter, amounts in bank accounts on a particular date is readily ascertainable. As a result, the district court's reliance upon *New Hope* was misplaced.

Third, the district court's finding that "not allowing the recovery of prejudgment interest simply because appraisal of the property proves complex" would defeat its obligation to fully compensate Central for loss of use of its property is also clearly erroneous and contrary to the law. (1-ER-30). A party is only entitled to prejudgment interest if it meets its burden of establishing all three of the statutory elements. *See* MCA §§ 27-1-210, 27-1-222; *Grosvold*, 568 P.3d at 551; *King*, 2014 WL 12591875, at *2. Central failed to do so, and the district court therefore abused its discretion by awarding prejudgment interest on the Accident Helicopter.

Fourth, prejudgment interest on the Accident Helicopter was erroneous for several other reasons. For example, Central's own expert recognized that ascertaining the lost value of a helicopter is "complex," and requires an analysis of "the specific aspects of that asset" and "the specific aspects of the market where that asset would transact." (9-ER-2066-67). There are at least "three different approaches" that could be taken to arrive "at a credible valuation or a credible

appraisal," each of which relies upon the appraiser's own subjective determination of certain factors. (9-ER-2066). The amount Crick came up with for the Accident Helicopter was <u>his</u> "assessment" of what he believed the fair market value was—not an amount that was "certain or capable of being made certain by calculation." (9-ER-2075). The Montana Supreme Court has consistently refused to award prejudgment interest even in breach of contract cases where the amount of damages due is not clearly ascertainable until determined at trial. *See, e.g., First Nat'l Prop, LLC v. Joel D. Hillstead Trust*, 472 P.3d 1234, 142 (Mont. 2020); *DiMarzio v. Crazy Mountain Constr., Inc.*, 243 P.3d 718, 725 (Mont. 2010).

The prejudgment interest award was also erroneous because the Accident Helicopter was just one component of the overall damages Central sought. Kaman had no way to pay that portion without conceding liability as to other aspects of Central's alleged damages—none of which were certain or capable of being made certain by calculation. There is no support of the proposition that the district court had the discretion to dissect portions of a monetary damages award to a single party in order to render specific aspects allegedly calculable. *See, e.g., Kraft v. High Country Motors, Inc.*, 276 P.3d 908, 919 (Mont. 2012) (describing the test as whether the "cause of action" or "claim" "is determined or can be determined by calculation" rather than breaking out categories of damages for a single claim); *see also Hoffman v. Geico Ins. Co.*, 2008 WL 11417041, at *5 (D. Mt. Jun. 25, 2008)

(concluding interest ran from when "the amount of recovery, as a factual matter, was made certain")

Finally, the prejudgment interest award was improper because "the right to recover" was not "vested in [Central] upon a particular day". Mont. Code Ann. § 27-1-210; *see also Northern Mont. Hosp. v. Knight*, 811 P.2d 1276, 1282 (Mont. 1991) (affirming trial court's refusal to award prejudgment interest because "[c]learly, right to recover interest vested only on the date of the jury verdict and not on an earlier particular date").

In sum, the district court abused its discretion by awarding prejudgment interest on the lost value of the Accident Helicopter. That portion of the Judgment should be reversed.

#### 2. The award of prejudgment interest on the Non-Accident Helicopters was also erroneous.

The district court also abused its discretion by awarding prejudgment interest. The district court's decision was once again based upon the clearly erroneous factual finding that "Kaman did not dispute the loss of value of the three grounded helicopters." (1-ER-31). Contrary to the district court's finding, the record reflects that Kaman vigorously disputed the lost value of the Non-Accident Helicopters through its cross examination of Central's expert, Crick, including attacking the facts that:

- Crick's own fair market value calculations actually established that the aggregate value of the Non-Accident helicopters increased between the date of the accident and the date he made his calculations;
- Crick's lost value calculations were based upon distressed sale values and not fair market values;
- the "30 to 40 percent" discount Crick applied to his own fair market value calculations was based upon the distressed sale of just one of the three Non-Accident Helicopters, and that he had no idea whether the second or third would be sold at distressed sale prices; and
- Crick had no idea whether Central made any attempt to market the Non-Accident Helicopters before selling them at distressed sale amounts.

(9-ER-2085-2089).

Kaman also repeatedly challenged the fact that the proper measure of damages was the difference in fair market value immediately before and immediately after the accident, and not Crick's distressed-sale analysis. (2-ER-382-383).

The district court also reached its conclusion by once again ignoring the applicable legal standard and instead relying solely upon *New Hope*. (1-ER-31). As explained above, *New Hope* is inapposite. Instead, this issue once again falls

squarely within the well-established Montana precedent establishing that "when a factfinder is not bound by a particular amount and could decide on nearly any award beyond or below that claim, prejudgment interest is not appropriate." *Grosvold*, 568 P.3d at 551; *see also Carriger*, 628 P.2d at 1110; *DeTienne*, 431 P.3d at 20-21; *Ryffel*, 386 P.3d at 981; *Knight*, 811 P.2d at 1282.

Under clearly established Montana precedent, the alleged lost value of the Non-Accident Helicopters was not certain or capable of being made certain by calculation. As a result, the district court abused its discretion by awarding prejudgment interest on the award of lost value for the Non-Accident Helicopters. That portion of the Judgment should therefore be reversed.

## CONCLUSION

For these reasons, Appellant Kaman Aerospace Corporation respectfully requests that this Court reverse the portion of the judgment awarding Central $6 million for lost value of the Non-Accident Helicopters, $4 million for lost past profits, $6 million for lost future profits, and prejudgment interest, render judgment that Central take nothing on those damage elements, and grant it such other relief to which it is justly or equitably entitled.

By: */s/_Steven D. Sanfelippo*
Steven D. Sanfelippo
CUNNINGHAM SWAIM, LLP

## CERTIFICATE OF COMPLIANCE

I certify that the total number of words in this brief, including footnotes is 13,647, as counted by Microsoft Word. This word count excludes any cover, tables, this certificate, and the proof of service.

By: *_/s/_Steven D. Sanfelippo_*
Steven D. Sanfelippo
CUNNINGHAM SWAIM, LLP

## CERTIFICATE OF SERVICE

I hereby certify that pursuant to the Appellate Rules of Civil Procedure a true and correct copy of the above and foregoing was served on all counsel of record on this the 27th day of March, 2026.

By: *_/s/_Steven D. Sanfelippo_*
Steven D. Sanfelippo
CUNNINGHAM SWAIM, LLP