**NO. 25-7653**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**CENTRAL COPTERS, INC., et al.**
Plaintiff-Appellee,
v.
**KAMAN AEROSPACE CORPORATION**
Defendant-Appellant.

On Appeal from the United States District Court for the District of Montana,
Helena Division; The Honorable Brian Morris;
Case No. 2:21-cv-00071-BMM

# CENTRAL COPTERS, INC.'S RESPONSE BRIEF


Kellie G. Sironi
GASTON LAW FIRM
Attorney at Law
P.O. Box 21571
Billings, MT 59104
Telephone: (406) 860-9476
ksironi@sironilaw.com

Calvin J. Stacey
STACEY & FUNYAK
P.O. Box 1139
Billings, Montana 59103-1139
Telephone: (406) 259-4545
cstacey@staceyfunyak.com

Matthew B. Hayhurst
Tyler M. Stockton
BOONE KARLBERG P.C.
P.O. Box 9199
Missoula, MT 59807
Telephone: (406) 543-6646
mhayhurst@boonekarlberg.com
tstockton@boonekarlberg.com
*Attorneys for Plaintiff-Appellee*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ i
TABLE OF AUTHORITIES ........ iv
STATEMENT OF JURISDICTION ........ 1
INTRODUCTION ........ 1
STATEMENT OF ISSUES ........ 3
STANDARDS OF REVIEW ........ 4
STATEMENT OF THE CASE ........ 5

I. Introduction. ........ 5
II. Central, Kaman, and the KMAX helicopter. ........ 6
III. The August 24, 2020, crash and following events. ........ 8
IV. Central and the Estate's suit against Kaman. ........ 9

SUMMARY OF THE ARGUMENT ........ 11
ARGUMENT ........ 13

I. The District Court correctly found Central's damages were not limited, because Central brought tort, not contract claims, and, in any event, Montana law applies in this diversity case and the Price Catalog is an unconscionable contract of adhesion. ........ 13
  A. The district court correctly applied Montana products liability law, which—as a matter of public policy—bars application of the UCC and economic loss rule in such actions. ........ 14
  B. The District Court correctly concluded Kaman's choice-of-law provision did not apply to Central's non-contract tort claims. ........ 18
  C. Montana's choice-of-law analysis requires applying Montana law. ........ 21
    1. Kaman tries to apply the choice-of-law test for contracts, rather than torts, but applying the right test—as the District Court did early in the case—resolves in favor of Montana law. ........ 21
    2. Even if the choice-of-law test for contracts is applied, Montana law applies. ........ 26

D. The District Court correctly found the Price Catalog was a contract of adhesion and, thus, unenforceable under Montana law. ....31

1. The Price Catalog violates Montana public policy. ....31

2. The Price Catalog is an unconscionable contract of adhesion. ....32

i. The Price Catalog is a contract of adhesion, because Kaman dictated the terms to Central, which had no meaningful opportunity to negotiate. ....33

ii. Kaman's Price Catalog is also unconscionable, because it is one-sided, sweeping in scope, and even excludes hidden defects in its products. ....35

II. Adequate evidence supported the jury's unanimous award of $6 million for Central's loss of value of its three non-accident helicopters. ....36

A. The only evidence confirmed Kaman's negligence <u>caused</u> Central's losses on its three non-accident KMAX helicopters. 38

1. Kaman failed to challenge Central's expert, David Crick, who concluded that because of the softened market the losses on Central's helicopters was between 30% to 40%. ....40

2. Kaman's personal attacks on the Duffys, claiming they inappropriately took money from Central, are a red herring. ....42

B. Kaman's insistence on only *one* method of damage misunderstands the law, because more than one method of calculating damages is available. ....42

1. Kaman focuses on only one method for calculating damages when the law says there are others. ....43

2. Crick's testimony established what the three non-accident helicopters should have been worth, but for the softening of the market. ....46

III. The evidence on which the jury awarded $6 million in lost profits is sufficient and should be affirmed. ....48

A. Kaman's critiques of Abbott/Kober goes to the weight of their testimony, not its sufficiency to support a verdict. ....................49

B. Kaman's arguments regarding speculation are wrong under Montana law. ....................53

C. Kaman offers no caselaw rejecting Abbott's/Kober's method of valuing lost future profits. ....................54

IV. The district court did not abuse its discretion to award Central prejudgment interest. ....................56

A. The jury's rounding of its award, excluding $37,500 from N314's value, does not defeat prejudgment interest. ....................58

B. Kaman's attempt to distinguish *New Hope* has no merit. ....................59

C. Kaman's argument that the value of N314 cannot be separated is incorrect. ....................60

CONCLUSION ....................61

CERTIFICATE OF COMPLIANCE ....................62

CERTIFICATE OF SERVICE ....................63

# TABLE OF AUTHORITIES

## Cases

*Acosta v. City Natl. Corp.*,
922 F.3d 880 (9th Cir. 2019) .......... 5, 57

*Adams v. United States*,
823 F.Supp.2d 1074 (D. Idaho 2011) .......... 40, 45, 46

*Alexander v. Montana-Dakota Utilities Co.*,
No. CV-18-82-GF-BMM, 2020 WL 6262101 (D. Mont. Oct. 23, 2020) .......... 50

*American Music Co. v. Higbee*,
103 P.3d 518 (Mont. 2004) .......... 59

*Bell v. Williams*,
108 F.4th 809 (9th Cir. 2024) .......... 37

*Bos v. Dolajak*,
534 P.2d 1258 (Mont. 1975) .......... 48

*Branch Banking and Tr. Co. v. D.M.S.I., LLC*,
871 F.3d 751 (9th Cir. 2017) .......... 5

*Brandenburger v. Toyota Motor Sales, U.S.A., Inc.*,
513 P.2d 268 (Mont. 1973) .......... 14, 17, 31

*Byrne v. Terry*,
741 P.2d 1341 (Mont. 1987) .......... 57

*Carriger v. Ballenger*,
628 P.2d 1106 (Mont 1981) .......... 57

*City of Pomona v. SQM North America Corporation*,
750 F.3d 1036 (9th Cir. 2014) .......... 49

*Cooper v. Brown*,
510 F.3d 870 (9th Cir. 1996) .......... 49, 52

*Covey v. Brishka*,
445 P.3d 785 (Mont. 2019) .......... 44, 46

*Dalbotten v. C. R. Bard, Inc.*,
No. 1:20-CV-00034-SPW, 2023 WL 346310
(D. Mont. Jan. 20, 2023) .......... 21, 23, 24, 30

*Dees v. Cnty. of San Diego*,
960 F.3d 1145 (9th Cir. 2020) .......... 5

*Desire, LLC v. Manna Textiles, Inc.*,
986 F.3d 1253 (9th Cir. 2021) .......... 4

*DeTienne v. Sandrock*,
431 P.3d 12 (Mont. 2018) .......... 57, 58

*Durden v. Hydro Flame Corp.*,
983 P.2d 943 (Mont. 1999) .......... 14

*Education Logistics, Inc. v. Laidlaw Transit, Inc.*,
No. CV 07-06-M-DWM, 2012 WL 761950 (D. Mont. Mar. 8, 2012) .......... 54, 55

*Five U's, Inc. v. Burger King Corp.*,
962 P.2d 1218 (Mont. 1998) .......... 18

*Grosvold v. Neely*,
568 P.3d 525 (Mont. 2025) .......... 57

*Harper v. City of Los Angeles*,
533 F.3d 1010 (9th Cir. 2008) .......... 37, 43, 52, 54

*Hillis v. Heineman*,
626 F.3d 1014 (9th Cir. 2010) .......... 28

*Hoenstine v. Rose,*
312 P.2d 514 (Mont. 1957) .......... 44, 45, 46

*Hostetter v. Donlan*,
719 P.2d 1243 (Mont. 1986) .......... 53

*James Talcott Construction, Inc. v. P& D Land Enterprises*,
141 P.3d 1200 (Mont. 2006) .......... 58, 59, 60, 61

*Jim's Excavating Serv., Inc. v. HKM Assocs.*,
878 P.2d 248 (Mont. 1994) .......... 17, 22

*Johannsen v. Zimmer, Inc.*,
No. 3:00CV2270 (DJS), 2005 WL 756509 (D. Conn. Mar. 31, 2005)................22

*Johnson v. Paradise Valley Unified Sch. Dist.*,
251 F.3d 1222 (9th Cir. 2001)........................................................ 37, 42

*Johnson v. Riverside Healthcare Sys., LP*,
534 F.3d 1116 (9th Cir. 2008)........................................................ 21, 31

*Keeney Construction v. James Talcott Construction Co.*,
45 P.3d 19 (Mont. 2002)....................................................................18

*Kelker v. Geneva-Roth Ventures, Inc.*,
303 P.3d 777 (Mont. 2013) ..............................................................35

*Kortum-Managhan v. Herbergers NBGL*,
204 P.3d 693 (Mont. 2009) ........................................................ 33, 35

*Kraft v. High Country Motors, Inc.*,
276 P.3d 908 (Mont. 2012) ........................................................ 56, 57

*Krechman v. Cnty. of Riverside*,
723 F.3d 1104 (9th Cir. 2013)..........................................................42

*Lee v. Kane*,
893 P.2d 854 (Mont. 1995) ........................................................ 53, 54

*Lenz v. FSC Secs. Corp.*,
414 P.3d 1262 (Mont. 2018) ................................... 13, 31, 32, 34, 35, 36

*Masters Group International, Inc. v. Comerica Bank*,
352 P.3d 1101 (Mont. 2015) ........................................... 18, 19, 22, 27

*McCray v. Westrock Servs., LLC*,
No. 21-9853-DMG (RAOX), 2024 WL 4579108
(D.C Cal. Sept. 10, 2024) .......................................................... 54, 55

*McGlinchy v. Shell Chem. Co.*,
845 F.2d 802 (9th Cir. 1988)...................................................... 54, 55

*Meyer v. Creative Nail Design, Inc.*,
975 P.2d 1264 (Mont. 1999) ..............................................................41

*Mountain W. Helicopter, LLC v. Kaman Aerospace Corp.*,
No. 3:01CV1746(AVC), 2005 WL 8167155 (D. Conn. Apr. 7, 2005) ..............22

*Narayan v. EGL, Inc.*,
616 F.3d 895 (9th Cir. 2010) ..............14

*New Hope Lutheran Ministry v. Faith Lutheran Church of Great Falls, Inc.*,
328 P.3d 586 (Mont. 2018) .............. 56, 57, 60

*Northern Montana Hospital v. Knight*,
811 P.2d 1276 (Mont. 1992) ..............58

*Orr v. Plumb*,
884 F.3d 923 (9th Cir. 2018) .............. 1, 28

*Patton v. Cox*,
276 F.3d 493 (9th Cir. 2002) ..............14

*Pavao v. Pagay*,
307 F.3d 915 (9th Cir. 2002) .............. 36, 37

*Phillips v. Gen. Motors Corp.*,
995 P.2d 1002 (Mont. 2000) .............. 22, 23, 24, 25, 26, 30

*Polzin v. Appleway Equip. Leasing, Inc.*,
191 P.3d 476 (Mont. 2008) .............. 27, 28, 29

*Ridgeway v. Walmart Inc.*,
946 F.3d 1066 (9th Cir. 2020) ..............5

*Riley v. American Honda Motor Co., Inc.*,
856 P.2d 196 (Mont. 1993) ..............41

*Ryffel Family Partnership, Ltd. v. Alpine Country Construction, Inc.*,
386 P.3d 971 (Mont. 2016) ..............57

*Semenza v. Bowman*,
885 P.2d 451 (Mont. 1994) ..............46

*Shivkov v. Artex Risk Sols., Inc.*,
974 F.3d 1051 (9th Cir. 2020) ..............4

*Stensvad v. Miners and Merchs. Bank of Roundup*,
640 P.2d 1303 (Mont. 1982) .......... 52, 53

*Sternhagen v. Dow Co.*,
935 P.2d 1139 (Mont. 1997) .......... 25, 30

*Streich v. Hilton-Davis, Division of Sterling Drug, Inc.*,
692 P.2d 440 (Mont. 1984) .......... 16, 17, 18, 22, 30, 32

*Sunburst School Dist. No. 2 v. Texaco, Inc.*,
165 P.3d 1079 (Mont. 2007) .......... 44

*Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*,
330 F.3d 1110 (9th Cir. 2003) .......... 4

*Teague v. Remington Arms Co., LLC*,
No. CV 18-184-M-DLC, 2022 WL 16574241 (D. Mont. Nov. 1, 2022) ..... 15, 32

*Thompson v. Nebraska Mobile Homes Corp.*,
647 P.2d 334 (Mont. 1982) .......... 15, 16, 17, 18, 30, 32

*Whitaker v. Farmhand, Inc.*,
567 P.2d 916 (Mont. 1977) .......... 20

*Zirkelbach Construction, Inc. v. DOWL, LLC*,
402 P.3d 1244 (Mont. 2017) .......... 18

**Statutes**

Montana Code Annotated § 27–1–206 .......... 57

Montana Code Annotated § 27–1–211 .......... 56, 58

Montana Code Annotated § 27–1–719 .......... 15, 18, 20, 22, 32

Montana Code Annotated § 28–3–102 .......... 28

Montana Code Annotated § 30–2–719 .......... 30

**Other Authorities**

Montana Pattern Jury Instruction 2d 25.42 .......... 53

Ninth Circuit Pattern Jury Instructions No. 5.2, 5.4 .......... 53

Restatement (Second) Conflict of Laws § 187 ........................................................28

Restatement (Second) Conflict of Laws § 188 .................................................. 26, 27

Restatement (Second) of Conflict of Laws § 6 .......................................... 23, 24, 27

**Rules**

Fed. R. Civ. P. 56(c)..................................................................................................4

## STATEMENT OF JURISDICTION

Appellee Central Copters, Inc. ("Central") agrees with Appellant Kaman Aerospace Corporation's ("Kaman") statement of jurisdiction, only adding that the District Court had personal jurisdiction over Kaman and any argument to the contrary has been forfeited. *Orr v. Plumb*, 884 F.3d 923, 932 (9th Cir. 2018).

## INTRODUCTION

Central is a Montana aviation company that provides helicopter lifting services. It is a second-generation company owned by Mark ("Mark") and Pam ("Pam") Duffy. The Duffy's oldest son, Tom ("Tom") Duffy, was one of Central's most experienced pilots (second to his father) and the heir to take over Central.

Tom was killed fighting a wildfire in Oregon in August 2020 when his helicopter (referred to by its tail number "N314"), a Kaman KMAX K-1200 ("KMAX"), crashed on his last refill of the day. N314 crashed because the servo flap (a critical flight control and stabilizer) on one of the blades failed due to a defective and negligently-manufactured glue bond—a conclusion Kaman no longer disputes. Not wanting another crash or death on its hands, Central would later ground its other three KMAX helicopters (hereinafter "non-accident helicopters") after observing concerning signs in other servo flaps (thus, causing lost profits) and incur the substantial cost of transitioning to a new helicopter platform (also causing lost profits).

Tom's death was the second of three fatal KMAX crashes in which the servo flap failed. The first occurred in Idaho in 2010 and another happened around a year after Tom's death in British Columbia. Given the impact of three crashes on the market for KMAX helicopters, Central would later suffer additional losses associated with the loss of value in the non-accident helicopters.

Central and Tom's estate filed suit against Kaman in 2021. On the eve of trial in April 2025, Tom's estate accepted Kaman's $8 million offer of judgment. Central proceeded to trial and the jury unanimously found Kaman negligently manufactured the servo flap, the servo flap was defective, and the defect and negligence caused the crash. The jury awarded Central $6 million for the loss of N314, $6 million for the loss in value of the non-accident helicopters, $4 million for past lost profits, and $6 million for future lost profits.

The damages award rests on common-sense premises. One is not required to continue using an inherently dangerous product and accept further risk of life in order to mitigate financial losses. Grounding the remaining three KMAX helicopters and transitioning to a different platform was both necessary and appropriate. Similarly, it goes without saying (and the evidence at trial established) that three fatal KMAX crashes negatively impacted the price Central could get for the non-accident helicopters.

In this appeal, Kaman—no longer disputing its negligence or its defective manufacturing caused N314's crash and Tom's death—wants this Court to discount the jury's verdict and to artificially limit Central's losses to only the value of N314 (*i.e.*, $6 million and nothing more). The Court should reject these arguments. The Honorable Brian Morris, a former Montana Supreme Court Justice, correctly applied Montana law in this diversity jurisdiction case. Montana law applies, because this is a tort (products liability) case, not breach of contract case, and Montana's choice-of-law analysis requires applying Montana law. In addition, Kaman's choice-of-law provision and consequential damages limitation are found in its Commercial Price Catalog ("Price Catalog"), which is an unconscionable contract of adhesion, and Montana law bars relying on the Uniform Commercial Code ("UCC") in products liability actions. Moreover, the jury instructions and evidence support the jury's award of $16 million in damages for loss of value and lost profits.

The Court should affirm.

## STATEMENT OF ISSUES

1. Did the District Court correctly apply Montana law and reject application of the consequential damages limitation and choice-of-law provision in Kaman's Price Catalog, where Central brought tort claims rather than

contract claims, Montana law applies in this diversity case, and Kaman's Price Catalog is an unconscionable contract of adhesion?

2. Was there sufficient evidence for the jury to award damages for the lost value of Central's non-accident helicopters, where the evidence established Central had sold two of the three non-accident helicopters at a loss due to market softening?

3. Was there sufficient evidence for the jury to award damages for lost profits where Central's experts testified to Central's losses following the crash and calculated a reasonable projection of future lost profits?

4. Did the District Court abuse its discretion in awarding prejudgment interest on the value of N314 from the date of the crash, where Kaman failed to challenge the valuation presented at trial and its witnesses and counsel referred to the value as $6 million throughout the trial?

## STANDARDS OF REVIEW

A district court's denial of a motion for summary judgment is reviewed *de novo* using the same standard used by the district court in Rule 56(c). *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1259 (9th Cir. 2021); *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1131 (9th Cir. 2003). Interpretation and meaning of contract provisions are also reviewed *de novo*. *Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1058 (9th Cir. 2020).

A district court's denial of a motion for judgment as a matter of law is reviewed *de novo*. *Dees v. Cnty. of San Diego*, 960 F.3d 1145, 1151 (9th Cir. 2020). However, a jury's verdict must be upheld if substantial evidence supports it. *Id.* Substantial evidence is such "evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence." *Ridgeway v. Walmart Inc.*, 946 F.3d 1066, 1082 (9th Cir. 2020) (quotation marks omitted).

A district court's denial of a motion *in limine* is reviewed for an abuse of discretion. *Branch Banking and Tr. Co. v. D.M.S.I., LLC*, 871 F.3d 751, 759 (9th Cir. 2017).

An award of prejudgment interest is reviewed for an abuse of discretion. *Acosta v. City Natl. Corp.*, 922 F.3d 880, 885 (9th Cir. 2019).

## STATEMENT OF THE CASE

### I. Introduction.

Tom was killed on August 24, 2020, while firefighting when a servo flap—a flight-critical carbon fiber flap that controls the pitch of the rotor blade—on his KMAX helicopter tore in half because it had a defectively manufactured glue bond that broke mid-flight. (5-SER-884–85, 892; 1-ER-68–70; 10-ER-2148–222, 2272–333; 9-ER-2040–57; 8-ER-1617–76.) The loss of the servo flap's afterbody caused the rotor blades to collide, causing the helicopter to crash. (*Id.*)

Tom's estate and Central brought suit against Kaman alleging N314's servo flap was defective. (12-ER-2864.) On the eve of trial, Tom's estate accepted an $8 million Offer of Judgment (1-SER-2–12) and, at trial, the jury found Kaman liable to Central for negligence and manufacturing defect (1-ER-68–71). The jury awarded Central $22 million in damages. (1-ER-68–71.)

## II. Central, Kaman, and the KMAX helicopter.

Mark and Pam started Central in the 1980s and, since its inception, it has, among other things, provided firefighting, construction services, and moving of oil and gas equipment. (5-SER-884.) When N314 crashed, Central owned four KMAX helicopters, which it used to operate its business. (*Id.*)

Kaman, as the KMAX manufacturer, was and is the <u>sole</u> purveyor of replacement parts necessary to maintain and operate any KMAX helicopter. (1-SER-101–02; 5-SER-958.) As the District Court determined:

> Central Copters' K-Max N314 needed new blades. Kaman was the sole manufacturer of the blades. Central Copters' helicopter would have been inoperable without the new blades.

(1-ER-114 (record citations omitted).) Kaman held a monopoly on keeping KMAX helicopters flying and, as such, could (and did) purport to impose any terms it wanted when it sold parts to a KMAX owner. (1-SER-101–02; 5-SER-921, 958; 2-SER-257–59.)

Enjoying this monopoly, Kaman buries in its lengthy Price Catalog a one-sided "STANDARD TERMS AND CONDITIONS OF SALE" and makes every part sale—even the smallest pieces—purportedly subject to those terms. (12-ER-2716.) Here, when Central purchased N314's rotor blades, the following phrase was slipped into the letter agreement:

> As shown on the attached Schedule A, Central Copters Inc. will make 3 payments as described in Schedule A. This sale is subject to Kaman Aerospace Corporation's terms and conditions of sale, a copy of which you have received as part of the Kaman 2015 Commercial Price Catalog.

(12-ER-2694.) The 2015 Price Catalog then contains, among other one-sided provisions, the liability and choice of law provisions Kaman now claims limit its liability in this case or impose Connecticut law. (12-ER-2716–23.) In those provisions, Kaman even disclaims hidden defects: "Kaman shall not be liable for any defects, either latent or patent, in the aircraft or any K-MAX product." (*Id.*)

However, beyond minute terms regarding timing of payment or warranty, Central had no ability to negotiate changes in the "standard" terms in the Price Catalog. It was a "take-it-or-leave-it situation." (1-SER-101–03; 5-SER-958.) Central did not know its parts purchases were supposedly subject to the Price Catalog's terms and without agreeing to Kaman's one-sided terms, Central would not have been able to maintain and operate its helicopters. (5-SER-921, 958; 1-SER-101–03.) Thus, Central was forced to either be unable operate its multi-

million dollar helicopters or agree to the “standard” terms in Kaman’s Price Catalog. (1-SER-101–03; 5-SER-921, 958; 2-SER-257–59.)

## III. The August 24, 2020, crash and following events.

Tom was killed on August 24, 2020, while operating N314 during fire suppression operations in Oregon. (5-SER-892.) Central, unsure of the cause of N314’s crash, continued to fly the non-accident helicopters. However, when Central saw concerning signs in other servo flaps, Mark made the difficult decision to ground the non-accident helicopters. (6-ER-1098.) This grounding had a significant financial impact on Central, but it did not want another fatality. (6-ER-1099–1100, 7-ER-1392.)

To keep its business afloat, Central migrated to the Black Hawk helicopter. (6-ER-1100–04.) That transition was expensive and, ultimately, the Black Hawk cost more to operate, because it had two engines and required two pilots (compared to the KMAX’s one of each). (6-ER-1104.)

Central did not want to sell unsafe aircraft, but was eventually forced to do so, because it needed the revenue. (6-ER-1144–45.) Central ultimately sold two of the non-accident helicopters before trial, but it took between 30% and 40% loss on the sales. (6-ER-1145; 12-ER-2779–80; 9-ER-2081–83.)

## IV. Central and the Estate's suit against Kaman.

Central filed suit against Kaman in 2021, alleging strict products liability and negligence premised on product liability breaches of duty. (6-SER-1219–29; 1-ER-2864–75.) Central brought no contract or contract-related claims. (*Id.*)

Kaman moved to dismiss, arguing, among other things, that the venue provision in the Price Catalog's required transfer to Connecticut. (13-ER-2929.) The venue <u>and</u> choice of law provisions are found in the same clause in the Price Catalog. (12-ER-2723.) The District Court denied Kaman's motion, concluding, among other things, that "[a] court may render forum selection clauses unenforceable if the contract between the parties involves a contract of adhesion." (1-ER-113.) The District Court found there was "[l]ittle question" that "the [Price Catalog] contract between Kaman and Central Copters for the sale of the blades in question constitutes a contract of adhesion." (1-ER-114.) The District Court also held the forum selection clause did not apply to Central's tort claims, because they were "claims for products liability, not breach of contract" claims arising from the agreement. (*Id.*)

Central moved for summary judgment on Kaman's defense that Connecticut's Product Liability Act ("CPLA") and the Price Catalog's purported contractual damages limitations both barred Central's damages. (6-SER-1163–1218.) Kaman sought the opposite ruling. (12-ER-2822, 2862.)

The District Court soundly rejected Kaman's attempt to enforce the Price Catalog's damages limitations. (1-ER-71–95.) Judge Morris concluded "Montana law unequivocally rejects application of the Uniform Commercial Code ["UCC"] and economic loss rules in product liability actions." (1-ER-84 (emphasis added).) On Kaman's contractual arguments, Judge Morris noted that Central had only brought tort claims—not contractual claims—and unlike the cases cited by Kaman, the tort claims did not sound in contract. Given the lack of contract claims and the fact that Central's products liability claims did not relate to the agreement between Central and Kaman, Judge Morris held "Connecticut law does not apply." (1-ER-87–88.)

The District Court also rejected Kaman's attempt to limit Central's damages arguments and exclude its damages experts. In reviewing the anticipated testimony of Central's economics experts—two professors at Montana Tech University—Judge Morris concluded they "provide[d] a reasonable basis for their calculations," but noted Kaman was "free to challenge [Central's] expert at trial through cross-examination." (1-ER-89.)

At the end of the trial, the jury returned a verdict in Central's favor, awarding Central $6 million for N314, $6 million in lost value for the non-accident helicopters, $4 million in lost earnings and profits to the date of the trial, and $6 million in future business losses. (1-ER-68–70.)

Following trial, Kaman sought post-judgment rulings as a matter of law on the grounds it generally now appeals. Central moved to amend the judgment to apply pre- and post-judgment interest. The District Court denied Kaman's motion (1-ER-24), but granted Central prejudgment interest on N314 (from the date of the crash) and the non-accident helicopters (from the date the last helicopter sold) (1-ER-31).[1] Kaman appealed.

## SUMMARY OF THE ARGUMENT

The District Court correctly concluded Montana law, not Connecticut law, applied to this case. Montana's products liability doctrine was adopted to place liability on the manufacturer regardless of how the consumer obtained the product, the Montana Supreme Court has expressly denied application of the UCC to products liability proceedings, and Central only brought tort claims, not contract claims. Moreover, under the correct choice-of-law analysis for torts in Montana, Montana law applies, because Montana and Connecticut law conflict and the most significant relationship test resolves in favor of Montana law. Even if the contractual choice-of-law test is applied, Montana law still applies. And, lastly, Kaman's Price Catalog is an unenforceable contract of adhesion in Montana, because it contradicts fundamental Montana products liability public policy,

[1] Central did not close the sale of its final remaining non-accident helicopter until after the judgment here was entered, so prejudgment interest on the non-accident helicopters is moot.

Central had no meaningful opportunity to negotiate it, and the terms are oppressive and one-sided.

The jury's unanimous award of $6 million in lost value of Central's three non-accident helicopters and $6 million in lost future profits should be affirmed because, viewing all the evidence in the light most favorable to Central, and drawing all reasonable inferences in Central's favor, the verdict was based on substantial evidence adequate to support the verdict. The value of Central's three helicopters softened because Kaman's negligence caused three substantially similar fatalities and Central was forced to sell its helicopters and change to a more expensive helicopter platform out of safety concerns for its pilots. On the future damages question, Kaman presented its own evidence and had freedom to cross-examine witnesses. The jury's award of lost future profits for 2–3 years into the future was not grossly excessive and Kaman's criticisms of Central's damage expert testimony were all presented to the jury through the trial process. The jury had freedom to disregard Kaman's arguments on Central's damages and did so.

Finally, the district court did not abuse its discretion in awarding Central prejudgment interest on the $6 million value of the destroyed N314 helicopter. Kaman never disputed that value throughout trial, and it was capable of being made certain by calculation on the day of the crash. Montana's prejudgment

interest statute is not discretionary and the District Court's award should be affirmed.

## ARGUMENT

At their core, Kaman's arguments are a request that this Court reduce the jury's verdict from $22 million to $6 million. Kaman does not dispute its negligence and a manufacturing defect caused the crash. It does not dispute it caused Tom's death. Rather, Kaman claims it had a right to pay less than the jury's award—$16 million less—because of boilerplate language it imposed in a contract of adhesion that was never even sued upon and its disagreement with the jury's assessment of the evidence. Governing Montana law and the evidence before the jury, however, require affirmance.

### I. The District Court correctly found Central's damages were not limited, because Central brought tort, not contract claims, and, in any event, Montana law applies in this diversity case and the Price Catalog is an unconscionable contract of adhesion.

Kaman's attempt to rely on contractual limitations and Connecticut law do not stand up. Montana's strict product liability scheme does not permit the type of contractual limitations—either through application of another state's law or otherwise—to escape liability. Moreover, Kaman's contract of adhesion is unconscionable and void on its own. Contracts that are "contrary to public policy or unconscionable" are unenforceable under Montana law. *Lenz v. FSC Secs. Corp.*, 414 P.3d 1262, 1273 (Mont. 2018). Thus, Kaman's attempt to invoke the

Price Catalog as a damages limitation is barred on two grounds—public policy <u>**and**</u> unconscionability—and should not be enforced.

"When a federal court sits in diversity, it must look to the forum state's choice of law rules to determine the controlling substantive law." *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002). The court must also apply the forum state's choice-of-law rules. *See, e.g.*, *Narayan v. EGL, Inc.*, 616 F.3d 895, 898 (9th Cir. 2010). Here, the forum state is Montana and the District Court correctly concluded "Plaintiffs' claims stand with or without a contract" and that "Connecticut law does not apply." (1-ER-87.)

### A. The district court correctly applied Montana products liability law, which—as a matter of public policy—bars application of the UCC and economic loss rule in such actions.

Montana adopted strict products liability "to place liability on the party primarily responsible for the injury occurring, that is, the manufacturer of the defective product." *Brandenburger v. Toyota Motor Sales, U.S.A., Inc.*, 513 P.2d 268, 273 (Mont. 1973) (quotation marks omitted); *see also Durden v. Hydro Flame Corp.*, 983 P.2d 943, 946 (Mont. 1999). Montana law is clear that <u>how</u> the product was obtained is <u>not</u> part of the analysis. *Brandenburger*, 513 P.2d at 273. The question under Montana law is whether the product was defective:

> Inherent in these policy considerations is <u>not the nature of the transaction by which the consumer obtained possession of the defective product, but the character of the defect itself</u>, that is, one

> occurring in the manufacturing process and the unavailability of an adequate remedy on behalf of the injury plaintiff.

*Id.* (emphasis added; quotation marks omitted). Put another way, the means of acquiring the product matters not under Montana law. Montana's statutory law reflects this principle by providing only two defenses to a products liability claim: discovery of defect/open and obvious or unreasonable misuse. *See* Mont. Code Ann. § 27–1–719 (2021); *Teague v. Remington Arms Co., LLC*, No. CV 18-184-M-DLC, 2022 WL 16574241, at *5 (D. Mont. Nov. 1, 2022). That is it. Contractual limitations are not a statutory defense to a products liability claim under Montana law.

Montana law also bars the application of contractual limitations on liability by explicitly rejecting the UCC's application in products liability actions. In *Thompson v. Nebraska Mobile Homes Corp.*, the plaintiff purchased a trailer home "as is" with all express and implied warranties disclaimed in the purchase agreement, but the trailer had significant defects. 647 P.2d 334, 334–35 (Mont. 1982). At the close of trial, the defendants obtained dismissal of the strict liability claims, thus, "Defendants were . . . allowed to rely on Uniform Commercial Code defenses not available for strict liability claims." *Id.* at 336. On appeal, the Montana Supreme Court concluded the district court erred and held: "[s]trict

liability is not governed by the Uniform Commercial Code. It cannot be disclaimed." *Id.* at 338 (emphasis added).

*Thompson* concerned a non-commercial plaintiff. However, a few years later the Montana Supreme Court applied the same principle to a commercial plaintiff, finding the UCC did not apply to strict product liability claims brought by commercial parties. In *Streich v. Hilton-Davis, Division of Sterling Drug, Inc.*, a commercial potato grower purchased a treatment designed to suppress sprouting until planting, which damaged the potatoes, and, ultimately, a nearly $800,000 verdict was reached in the farmers' favor for lost profits. 692 P.2d 440, 442 (Mont. 1984). On appeal the defendant argued that "strict liability in tort has no application in cases of lost profits in a purely commercial setting." *Id.* at 444 (emphasis added). The defendant argued that given the commercial relationship, the policy reasons supporting strict product liability did not apply and the parties should be left to UCC-permitted remedies. *Id.* The Montana Supreme Court rejected those arguments, reiterating "that strict liability is not governed by the [UCC]." *Id.* at 444–45. Thus, the Montana Supreme Court made clear two things: (1) consequential damages (*i.e.*, lost profits) are available in strict liability claims; and (2) commercial consequential damages claims are not barred by application of the UCC in Montana. *Id.* If that was not clear enough, the Montana Supreme Court also concluded the economic loss rule does not apply in Montana. *Jim's*

*Excavating Serv., Inc. v. HKM Assocs.*, 878 P.2d 248, 251–55 (Mont. 1994) (rejecting request to adopt economic loss doctrine).

Given the foregoing, Montana law makes clear that tort remedies and consequential damages are available, and UCC-grounded limitations are legally void, in the products liability context. Thus, the District Court, relying on *Thompson* and *Streich*, correctly concluded that "Montana's law clearly applies tort remedies to plaintiffs regardless of the existence of contract and explicitly has rejected application of the UCC in strict liability cases. Montana law allows further for strict liability claims between commercial entities." (1-ER-88 (citations omitted).)

Kaman tries to wipe away Montana caselaw arguing the cases merely "embody the evolution of strict product liability in Montana," without barring contractual damages limitations permitted under the UCC. (Op. Br. at 24–25.) The argument fails for two reasons.

Kaman's first mistake is to minimize the authoritative decisions by the Montana Supreme Court in *Brandenburger*, *Thompson*, *Streich*, and *Jim's Excavating*. As articulated above, Montana's product liability precedent is straightforward and its purpose is to place liability on the entity responsible for the injury (here, Kaman) and the nature of the transaction for acquiring the product (*i.e.*, contract) is not relevant. *Brandenburger*, 513 P.2d at 273. Thus, as articulated

throughout this brief, the Montana Supreme Court has steadfastly rejected application of UCC to products liability actions. *Thompson*, 647 P.2d at 338; *Streich*, 692 P.2d at 444–45; Mont. Code Ann. § 27–1–719 (2021) (permitting only two affirmative defenses to products liability proceedings).

Kaman's second mistake is relying on inapt non-products liability cases to argue contractual consequential damages limitations are enforceable in products liability proceedings. *Zirkelbach Construction, Inc. v. DOWL, LLC*, 402 P.3d 1244 (Mont. 2017), *Keeney Construction v. James Talcott Construction Co.*, 45 P.3d 19 (Mont. 2002), and *Five U's, Inc. v. Burger King Corp.*, 962 P.2d 1218 (Mont. 1998), did not concern products liability claims. This case does. The District Court correctly concluded Montana law permits Central's claims "regardless of the existence of a contract." (1-ER-88.)

### B. The District Court correctly concluded Kaman's choice-of-law provision did not apply to Central's non-contract tort claims.

Kaman next challenges the District Court's choice of law analysis. Relying on *Masters Group International, Inc. v. Comerica Bank*, 352 P.3d 1101 (Mont. 2015), Kaman argues that "[u]nder Montana law, the law of the state chosen by the parties to govern <u>their contractual rights</u> will be applied" except if certain elements are met. (Op. Br. at 20.) Kaman claims the District Court did not conduct that analysis, but this argument reveals a fundamental misunderstanding of both *Masters Group* and the District Court's decision.

*Masters Group* concerned a financial dispute over certain financial agreements between Masters and Comerica. *Masters Grp. Int'l, Inc.*, 352 P.3d at 1104–08. The dispute culminated in a forbearance agreement, which Comerica allegedly breached by seizing certain assets that led to Masters' collapse. *Id.* The agreement stated "it would 'be governed by and construed and enforced in accordance with the laws of the State of Michigan'" and amendments and the forbearance agreement contained similar clauses. *Id.* at 1105–07.

Masters alleged Comerica had breached the forbearance agreement and committed various torts. *Id.* at 1108. Among other issues, there was a dispute about the *scope* of the choice-of-law provision and whether it applied to Masters' tort claims. In that case, the Montana Supreme Court noted the key distinction was whether choice-of-law provisions in a contract "cover tort claims <u>arising out of</u> a contract." *Id.* at 1115 (emphasis added) (citing cases distinguishing between claims arising out of an agreement and those existing independent of any contract). The Montana Supreme Court concluded that Masters' tort claims were covered by the choice-of-law provision because "[w]ithout the contracts that tied Masters and Comerica together, there would be no tort claims." *Id.*

In this case, however, the District Court concluded that Central's claims <u>were not</u> encompassed by the choice-of-law provision in the Price Catalog. The District Court noted that the claims in *Masters Group* all "had contractual

underpinnings," because "the various torts alleged by [Masters] arose directly from the defendant's failure to comply with the terms of the contract." (1-ER-87 (emphasis added).) In contrast to *Masters*, Central brought no contract claims:

> Plaintiffs allege no contract claims against Kaman. Plaintiffs allege seven claims in their Complaint. Three of those claims involve strict product liability claims. Plaintiffs premise the other four claims (negligence and damages claims) on the strict product liability claims and do not relate to the contract between Central and Kaman.

(1-ER-88 (emphasis added; record citations omitted).) Thus, the District Court held in this case:

> Plaintiffs' strict liability claims have no such contractual underpinnings. Plaintiffs' claims stand with or without a contract. Connecticut law does not apply. The contract between Central and Kaman does not control the choice of law as Plaintiffs' claims arise from a strict liability theory rather than breach of contract theory. Plaintiffs' damages claims can proceed.

(1-ER-87–88.)

The District Court was correct. "Montana's law clearly applies tort remedies to [Central] regardless of the existence of contract and explicitly has rejected application of the UCC in strict liability cases." (1-ER-88.) There was no breach of contract or breach of implied covenant claims. Rather, the claims at issue all centered around a defective part manufactured by Kaman. (12-ER-2864–75.) Central could bring that claim with or without a contract with Kaman. *See Whitaker v. Farmhand, Inc.*, 567 P.2d 916, 919–20 (Mont. 1977); Mont. Code Ann. § 27–1–719(3)(b) (2021). As such, Central's claims did not arise out of the

Price Catalog. Thus, the District Court correctly concluded Connecticut law did not apply.

### C. Montana's choice-of-law analysis requires applying Montana law.

Kaman claims the District Court failed to conduct the proper choice-of-law analysis and, had it done so, Connecticut law would apply. (Op. Br. at 20–22.) Kaman's argument contains two fundamental errors, both of which are explained below. The District Court was correct to apply Montana law, and even if this Court were to disagree with the District Court's analysis in some respect, it may affirm the district court on any ground supported by the record. *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008).

#### 1. Kaman tries to apply the choice-of-law test for contracts, rather than torts, but applying the right test—as the District Court did early in the case—resolves in favor of Montana law.

Kaman's first error lies in its attempt to impose Montana's contractual choice-of-law analysis onto a case where only tort claims were alleged. (12-ER-2864–75.) Again, Central has no contractual claims against Kaman, only tort claims sounding in product liability and related negligence. (*Id.*) Where torts are at issue, Montana courts ask two questions: (1) whether the laws of the two states conflict and, if so, (2) whether the most significant relationship test resolves in favor of one state or the other. *Dalbotten v. C. R. Bard, Inc.*, No. 1:20-CV-00034-SPW, 2023 WL 346310, at *1 (D. Mont. Jan. 20, 2023) (applying tort choice-of-

laws analysis to products liability action); *Phillips v. Gen. Motors Corp.*, 995 P.2d 1002, 1007 (Mont. 2000); *cf. Barber v. Bradford Aquatic Grp., LLC*, 539 P.3d 648, 651 (Mont. 2023) (applying Kaman's proposed analysis where party "raise[d] only questions sounding in contract"); *Masters Grp. Int'l, Inc.*, 352 P.3d at 1115 ("Without the contracts that tied [the parties] together, there would be no tort claims."). Thus, Kaman—at the outset—attempts to impose the incorrect test for choice-of-law analysis in Montana.

Under the correct analysis for tort claims, Montana law clearly applies. *First*, Montana and Connecticut products liability law conflict. Central brought a negligence claim alleging breach of duty to manufacture a safe product along with its products liability claims, which Montana law permits, but Connecticut law does not. *See* Mont. Code Ann. § 27–1–719(5) (2021); *Johannsen v. Zimmer, Inc.*, No. 3:00CV2270 (DJS), 2005 WL 756509, at *9 (D. Conn. Mar. 31, 2005). Connecticut also bars consequential damages in products liability actions, whereas Montana does not. *See Mountain W. Helicopter, LLC v. Kaman Aerospace Corp.*, No. 3:01CV1746(AVC), 2005 WL 8167155, at *5–6 (D. Conn. Apr. 7, 2005); *Streich*, 692 P.2d at 444 (UCC does not apply to strict liability); *Jim's Excavating Serv., Inc.*, 878 P.2d at 255.

*Second*, the most significant relationship test resolves in favor of Montana law. That test requires examining where the injury occurred, where the injury-

causing conduct occurred, the domicile, residence, and place of business of the parties, and the place where the relationship is centered. *Dalbotten*, 2023 WL 346310, at *1. Montana law also requires examining the factors in the Restatement (Second) of Conflict of Laws § 6. *Id.* The law of the "place of injury is presumptively applicable unless another state has a more significant relationship." *Phillips*, 995 P.2d at 1009. And, where products liability proceedings are concerned, "[t]he place of manufacture in products liability cases is of diminished importance under Montana law." *Dalbotten*, 2023 WL 346310, at *2.

Here, despite Kaman's arguments to the contrary, the District Court found that "Montana's choice of law provision for tort claims applies the most significant relationships test" and concluded that "[a]pplying the test to the case at hand, the most significant relationships exist <u>in Montana</u>." (1-ER-116 (applying test in context of motion to transfer) (emphasis added).) That conclusion was correct. Connecticut had no relationship to the crash. The crash occurred in Oregon, where a Montana pilot, flying a Montana-owned and operated KMAX, was killed. (5-SER-883–84, 892, 902; 6-ER-1070.) Central—as the owner of N314 and the non-accident helicopters—incurred the financial losses associated with the crash, lost value, and lost profits in Montana, not to mention the emotional and other harms all arose in Montana as well. (5-SER-883–85, 892; 6-ER-1070, 1144–45.) Absolutely <u>no</u> aspect of the crash or injury occurred in Connecticut.

As for the place of the relationship, the District Court found Kaman had multiple contacts with Montana (1-ER-110) and Kaman, regularly, shipped parts to Central in Montana (5-SER-902). Lastly, though Kaman manufactured the defective part in Connecticut, "[t]he place of manufacture in products liability cases is of diminished importance under Montana law." *Dalbotten*, 2023 WL 346310, at *2 (citing *Phillips*, 995 P.2d at 1011–12).

The *Dalbotten* decision is instructive. There, the district court concluded Montana law applied in a product liability action where the injury occurred in Montana, the product was sold in Montana, and the basis of the claims occurred in Montana, but the product was made and designed in Arizona <u>and neither party was domiciled in Montana</u>. *Dalbotten*, 2023 WL 346310, at *1–2. Here, the facts provide an even stronger tie to Montana.

The Restatement (Second) Conflict of Laws § 6 factors also resolve in favor of Montana law. The first § 6 factor, regarding the interstate system, is irrelevant when analyzed in conjunction with the most significant relationship test, which, as noted above, resolves in favor of Montana. *Phillips*, 995 P.2d at 1008–09. The second and third § 6 factors—considered the "most important" in a products liability case—require a comparison of the competing policies of the forum state and other interested states, and, specifically, whether applying Montana law would further "the purpose that law was designed to achieve." *Id.* at 1009. In Montana,

the "place of injury is presumptively applicable" and "[o]ne of the central purposes of Montana's product liability scheme is to prevent injuries to Montana residents caused by defectively designed products." *Id.* 1009, 1012. Moreover, strict products liability was adopted to ensure "maximum protection for consumers against dangerous defects in manufactured products[.]" *Sternhagen v. Dow Co.*, 935 P.2d 1139, 1144 (Mont. 1997). In short, where Montanans are involved, Montana's interests control. Here, a Montanan was killed, a Montana-owned helicopter was destroyed, and a Montana-based business was damaged. (5-SER-883–85, 892, 902; 6-ER-1070, 1144–45.)

The fourth § 6 factor considers the justified expectations of the parties. *Phillips*, 995 P.2d at 1013. Montana law provides that "tort cases generally do not involve justified expectations." *Id.* In *Phillips*, the Montana Supreme Court rejected GMC's arguments that North Carolina law applied, highlighting that cars are sold (and resold) all over the country, making any expectation that the law of one state would apply "would not be justified." *Id.* at 1013–14. Such is true here. Kaman sold KMAX helicopters across the world and they were also sold on the secondary market, with, for example, Central selling one to a South Korean operator and another to a Swiss company. (5-SER-902; 6-ER-1135.) Kaman cannot reasonably claim Connecticut law will control any and all injuries caused by its products, which are worldwide.

Finally, the "basic policies underlying the particular field of law" resolve in favor of Montana law. *Phillips*, 995 P.2d at 1014. Here, the policies of the states at issue diverge significantly, therefore the Montana Supreme Court has been clear there is no "need [to] go further in addressing this contact." *Id.*[2]

Given the foregoing, the District Court correctly concluded, early on in this case, the most significant relationship was with Montana. The crash occurred in Oregon, the damages were sustained in both Oregon and Montana, and Central is a Montana resident. Only Kaman has a connection to Connecticut and the relationship of the parties is not centered there. Such facts mandate applying Montana law to this tort case.

**2. Even if the choice-of-law test for contracts is applied, Montana law applies.**

Not only does Kaman apply the wrong test, but its analysis under that test is incorrect. Where a contractual choice-of-law provision is at issue, Montana law will apply the law in the choice-of-law provision unless the following three factors are met:

> (1) but for the choice of law provision, Montana law would apply under § 188 of the Restatement; (2) Montana has a materially greater interest in the particular issue than the parties' chosen state; and (3) application of the chosen state's law would contravene a Montana fundamental policy.

[2] The last factor is neutral. *Phillips*, 995 P.2d at 1014.

*Masters Grp. Int'l, Inc.*, 352 P.3d at 1113 (alterations omitted). The § 188 test is the "most significant relationship" test for contracts, as well as the Restatement (Second) Conflict of Laws § 6. *Polzin v. Appleway Equip. Leasing, Inc.*, 191 P.3d 476, 480–81 (Mont. 2008).

Here, each of these factors are met. *First*, as analyzed above, the § 188 factors for torts (and incorporated § 6 factors, which are the same for contracts) all resolve in favor of Montana law. The same is true for the letter agreement. The letter agreement was discussed by "telcoms" and was sent to Central in Montana, Central was located in Montana, Central paid from Montana, and the blades were for N314, which was owned by a Montana entity. (12-ER-2694–97; 5-SER-884, 902.)

In contrast, Kaman claims just one aspect of the letter agreement means the § 188 and § 6 factors are met, asserting its parts are always shipped "FOB Bloomfield, Connecticut," indicating the place of performance of the contract was Connecticut, not Montana. (Op. Br. at 21.) Kaman's argument is both new and meritless.

As an initial matter, Kaman never argued before the District Court the Restatement (Second) Conflict of Laws §§ 6 or 188 factors, that Connecticut was the place of performance, that these shipping provisions constituted the place of

performance, or relied upon Montana Code Annotated § 28–3–102.[3] Arguments not raised before the District Court are waived. *Hillis v. Heineman*, 626 F.3d 1014, 1019 (9th Cir. 2010).

In any event, Kaman's attempt to rely on a shipping and risk of loss provision as the "place of performance" fails. The phrase "FOB Bloomfield, Connecticut" comes from the Price Catalog (which, as argued below, is an unconscionable contract of adhesion) and it is found in the "SHIPMENT, FORCE MAJEURE" provision and referred to in the "RISK OF LOSS: SECURITY" provision. (12-ER-2716–17.) In contrast to these shipping provisions, Central made payments from Montana to New York, not Connecticut (12-ER-2697.) Neither party argues New York law applies. Critically, neither the text of the letter agreement nor the Price Catalog specify a "place of performance." (12-ER-2716–23.)

The *Polzin* decision is instructive and, despite Kaman's reliance, it defeats Kaman's argument. In *Polzin*, the parties argued over the place of performance in a lease-to-own contract for a truck, because that would help decide what state law applied. 191 P.3d at 480–81 (outlining test and Mont. Code Ann. § 28–3–102). The truck was physically conveyed to the buyer in Washington and that is where lease

[3] Instead, Kaman argued below that the Restatement (Second) Conflict of Laws § 187 applied, but it does not raise that argument on appeal. Arguments not raised in the opening brief are forfeited. *Orr*, 884 F.3d at 932.

payments were sent, but the truck broke down in Montana and that was where the warranty work would be done. *Id.* at 479, 481. Rather than examine transfer or payment provisions, however, the Montana Supreme Court looked to the language of the agreement itself and concluded it "d[id] not indicate a place of performance." *Id.* at 481. Thus, because there was no express provision in the agreement, the Montana Supreme Court concluded the "statutory directive" was to look to where the contract was made. *Id.* The answer was straightforward, because the agreement was negotiated and signed in Washington. *Id.*

Here, there is no "place of performance" defined in the Price Catalog or the letter agreement. (12-ER-2716–23; 12-ER-2694–97.) That silence is dispositive under *Polzin*. As to where the letter agreement was made, it was negotiated with Central in Montana and Kaman in Connecticut. The letter agreement also indicates Kaman sent it to Central by "facsimile," that it was addressed to Central in Montana, and that the parties had engaged in "various telecoms" regarding the agreement. (12-ER-2694.) Given there is no one location for "where it [was] made," the next step is to examine the §§ 6 and 188 factors under the Restatement. Kaman failed to do that in its Opening Brief and, as outlined above, those factors resolve in favor of Montana law.

*Second*, Montana has a materially greater interest in this proceeding than Connecticut. Kaman manufactured the defective servo flap in Connecticut, but

"[t]he place of manufacture in products liability cases is of diminished importance under Montana law." *Dalbotten*, 2023 WL 346310, at *2. On the other hand, Montana law provides "[o]ne of the central purposes of Montana's product alibility scheme is to prevent injuries to Montana residents caused by defectively designed products." *Phillips*, 995 P.2d at 1012 (emphasis added). Montana's goal is to provide "maximum protection for consumers." *Sternhagen*, 935 P.2d at 1144. This case concerns a Montana pilot, a Montana business, Montana-owned KMAX helicopters, and damages incurred in Montana. (5-SER-883–85, 902; 6-ER-1070, 1144–45.) Montana has a materially greater interest.

*Lastly*, Kaman attempts to claim that imposing Connecticut law through the Price Catalog does not contradict a fundamental policy in Montana. (Op. Br. at 20–21.) Kaman cites Montana Code Annotated § 30–2–719(3), claiming it expressly permits contractual consequential damages limitations. (*Id.* at 21.) Kaman, however, omits that Montana Code Annotated § 30–2–719(3) is found in Montana's UCC. As articulated above, "[s]trict liability is **not** governed by the Uniform Commercial Code" in Montana, even in commercial settings. *Thompson*, 647 P.2d at 338 (emphasis added); *Streich*, 692 P.2d at 444–45. Kaman cannot reasonably argue that applying a UCC provision to this products liability case does not violate fundamental policy in Montana. It clearly does.

Even if one were to quibble with aspects of the District Court's rationale, Montana's contractual choice-of-law analysis still requires application of Montana law. The District Court did not err by refusing to apply Connecticut law.

### D. The District Court correctly found the Price Catalog was a contract of adhesion and, thus, unenforceable under Montana law.

At the outset of this case, the District Court concluded "[l]ittle question exists that the contract between Kaman and Central Copters for the sale of the blades in question constitutes a contract of adhesion" and thus refused to apply the venue provision in the Price Catalog. (1-ER-114.) The District Court was correct, and the same analysis necessarily applies to the choice-of-law and consequential damages limitations clauses.[4] The Price Catalog is an unenforceable contract of adhesion under Montana law, which holds contracts that are "contrary to public policy **or** unconscionable" are unenforceable. *Lenz*, 414 P.3d at 1273 (emphasis added). The Price Catalog fails under both prongs.

#### 1. The Price Catalog violates Montana public policy.

As outlined fully above, Montana's strict product liability doctrine was adopted to hold the manufacturer responsible for its defective products. *Brandenburger*, 513 P.2d at 273. Montana's statutory product liability law provides for only two defenses, neither of which permits a manufacturer to

[4] This Court may affirm the District Court on any ground supported by the record. *Johnson*, 534 F.3d at 1121.

contractually limit its liability or rely on UCC provisions to enforce a contractual damages limitation. Mont. Code Ann. § 27–1–719 (2021); *see also Teague*, 2022 WL 16574241, at *5; *Thompson*, 647 P.2d at 338; *Streich*, 692 P.2d at 444–45.

Kaman's argument that choice of law provisions do not violate Montana public policy is incorrect. The Price Catalog's *object* is to get around Montana's expressed policy provisions regarding strict product liability—even going so far as limiting liability for <u>hidden</u> defects in the products. That expressly contradicts Montana's public policy and it is, therefore, void and unenforceable in Montana.

#### 2. The Price Catalog is an unconscionable contract of adhesion.

Kaman's Price Catalog is an unenforceable contract of adhesion. Kaman claims Central is sophisticated and argues that, even if the Price Catalog is an adhesion contract, it should still be enforced because it was in Central's responsible expectations. (Op. Br. at 27–28.) Kaman's argument is incorrect, relies on the wrong law, and should be rejected.

A contract is unconscionable—and therefore invalid—if it is a contract of adhesion and "the contract or term unreasonably favors the stronger party or is unduly oppressive to the weaker party." *Lenz*, 414 P.3d at 1274. "[A] contract of adhesion is a contract wherein a party in superior bargaining position dictates the contract terms to the weaker party on a take it or leave it basis without any reasonable opportunity for negotiation." *Id.* Contracts are unconscionable if they

are "unduly oppressive, unconscionable or against public policy." *Kortum-Managhan v. Herbergers NBGL*, 204 P.3d 693, 698 (Mont. 2009).

#### i. The Price Catalog is a contract of adhesion, because Kaman dictated the terms to Central, which had no meaningful opportunity to negotiate.

The District Court correctly found the Price Catalog was a contract of adhesion. (1-ER-114.) Except for minute flexibility on payment timing or warranty length, the Price Catalog was a take-it-or-leave-it proposition, particularly the limitations of liability and choice of law clause. (1-SER-102–03; 2-ER-256–59; 5-SER-921, 958.)

Kaman's terms were non-negotiable and Mark testified Kaman was the only place to purchase replacement parts:

> **Q. So what happens if you didn't like something in the terms and conditions? Was it a take-it-or-leave-it situation?**
> A. Yeah. We couldn't—there's nowhere to get parts except from them.

(5-SER-958; 1-SER-101–02.) As the District Court found: Central "needed new blades. Kaman was the sole manufacturer of the blades. Central Copters' helicopter would have been inoperable without the new blades." (1-ER-114 (record citations omitted).) Furthermore, Central did not know that the Price Catalog's limitations applied:

> **Q. When you were ordering parts, did you understand that they were subject to the terms and conditions of the Kaman Commercial Price Catalog?**
> A. No.

> **Q. Why not?**
> A. Well, as I stated earlier, I spoke to the founder of Kaman, Charlie Kaman, and he assured me with a handshake that they were going to stand behind their aircraft. They were going to warranty everything, they were going to take care of it, they were going to support me. And that meant a lot to me. He was the founder of the company.
>
> <u>We never had anyone, during the course of our transaction, shove this document [Price Catalog] or any document in our face and say, "Hey, you better watch out because we're, you know, subject to these limitations."</u> . . . .

(5-SER-921 (emphasis added).) Indeed, as it relates to the blades at issue, the only mention the Price Catalog was its incorporation by reference in the letter agreement. (12-ER-2694.)

Even if Central had known or was presumed to know about the Price Catalog's clauses, there was no changing them. When asked if "an operator realistically [could] just remove[]" the liability or choice of law provisions, Kaman's customer service supervisor from 2006 to 2018 testified "No. Not in my experience[]" and "No. Not that I know of." (2-SER-170–72, 257–59.)

Kaman makes much of Central being sophisticated, but the analysis is whether the party in a superior bargaining position dictates terms to the smaller party. *Lenz*, 414 P.3d at 1274. The comparison is relative. Compared to Kaman—a global aerospace entity—Central is a small company, founded and run by a husband and wife team, with Mark managing the flight operations and flying aircraft, and supported by about 25 employees, who depend on the aircraft being

airworthy to earn income and put food on the table. (6-ER-1056–62, 1068, 1099.) Central needed to keep its helicopters flying and, thus, had to come to Kaman for the needed parts. Like the District Court found, there is "little question" the Price Catalog is a contract of adhesion. (1-ER-114.)

**ii. Kaman's Price Catalog is also unconscionable, because it is one-sided, sweeping in scope, and even excludes hidden defects in its products.**

The Commercial Price Catalog's terms are also "unduly oppressive, unconscionable or against public policy." *Kortum-Managhan*, 204 P.3d at 698. Kaman's liability and damages limitation provision is one-sided and sweeping in scope. (12-ER- 2718.) Among other provisions, it purports to disclaim any and all liability in tort or contract, for defects (even obvious or hidden ones), and even purports to limit third party claims. (12-ER-2718.) In addition to violating Montana public policy, as argued above, there is no question its terms are "unreasonably favorable to the drafter" and, thus, unconscionable. *Kelker v. Geneva-Roth Ventures, Inc.*, 303 P.3d 777, 781 (Mont. 2013).

Kaman attempts to avoid this problem by arguing the "existence of choice of law and consequential damage provisions w[ere] within Central's reasonable expectations." (Op. Br. at 28.) This, however, is not a factor under Montana law. The *Lenz* decision removed the "reasonable expectations" analysis from interpretation of non-insurance contracts and held that "the reasonable expectations

doctrine is not a generally applicable contract principle." *Lenz*, 414 P.3d at 1274–76 (emphasis added). In any event, Mark testified Kaman never told him parts were sold subject to the limitations in the Price Catalog. (5-SER-921.)

* * *

Kaman's Price Catalog is an unconscionable contract of adhesion. The District Court correctly found the venue provision did not apply at the outset of this case and the same is true of the choice-of-law and consequential damages limitation provisions. They are unenforceable under Montana law.[5]

## II. Adequate evidence supported the jury's unanimous award of $6 million for Central's loss of value of its three non-accident helicopters.

Kaman claims the $6 million award for lost value to the non-accident helicopters should be reversed, because "it is not supported by substantial evidence." (Op. Br. at 32.) Essentially, Kaman asks this Court to step into the shoes of the jury and reach a different conclusion. But the law does not support Kaman's argument. Kaman has no proof that the "only one reasonable conclusion," in light of the evidence and testimony, is "contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

[5] Kaman's final argument is a request that this Court import and rely upon two non-binding decisions from other district courts that chose—applying Connecticut and New York law—to apply Kaman's consequential damages limitation. Neither case applies here, because they do not apply Montana law and, in fact, conflict with Montana law.

The law affords great respect to jury verdicts. The jury is the "constitutional tribunal provided for trying facts in courts of law." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008) (quotation marks omitted). This Court gives "substantial deference to a jury's finding of the appropriate amount of damages." *Id.* at 1028 (internal citation and quotation marks omitted); *see also Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001) ("bedrock principle" that a Court's review of a jury's factual findings is limited). A Court should not "substitute its view of the evidence for that of the jury," "weigh evidence," or "make credibility determinations." *Paradise Valley Unified Sch. Dist.*, 251 F.3d at 1227.

The Court should "affirm unless there is 'no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party.'" *Id.* "[S]ubstantial evidence . . . is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Bell v. Williams*, 108 F.4th 809, 818 (9th Cir. 2024) (quoting *Pavao*, 307 F.3d at 918). The Court "must view all evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in the favor of the non-mover." *Id.*; *see also Paradise Valley Unified Sch. Dist.*, 251 F.3d at 1227–28. Based on well-settled law, Kaman's burden to overturn the jury's verdict is a heavy one it cannot satisfy.

### A. The only evidence confirmed Kaman's negligence caused Central's losses on its three non-accident KMAX helicopters.

Kaman's claim it did not *cause* loss to Central's three non-accident helicopters is contradicted by the evidence. Kaman offered nothing to counter the proof that, but for Kaman's negligence, Central would still be flying the KMAX and the KMAX market would be strong. The jury had adequate evidence to find Kaman caused Central's losses.

Central has flown KMAX helicopters since the 1990s, which met Central's specific need for an "aerial truck" to lift external loads. (6-ER-1070–71.) Central invested millions into its four KMAX helicopters, using them for firefighting or heavy loads "day in and day out, thousands of times a year." (6-ER-1067–68, 1071, 1072, 1076.)

However, responding to safety concerns, Central eventually grounded its KMAX helicopters. (6-ER-1098; 9-ER-1864.) Central's pilots did not know exactly what went wrong and wanted to work. (6-ER-1098.) But, as facts emerged regarding how N314 crashed, Central grew concerned because "[t]hey have wives. They have kids. And, it's just not a safe aircraft, and we're not going to put them in it." (6-ER-1099.) The hard decision was devastating financially, but the lives of Central's pilots outweighed economics. (6-ER-1099–1100; 7-ER-1392.)

Central was reluctant to sell the unsafe KMAX, but because it was losing so much money it sold to only those who understood and assumed the safety risks. (7-

ER-1145.) Even with interested buyers and Central's great need for the highest price possible, Central could only sell at a 30% to 40% loss. (12-ER-2779–80; 6-ER-1145; 12-ER-2779–80; 9-ER-2081–83.) Central's expert, David Crick, testified that the loss on the sales of two of the non-accident helicopters, plus the projected loss on the third, was nearly $6 million dollars. (9-ER-2082–84.) He was not at all surprised that the non-accident helicopters were selling below what they should be worth:

> **Q. In your experience, Mr. Crick, would several fatal crashes of a particular helicopter model cause the market to soften and cause the prices to begin to decline?**
>
> A. I have seen this in other models of helicopters. . . . . And, yeah, it does have an impact on the value of the helicopters.

(9-ER-2089–90.) Again, Crick was the only expert to testify on this topic and his testimony was unrefuted.

Kaman describes Central's decision to sell as "voluntary," but the *only evidence* presented confirmed that, without Kaman's negligence, Central would still be operating the KMAX. Without Kaman's negligence, Central could have sold the KMAX for a 30% to 40% higher price. Central made the only choice it could to keep its business alive while not exposing its family of pilots to another fatality.

The district court recognized it "proves illogical that Central would have sold the helicopters for less than they were allegedly worth if it had a willing buyer

at the higher price as 'fair market value' suggests there should be." (1-ER-52.) Central sold for the price to which a buyer would agree. The KMAX has recently taken the life of (at least) three pilots, one of whom was Central's key man and the owners' son. It is unreasonable to demand Central continue flying what it feels is unsafe.

"Causation has been sufficiently proven for the jury to return a damages award on the lost value issue." (1-ER-049.)

> [T]he evidence must be sufficient to avoid speculation among multiple causes. Where causation is to be inferred from circumstantial evidence, the trier of fact must be able to find, reasonably, that the inference linking the defendant's conduct to the damage is more probable than an inference connecting the loss to other causes.

*Adams v. United States*, 823 F.Supp.2d 1074, 1084 (D. Idaho 2011) (quotation omitted).

#### 1. Kaman failed to challenge Central's expert, David Crick, who concluded that because of the softened market the losses on Central's helicopters was between 30% to 40%.

Kaman presented no evidence to dispute that Central grounded the helicopters for safety reasons or sold them at a loss because three substantially similar fatalities softened the market. The district court rightly held Kaman provided "no other numbers to assess diminution in value other than those from the sales." (1-ER-52.) The undisputed testimony showed the KMAX helicopters lost value and could not be sold for what they were worth. *Someone* had to assume this

lost value. Based on the evidence, the jury determined it should be Kaman as the negligent party.

Kaman's reliance on *Riley v. American Honda Motor Co., Inc.*, 856 P.2d 196 (Mont. 1993), and *Meyer v. Creative Nail Design, Inc.*, 975 P.2d 1264 (Mont. 1999), does not change this reality. In *Riley*, the court found no evidence upon which reasonable minds could conclude there was a causal relationship between the lack of a warning of the motorcycle's propensity to wobble and the rider's injuries. *Riley*, 856 P.2d at 199. In *Meyer*, the court held the plaintiff failed to establish a prima facie case of product liability by not specifically identifying each harmful product or describing the circumstances of exposure to each product. *Meyer*, 975 P.2d at 1268. These cases do not apply.

Unlike the *Riley* and *Meyer* defendants, "Kaman did not dispute evidence that fatal crashes had softened the market for K-Max helicopters." (1-ER-7, 44.) The District Court was correct:

> It is logical and reasonable for the jury to have determined that the value of the remaining K-Maxes decreased in the eyes of Central and the market following the accident(s). Regardless of whether such loss was anticipated, the manufacturing defect and negligence of Kaman in regard to the Accident K-Max Helicopter, detrimentally impacted the resale value of the Non-Accident K-Max Helicopters. The jury fairly awarded damages for this diminution in value.

(1-ER-7, 44.) Kaman has not established "there is **no legally sufficient basis** for a reasonable jury to find for [Central] on that issue." *Krechman v. Cnty. of Riverside*, 723 F.3d 1104, 1109–10 (9th Cir. 2013) (emphasis added).

### 2. Kaman's personal attacks on the Duffys, claiming they inappropriately took money from Central, are a red herring.

Kaman tries to discredit Central's damage claim by focusing on certain loans taken by its owners, Mark and Pam. (Op. Br. at 45.) However, a jury is "free to disbelieve, and therefore to disregard" evidence "favorable to [Kaman]." *Paradise Valley Unified Sch. Dist.*, 251 F.3d at 1227. The jury disregarded Kaman's arguments on this point. (7-ER-1396.) The Duffys and their accounting witnesses explained the Duffys' use of all Central funds. (7-ER-1396, 1404.) The jury is the sole judge of a witnesses' credibility and the Court "may not substitute its view of the evidence for that of the jury" or "make credibility determinations or weigh the evidence," *Paradise Valley Unified Sch. Dist.*, 251 F.3d at 1227–28. Here, the jury disregarded Kaman's arguments and this Court cannot reweigh the evidence.

## B. Kaman's insistence on only *one* method of damage misunderstands the law, because more than one method of calculating damages is available.

Kaman argues the jury's verdict should be overturned because Central did not offer evidence of the value of the three non-accident helicopters immediately before and after the August 24, 2020, crash. Kaman's argument is flawed because there is not one sole method for calculating damages.

### 1. Kaman focuses on only one method for calculating damages when the law says there are others.

Kaman argues the evidence presented regarding fair market value, combined with the jury instruction on fair market value, establishes that the jury did not have substantial evidence to award $6 million in losses for the non-accident helicopters. Kaman, however, disregards the other damage instructions given to the jury.

"[I]f sufficient evidence is presented to a jury on a particular issue and if the jury instructions on the issue stated the law correctly, the court must sustain the jury's verdict." *Harper*, 533 F.3d at 1021. Here, the District Court correctly instructed the jury that damage are intended to make Central whole from *all* its losses. The District Court instructed the jury that, if it found Kaman liable for its negligence or strict liability (which it did), it "must determine the amount of money which will reasonably and fairly compensate the Plaintiff for *all* loss caused by the Defendant, regardless of whether such loss could have been anticipated." (2-ER-381 (emphasis added).) Moreover, the District Court instructed the jury that it must "consider the following *non-exhaustive list* when awarding damages" when it instructed on fair market value before and after. (2-ER-382.) The district court correctly observed, "Kaman cites no case law supporting its claim that the difference in fair market value represents the only proper measure for damages as compared to using fair market value and sale value." (1-ER-51–52.)

Kaman misunderstands *Covey v. Brishka*, 445 P.3d 785 (Mont. 2019), and *Hoenstine v. Rose,* 312 P.2d 514 (Mont. 1957). *Neither* says the *only way* Central can recover damages to its three non-accident KMAX helicopters was to have them appraised as of August 25, 2020. When *Covey* affirmed a damage award for Covey's property being flooded by the neighbor's pond, it cited *Sunburst School Dist. No. 2 v. Texaco, Inc.*, 165 P.3d 1079 (Mont. 2007), dealing with damages to real property and rejecting a one-size-fits-all approach. *Covey*, 445 P.3d at 795–97. "The difference between the value of the property before and after the injury, or the diminution in value, generally constitutes the appropriate measure of damages. We recognize[], however, that no single measure of damages can serve in every case to adequately compensate an injured party." *Sunburst Sch. Dist. No. 2*, 165 P.3d at 1086. (quotation marks and ellipsis omitted).

Likewise, *Hoenstine* does *not* "unequivocally state[]" the *only* calculation of damage of injury to the helicopters is the amount between the market value before and immediately after the injury. (Op. Br. at 39.) The central question in *Hoenstine* was what impact the plaintiff's decision to repair his destroyed truck had on the damage claim. *See generally Hoenstine*, 312 P.2d 514. The court affirmed the measure of damages is the amount that will compensate for all the detriment proximately caused thereby. *Id.* at 517. The court recognized the best way to value a physically damaged truck was before and after the wreck, accounting for repairs

and loss of use. But, *Hoenstine* does not foreclose other ways to value losses if they appropriately measure the detriment proximately caused. Here, Central "suffered detriment and loss in [its] property as a direct and proximate result of [Kaman's negligence] for which loss [Central] is entitled to be compensated." *Id.* at 518.

Nevertheless, Central's expert, Crick, valued the losses before and after the crash because his *undisputed* testimony proved Kaman's negligence softened the KMAX market by 30% to 40%. (12-ER-2777–821; 9-ER-2081–83.) "[S]everal fatal crashes of a particular helicopter model [would] cause the market to soften and cause the prices to begin to decline" and "have an impact on the value of the helicopters." (9-ER-2089–90.) Kaman offered no counter to the fact that a softening market manifests at the point of sale. It cites no law prohibiting a jury from reaching this result.

Kaman disregards the main point of damage analysis: to make the plaintiff whole. *Adams*, 823 F. Supp. 2d at 1074. Here, the District Court correctly relied on the *Adams* decision: "'[M]ore recent decisions allowed deviation from the diminution-in-market-value rule to accommodate the basic goal of compensatory damages, which is to put an injured person in a position as nearly as possible equivalent to his position prior to the tort.'" *Id.* at 1082 (internal quotation marks omitted).

*Covey*, *Hoenstine*, and *Adams* contradict Kaman's claim that the *only way* Central could recover losses on its three helicopters was to show physical damage to each one. The damage to the helicopters was not physical, but found in their declining value. Indeed, this Court affirmed the *Adams* verdict reimbursing plaintiff for losses incurred when he had to sell a perfectly good piece of land, which sustained no physical injury like his other assets, because the sale was part of the overall damage analysis. *Id.*

Lastly, Kaman's attempts to discredit *Semenza v. Bowman*, 885 P.2d 451, (Mont. 1994), fails. *Semenza* does not restrict its holding to only crop losses, but affirms damages are meant to "put the damaged party in the position he or she would have attained absent the tortious conduct." *Id.* at 456. The court affirmed a damages award for the amount Semenza would have been able to obtain from selling its damaged barley but for the other party's negligence. *Id.* at 453. Using the barley *sales prices* put Semenza back to its pre-negligence position. *Id.* Similarly, the jury used the KMAX sales price as a measure of damages to make Central whole again. There was no error in relying on the *Semenza* decision.

### 2. Crick's testimony established what the three non-accident helicopters should have been worth, but for the softening of the market.

Crick's valuation, showing appreciation in the helicopter's values from their original purchase, was what they *should have* been sold for had Kaman not acted

negligently. (9-ER-2083, 12-ER-2793.) Crick's analysis was based on the sales approach—values are driven by what someone will pay for the aircraft. (9-ER-2077, 2080.) The point was *not* that the helicopters gained in value such that Central sustained no damages, but that, because of Kaman's negligence, Central was forced, in the sale, to exchange a more valuable asset (helicopter) for a less valuable one (cash) when it sold them. The jury properly decided Kaman should bear the loss.

Kaman cites no authority that Montana does not support use of distressed sales prices in damage analysis. Fair market value is a method of valuation, not an assessment of causation. If Kaman's negligence caused an asset to be worth less in the marketplace, the decline is the very loss Kaman's conduct caused. Fair market analysis necessarily accounts for *all* market conditions existing when the sale occurred. Kaman's claim that Crick's "discount rate" was not the "proper" one was an issue for Kaman's cross-examination, not a basis for this Court to override the jury's decision. The jury is entitled to disregard Kaman's attack on Crick's analysis (which it did). (9-ER-2085–89.)

A market softening of 30% to 40% means willing buyers would pay much less than one would expect the helicopters to sell for without Kaman's negligence. When buyers were informed of the crashes, Central eventually sold the helicopters

for the price to which the buyers would agree. (6-ER-1145.) Kaman's negligence caused the value to decrease from where it should have been.

The district court correctly held the KMAX's unique design and special use make sales limited in the first place. (1-ER-19–20 (citing *Bos v. Dolajak*, 534 P.2d 1258, 1260 (Mont. 1975)). "These facts also prove that it was reasonable for the jury to rely upon the sales values rather than the alleged fair market values of the Non-Accident K-MAX Helicopters. Further calculations also may demonstrate that the sales amounts received reflected the true fair market value based on the safety concerns and fatalities associated with the K-MAX helicopters." (1-ER-19–20.) The jury's verdict had adequate evidentiary support.

## III. The evidence on which the jury awarded $6 million in lost profits is sufficient and should be affirmed.

Kaman's next attempt to reduce its liability is its argument that Central's lost profits evidence was insufficient for the jury to award of $6 million in future lost profits. (Op. Br. at 46–52.) Kaman attacks Central's experts—two business/economics professors at Montana Tech University ("Abbott/Kober")—disagreeing with their analysis, but ultimately, its criticism goes to weight, not admissibility. Kaman had its chance to cross-examine and put on its own expert, but the jury still reached the verdict it did. The Court should affirm.

### A. Kaman's critiques of Abbott/Kober goes to the weight of their testimony, not its sufficiency to support a verdict.

Kaman argues the District Court erred by admitting testimony from Abbott/Kober and denying its motion to exclude their testimony (11-ER-2498, 2616.) Kaman omitted this argument from its Rule 50 Motion, but it now claims the District Court abused its discretion by allowing Abbott/Kober to testify, centering its attacks not on their qualifications, but their method of using a company-wide analysis of Central's business to assess the overall damage from Kaman's negligence, and that their testimony was insufficient to support the jury's verdict. Trial courts are the gatekeepers of evidence, but have "wide discretion" to admit evidence and consider whether it is "helpful to the jury." *Cooper v. Brown*, 510 F.3d 870, 876–77, 942 (9th Cir. 1996) (quotation marks omitted).

"The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *City of Pomona v. SQM North America Corporation*, 750 F.3d 1036, 1044 (9th Cir. 2014) (alterations and quotation marks omitted). An expert meeting the Rule 702 threshold (like Abbott/Kober), "may testify and the fact finder may decide how much weight to give that testimony." *Id.* "Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge." *Id.* "A court's responsibility as gatekeeper should not replace the adversary system or the jury's role in assigning weight, as 'vigorous cross-examination,

presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Alexander v. Montana-Dakota Utilities Co.*, No. CV-18-82-GF-BMM, 2020 WL 6262101, at *3 (D. Mont. Oct. 23, 2020) (alteration omitted).

Abbott/Kober's approach is straightforward and is a "generally accepted practice that [Abbott] use[s] to teach in [his] classes" at Montana Tech University. (8-ER-1730.) He testified that "based on [his] education and experience, [their methodology] is an appropriate way to do the math." (*Id.*) They examined Central's business as a whole, evaluating its profitability before and after the crash, using Central's tax returns to come up with a conservative pre- and post-crash comparison. (8-ER-1730–54.) A company-wide analysis averaged over time, they explained, gives a more accurate representation of the affect an event has on the whole company while eliminating good or bad outliers. (*Id.*) Abbott said the best predictor of the future of a company is its past performance. (8-ER-1727.) The experts sought to provide the jury an "accurate representation" of the company's performance and the impact of Kaman's negligence. (*Id.*)

They then projected the average difference in pre-crash and post-crash numbers (approximately $2.3 million annual loss) 15 years into the future (10 years in the future from the trial date). (8-ER-1743–46, 1771, 1786.) The jury was able to decide how far and by how much the losses would continue into the future

based on Central's evidence. To aid with that, Abbott/Kober also explained that every future damage amount must be valued in current dollars using a discount rate. (8-ER-1746–53.) They furnished credible Mercer Capital information on applying a discount rate and explained to the jury what factors to consider. (8-ER-1749–51.) They also provided the jury a document giving "options of choosing a number of years [of future losses] as well as discount rate[s]" applicable to Central's damages that Abbott/Kober believed would "help the jury." (8-ER-1789; 6-SER-1230.)

Kaman, as its Opening Brief demonstrates, raised a number of purported faults and vigorously cross-examined Abbott/Kober on their methodology and conclusions. Every criticism Kaman now asserts about Abbott/Kober it raised on cross-examination, including whether they considered COVID effects, other environmental factors, forest service contracts, or other Central product lines. (8-ER-1809–11.) Even more, Kaman presented its own damages expert, cross-examined Central's bookkeeper, and raised these arguments in opening and closing statements.

Yet, after all this, during its deliberations, the jury took the evidence presented (surely considering the cross-examination done by Kaman) and concluded $6 million in future losses (essentially 2–3 years) was appropriate. "As a matter of Montana law, . . . speculative damages regarding future lost profits

remain a matter for the finder of fact." (1-ER-89 (citing *Stensvad v. Miners and Merchs. Bank of Roundup*, 640 P.2d 1303, 1310 (Mont. 1982)).) Kaman's disagreement with the jury is no basis to overturn it.

The District Court did not abuse its "wide discretion" in permitting Abbott/Kober's testimony to come in at trial. As the District Court held: "[Central's] experts provide a reasonable basis for their calculation." (1-ER-89.) Kaman is certainly critical of Abbott/Kobert's approach, but that criticism was exercised in cross-examination, and their testimony was "helpful to the jury." *Cooper*, 510 F.3d at 942.

Moreover, the jury had substantial evidence to award $6 million in future lost profits. Unless "the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork," the jury's award should be upheld. *Harper*, 533 F.3d at 1028. The jury's conclusion that Central would incur 2–3 years in future damages is neither excessive, nor unsupported. Indeed, the crash occurred in 2020 and, by the time of trial in 2025, Central was still incurring multi-million dollar losses. (1-ER-64; 6-ER-1144.) Kaman's damage expert, Ms. Rowsey, found Central suffered business earning losses of almost $1 million in 2021 alone. (6-ER-1234, 1241, 1243.) And, as Kaman argues in its Opening Brief, Central's losses had decreased annually—but were still losses—even up to trial. (Op. Br. at 48.) The jury's decision to

compensate Central for 2–3 years of future lost profits was supported and is due "substantial deference." The Court should leave the jury's decision intact.

### B. Kaman's arguments regarding speculation are wrong under Montana law.

Kaman's attack on Abbott's/Kober's calculations as speculative has no merit. The district court correctly held the key distinction regarding speculative damages, as noted by the Montana Supreme Court, depends on whether "mere guesswork as to whether or not the claimed damages is a result of the Defendants' action, rather than to an uncertainty as to the amounts of damages." *Lee v. Kane*, 893 P.2d 854, 857 (Mont. 1995). As the District Court found:

> Damages still may be awarded when speculation exists "where injury caused by the breach is certain." *Hostetter v. Donlan*, 719, P.2d 1243, 1245 (Mont. 1986). When the damages caused by the breach is certain, lost profits can be calculated by the jury "on a reasonable basis . . . and [using] the best evidence available under the circumstances." *Stensvad v. Miners & Merchs. Bank*, 640 P.2d 1[3]0[3], 1[3]10 (Mont. 1982); *see also* Montana Pattern Jury Instruction 2d 25.42; Ninth Circuit Pattern Jury Instructions No. 5.2, 5.4.

(1-ER-089 (ellipsis and first alteration original).) Because Kaman did not counter testimony that Central's damages were attributed to Kaman's negligence, the jury's award is acceptable, even if speculative, because its calculation had a reasonable basis. *Lee*, 893 P.2d at 859.

Lost future profits will always involve some level of speculation on the amount. In Montana, a lost profit award does not even "require[]" the support of

expert testimony. *See Lee*, 893 P.2d at 856. The District Court rightly held Abbott/Kober provided a "reasonable basis for their calculation" and permitted their testimony at trial.

Moreover, the District Court correctly instructed the jury on Montana law. It told the jury it "may include lost profit or other prospective gain from the operation of the Plaintiff's business." (2-ER-238.) "Damages for lost profits . . . are recoverable only to the extent that the evidence affords a reasonable basis for their determination." (*Id.*) And, it instructed that "[r]ecovery cannot be denied, however, simply because damages are difficult to determine. Lost profits must be established by more than mere guess or speculation. Mathematical precision is not required." (2-ER-384.) The instruction correctly states the law and the jury's verdict should be sustained. *Harper*, 533 F.3d at 1021.

### C. Kaman offers no caselaw rejecting Abbott's/Kober's method of valuing lost future profits.

Kaman's last attempt to discredit Abbott/Kober's analysis by relying on *McCray v. Westrock Servs., LLC*, No. 21-9853-DMG (RAOX), 2024 WL 4579108 (D.C Cal. Sept. 10, 2024), *Education Logistics, Inc. v. Laidlaw Transit, Inc.*, No. CV 07-06-M-DWM, 2012 WL 761950 (D. Mont. Mar. 8, 2012), and *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802 (9th Cir. 1988), falls short.

Kaman misunderstands *McCray*'s application in this case. *McCray* involved a projection of 16 years of future lost wages, specifically involving issues of "front

pay." 2024 WL 4579108 at *7–8. Despite district courts "disfavoring" front pay awards, evidence the plaintiff intended to return to work and the position would likely not exist much longer, the court still awarded 8 years of front pay that was "longer than customary but not so unsound as to warrant reversal." *Id.* Here, the jury's verdict awarded 2–3 years of future lost profits, well under what the *McCray* Court awarded. (1-ER-64.)

Kaman also incorrectly relies on *Education Logistics* and *McGlinchy* to claim the jury improperly disregarded other factors of Central's losses. Neither case applies. Experts in both cases could not attribute loss to any specific act (unlike in this case). *Education Logistics, Inc.*, 2012 WL 761950, at *8; *McGlinchy*, 845 F.2d at 806–07. The expert in *Education* could not say $73.5 million in lost profits was related to defendants' failure to market a software product because the huge company could have experienced losses from many other causes. 2012 WL 761950, at *8. Similarly, the *McGlinchy* expert was excluded under Rule 403 for simultaneously claiming lost profits were related to the defendant's actions while admitting to not knowing which of plaintiffs' product lines declined in sales. 845 F.2d at 806–07. Here, Central's experts and witnesses attribute its lost income to Kaman's negligence, grounding the helicopters, and paying to transition to a different helicopter platform and even Kaman's expert admitted her calculation of loss was attributed to the crash. (2-ER-238-9.)

## IV. The district court did not abuse its discretion to award Central prejudgment interest.[6]

Prejudgment interest "fully compensate[s] the injured party for the loss of use of his money during the period in which a valid claim was not paid." *New Hope Lutheran Ministry v. Faith Lutheran Church of Great Falls, Inc.*, 328 P.3d 586 (Mont. 2018) (quotation marks omitted). Under Montana law, it is allowed when the claimant is "entitled to recover damages certain or capable of being made certain by calculation and the right to recover that is vested in the person upon a particular day . . ." Mont. Code Ann. § 27–1–211. "[S]ection 27–1–211, MCA, is not a discretionary statute." *Kraft v. High Country Motors, Inc.*, 276 P.3d 908, 919 (Mont. 2012).

Kaman offered no counter evidence on N314's valuation. Kaman's damage expert conceded Crick's N314 valuation was the value on the date of the crash. (2-ER-238.) And, in closing on damages, Kaman's counsel stated:

> The first category there, the 6 million for the value of the helicopter. There is no dispute there. That is the fair market value. ***We don't dispute that.*** Okay.

(4-ER-698–99 (emphasis added).)

Thus, the District Court properly relied on *New Hope* to award Central prejudgment interest on N314's value. Because the amount of New Hope's bank

[6] The District Court held Central is "entitled to prejudgment interest from the date the last of the three grounded helicopters was sold to the date of entry of judgment." Central no longer seeks prejudgment interest on those losses because the sale of the last of the three finally closed after the entry date of judgment.

account funds was "undisputed," "the amount of recovery is certain" and properly subject to prejudgment interest. *New Hope Lutheran Ministry*, 328 P.3d at 602; (1-ER-30.) N314's value, *as undisputed*, is an amount capable of being made certain. Central's right to this amount vested on the August 24, 2020, crash date. Mont. Code Ann. § 27–1–206. The district court's award of prejudgment interest was not an abuse of its discretion. *Acosta*, 922 F.3d at 885.

Now, on appeal, Kaman attempts to rewrite the trial record to suit its post-trial objectives. The Court should decline the request. Kaman disputed liability for destroying N314, but never disputed its value. Disputing the *liability claim*, does not make N314's value uncertain or ineligible for prejudgment interest. *Byrne v. Terry*, 741 P.2d 1341, 1343 (Mont. 1987); *Kraft*, 276 P.3d at 919.

To get around the consequences of its decision, Kaman cites a number of cases where prejudgment interest was not awarded. Those cases, however, do not apply. In *Carriger v. Ballenger*, 628 P.2d 1106, 1106–08, 1110 (Mont 1981), the parties *disputed* the claimed amount so the plaintiff could not show a clearly ascertainable amount until factual issues were resolved. *Id.* Here, Kaman never disputed N314's value. Similarly, Kaman's reliance on *Grosvold v. Neely*, 568 P.3d 525 (Mont. 2025), *DeTienne v. Sandrock*, 431 P.3d 12 (Mont. 2018), *Ryffel Family Partnership, Ltd. v. Alpine Country Construction, Inc.*, 386 P.3d 971 (Mont. 2016), and *Northern Montana Hospital v. Knight*, 811 P.2d 1276 (Mont.

1992), is misplaced. In *Grosvold* "the amount in controversy was not readily ascertainable or capable of being made certain until the jury's determination." 568 P.3d at 550–52. In *DeTienne*, defendant's expert, unlike Kaman's expert (2-ER-238), argued there was no economic loss suffered. 431 P.3d at 20. In *Ryffel*, it took a trial to determine whether there was even a contract, and if so, its terms. 386 P.3d at 981. And, in *Northern Montana Hospital,* there was no evidence of an undisputed amount common to both parties. 811 P.2d at 1282. Unlike these cases, Kaman conceded to Crick's N314 valuation.

### A. The jury's rounding of its award, excluding $37,500 from N314's value, does not defeat prejudgment interest.

"[F]ully compensating the injured party," is the "primary objective of the prejudgment interest statute, [and] should predominate over other equitable considerations. If the legislature has chosen to provide a right to prejudgment interest (§ 27–1–211), the primary objective of the courts, where possible, should be to award prejudgment interest." *James Talcott Construction, Inc. v. P& D Land Enterprises*, 141 P.3d 1200, 1208 (Mont. 2006).

In awarding Central $6 million instead of $6,037,500, there is no evidence the jury was doing anything other than rounding N314's value like both parties had done throughout trial. Kaman's counsel referred to "*6 million* for the value of the helicopter." (4-ER-699.) Various counsel, parties, and witnesses referred to N314's value as *$6 million*: Central opening statement (11-ER-2435–36), expert testimony

(9-ER-2075), comments to the bench (6-ER-1041), expert direct examination (8-ER-1732), witness testimony (8-ER-1841), expert cross-examination (6-ER-1291), and closing statements (4-ER-669, 698–99).

Relying on *American Music Co. v. Higbee*, 103 P.3d 518 (Mont. 2004), Kaman attempts to claim that the jury's rounding down slightly in its award means the jury rejected Central's valuation. Not so. In *American Music*, the damages were *disputed,* and the jury's award of "substantially less" than the demand ($82,000 when the demand was $208,222.00) clearly indicated rejection of the plaintiff's claim. 103 P.3d at 524. That is not the case here.

Rather, the Montana Supreme Court in *Talcott* expressly rejected denial of interest because of a "disparity between claimed damages and the damages actually awarded," holding "[w]e are not persuaded . . .the difference between Talcott's lien and the damages actually awarded . . . precludes the approval of prejudgment interest . . . ." 141 P.3d at 1207. This Court should reject Kaman's attempt to avoid paying prejudgment interest on a $6 million award for an aircraft Kaman destroyed almost six years ago simply because the jury rounded down by *sixth-tenths of a percent* of the value.

### B. Kaman's attempt to distinguish *New Hope* has no merit.

Kaman's attempt to discredit Crick's opinion as an "estimate" ignores that he provided an expert appraisal on which the jury's award was based. (9-ER-2075,

13-ER-2075.) Kaman places undue significance on the fact that the *New Hope* plaintiff sought prejudgment interest on bank funds but not on the real property. *New Hope* does not explain the plaintiff's reasons for its position nor suggest the court denied an interest request because real property is categorically incapable of valuation. The critical inquiry was whether the *amount* of damages were ascertainable, not the *category* of property involved. *New Hope* affirmed prejudgment interest on undisputed amounts; the same should apply here.

As an aircraft appraiser, Crick provided the jury specialized, expert, and helpful analysis, as appraisers routinely do in matters of insurance, taxation, sales, financing, or litigation. Notably, Kaman offered no competing expert. The complexity of an appraisal is no reason to disregard it or prejudgment interest would be unavailable whenever expert valuation was required.

### C. Kaman's argument that the value of N314 cannot be separated is incorrect.

Kaman claims the District Court cannot dissect N314's value from the rest of the jury's verdict in order to award prejudgment interest on that value alone (Op. Br. at 59.) This claim is directly contradicted by *New Hope's* award of prejudgment interest on only the part of the claim for bank funds, but not land. 328 P.3d at 602; *see also Talcott*, 141 P.3d at 1207. In *Talcott*, the Court painstakingly examined each component of the award, confirming prejudgment interest payable

on each. 141 P.3d at 1207–09. "[T]he primary objective of the courts, where possible, should be to award prejudgment interest." *Id.*

## CONCLUSION

For the foregoing reasons, Central respectfully requests the Court affirm the District Court and the jury's verdict.

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains 13,993 words, including 48 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6). I certify that this brief complies with the word limit of Cir. R. 32-1.

DATED: June 26, 2026

BOONE KARLBERG P.C.
/s/ Tyler M. Stockton
Matthew B. Hayhurst
Tyler M. Stockton

GASTON LAW FIRM
/s/ Kellie G. Sironi
Kellie G. Sironi

Calvin J. Stacey (STACEY & FUNYAK)
*Attorneys for Plaintiff-Appellee*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing documents(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

DATED: June 26, 2026

BOONE KARLBERG P.C.
/s/ Tyler M. Stockton
Matthew B. Hayhurst
Tyler M. Stockton

GASTON LAW FIRM
/s/ Kellie G. Sironi
Kellie G. Sironi

Calvin J. Stacey (STACEY & FUNYAK)
*Attorneys for Plaintiff-Appellee*