**NO. 25-7653**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

CENTRAL COPTERS, INC., et al.
*Plaintiff-Appellee,*

v.

KAMAN AEROSPACE CORPORATION
*Defendant – Appellant.*

---

On Appeal from the United States District Court for the District of Montana,
Helena Division; The Honorable Brian Morris;
Case No. 2:21-cv-00071-BMM

---

# APPELLANT'S REPLY BRIEF

---



| | |
|---|---|
| Steven D. Sanfelippo<br>Cunningham Swaim, LLP<br>4015 Main Street, Suite 200<br>Dallas, TX 75226<br>214.646.1495<br>ssanfelippo@cunninghamswaim.com<br><br>Mark S. Williams<br>Williams Law Firm, P.C.<br>235 E. Pine<br>P.O. Box 9440<br>Missoula, MT 59807<br>406.721.4350<br>mark@wmslaw.com | Kevin M. Smith<br>Robyn E. Gallagher<br>Colleen Kozikowski<br>Wiggin and Dana LLP<br>265 Church Street<br>New Haven, CT 06510<br>203.498.4579<br>ksmith@wiggin.com<br>rgallagher@wiggin.com<br>ckozikowski@wiggin.com |

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iv

SUMMARY OF REPLY ........ 1

REPLY ........ 2

I. The district court erred by refusing to enforce the parties' contractual agreements to apply Connecticut law and limit damages. ........ 2

A. Montana law does not prohibit the enforcement of agreed-upon contract terms in commercial cases simply because a strict liability claim is asserted. ........ 2

B. The district court erred in refusing to apply the parties' agreed-upon choice of Connecticut law. ........ 5

C. Under Montana's choice of law rules, Connecticut law should have been applied. ........ 6

D. The Replacement Blade Agreement, which incorporated the Kaman Price Catalog, is not a contract of adhesion. ........ 8

1. The agreement does not violate Montana public policy... 8

2. The agreement is not unconscionable. ........ 8

i. The agreement is not an adhesion contract. ........ 9

ii. The agreement does not unreasonably favor Kaman or unduly oppress Central. ........ 11

II. The award of $6 million for lost value of the Non-Accident Helicopters should be reversed because it lacks sufficient evidentiary support. ........ 14

A. The "only evidence confirmed" that any damages Central sustained with respect to the Non-Accident

Helicopters was caused by its own voluntary decisions. ....................................................................14

1. Kaman did challenge Crick's discounted value opinion, and challenged or not, his testimony is insufficient to support the damage award. ............................................16

B. The evidence is insufficient to support the lost value damage award under the method of calculation Central chose to pursue. ........................................17

C. Central's "softening the market" argument actually illustrates why the evidence is insufficient to support the damage award. ......................................................19

III. The $6 million lost profit award should be reversed because it is not supported by sufficient evidence. .............................21

A. Kaman's argument goes to Abbott and Kober's defective methodology—not the weight of their testimony. ....................................................................21

B. Kaman's arguments regarding speculation are correct under Montana law. ....................................................24

C. Contrary to Central's argument, Kaman does offer caselaw to support its argument that Abbott and Kober's methodology is invalid. .............................................26

IV. The prejudgment interest award should be reversed. ..........................27

A. The prejudgment interest award should be reversed because the lost value of the Accident Helicopter was uncertain and disputed. .....................................................28

B. Central's reliance upon *New Hope* is misplaced. .....................29

C. Even if Central's arguments were correct, the prejudgment interest award would still have to be reversed. ........................................................................30

CONCLUSION ....................................................................................................31

CERTIFICATE OF COMPLIANCE ....................................................................31

CERTIFICATE OF SERVICE.............................................................................32

# TABLE OF AUTHORITIES

## Cases

*All-States Leasing Co. v. Top Hat Lounge, Inc.*,
649 P.2d 1250 (Mont. 1982) ........................................................................9

*Bank of Cal., N.A. v. Opie*,
663 F.2d 977 (9th Cir. 1981)........................................................................24

*Barber v. Bradford Aquatic Grp. LLC*,
539 P.3d 648 (Mont. 2023) ......................................................................3, 6

*Black Tusk Helicopters v. Kaman Aerospace Corp.*,
No. 24 Civ. 4259 (JHR), 2026 WL 607690 (S.D.N.Y. March 4, 2026) .........3

*Brandenburger v. Toyota Motor Sales, U.S.A, Inc.*,
513 P.2d 268 (Mont. 1973) ...................................................................2, 4, 8

*Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ...................................................................................22

*Bucy v. Edward Jones & Co., L.P.*,
445 P.3d 812 (Mont. 2019) ..........................................................9, 11, 12, 13

*Carriger v. Ballenger*,
628 P.2d 1106 (Mont. 1981) ..................................................................28, 29

*Covey v. Brishka*,
445 P.3d 785 (Mont. 2019) ....................................................................17, 18

*Denton v. First Interstate Bank of Commerce*,
142 P.3d 797 (Mont. 2006) ......................................................................9, 11

*DeTienne v. Sandrock*,
431 P.3d 12 (Mont. 2018) ......................................................................28, 29

*Dunluck v. Assicurazioni Generali S.P.A.-UK Branch*,
590 F.Supp.3d 1283 (D. Mont. 2022) ............................................................7

*Durden v. Hydro Flame Corp.*,
983 P.2d 943 (Mont. 1999) ...........................................................................3

*Education Logistics, Inc. v. Laidlaw Transit, Inc.*,
No. CV 07-06-M-DWM, 2012 WL 761950 (D. Mont. Mar. 8, 2012) ...23, 27

*Five U's, Inc. v. Burger King Corp.*,
962 P.2d 1218 (Mont. 1998) ......................................................................4, 8

*Freund v. Nycomed Amersham*,
347 F.3d 752 (9th Cir. 2003)....................24

*Grosvold v. Neely*,
568 P.3d 525 (Mont. 2025)....................28, 29

*Harper v. City of Los Angeles*,
533 F.3d 1010 (9th Cir. 2008)....................24

*Highway Specialties, Inc. v. Department of Transp.*,
215 P.3d 667 (Mont. 2009)....................11

*Hoenstine v. Rose*,
312 P.2d 514 (Mont. 1957)....................17, 18

*Hostetter v. Donlan*,
719 P.2d 1243 (Mont. 1986)....................25

*Jim's Excavating Serv., Inc. v. HKM Assocs.*,
878 P.2d 248 (Mont. 1994)....................3, 4

*Keeney Constr. v. James Talcott Constr. Co.*,
45 P.3d 19 (Mont. 2002)....................4, 7, 8

*Kelker v. Geneva-Roth Ventures, Inc.*,
303 P.3d 777 (Mont. 2013)....................13

*Lee v. Kane*,
893 P.2d 854 (Mont. 1995)....................25, 26

*Lenz v. FSC Securities Corp.*,
414 P.3d 1262 (Mont. 2018)....................9, 13

*Masters Group Int'l, Inc. v. Comerica Bank*,
352 P.3d 1101 (Mont. 2015)....................5, 6, 7

*McGlinchy v. Shell Chem. Co.*,
845 F.2d 802 (9th Cir. 1988)....................23, 27

*Meyer v. Creative Nail Design, Inc.*,
975 P.2d, 1264 (Mont. 1999)....................15

*New Hope Lutheran Ministry v. Faith Lutheran Church of Great Falls, Inc.*,
328 P.3d 586 (Mont. 2014)....................29, 30

*Northern Montana Hospital v. Knight*,
811 P.2d 1276 (Mont. 1991)....................29

*Polzin v. Appleway Equip. Leasing, Inc.*,
191 P.3d 476 (Mont. 2008) ....................................................5, 6, 11

*Riley v. American Honda Motor Co., Inc.*,
856 P.2d 196 (Mont. 1993) ....................................................15

*Ryffel Family Partnership, Ltd. v. Alpine Country Construction, Inc.*,
386 P.3d 971 (Mont. 2016) ....................................................29

*Semenza v. Bowman*,
885 P.2d 451 (Mont. 1994) ....................................................19

*Stensvad v. Miners and Merchants Bank of Roundup*,
640 P.2d 1303 (Mont. 1982) ....................................................25

*Streich v. Hilton-Davis, a Div. of Sterling Drug, Inc.*,
692 P.2d 440 (Mont. 1984) ....................................................2, 3, 4

*Sunburst School Dist. No. 2 v. Texaco, Inc.*,
165 P.3d 1079 (Mont. 2007) ....................................................1, 19

*Teague v. Remington Arms, LLC*,
No. CV 18-184-M-DLC, 2022 WL 16574241 (Dist. Mont. Nov. 1, 2022)....3

*Thompson v. Nebraska Mobile Homes, Corp.*,
647 P.2d 334 (Mont. 1982) ....................................................2, 4

*Warrington v. Great Falls Clinic, LLP*,
467 P.3d 567 (Mont. 2020) ....................................................30

*Woody Contracting, Inc. v. Kaman Corporation*,
Case No. 3:12-cv-1010-AVC, United States District Court, District of Connecticut ....................................................3

*Zirkelbach Constr., Inc. v. DOWL, LLC*,
402 P.3d 1244 (Mont. 2017) ....................................................4, 7, 8

**Statutes**

MCA § 30-2-719(3)....................................................7

MCA 28-2-702 ....................................................4, 8

## SUMMARY OF REPLY

Appellee Central Copters Inc. ("Central") states "the main point of damage analysis" is "to make the plaintiff whole." (Resp. at 45). That "main point" does not exist in a vacuum. It must be viewed in light of what a party is actually entitled to recover. As the Montana Supreme Court has explained, "[a]n injured party is to be made as nearly whole as possible—but not to realize a profit." *Sunburst School Dist. No. 2 v. Texaco, Inc.*, 165 P.3d 1079, 1088 (Mont. 2007).

Here, Central contractually agreed that it was not entitled to recover consequential damages. Yet, it was awarded $16 million in consequential damages. Central was also awarded prejudgment interest from August 24, 2020, on the lost value of the Accident Helicopter, even though lost value damages were not capable of being made certain prior to judgment. These (and other) elements of the damage award did not make Central "whole"—they gave Central a windfall.

As explained below and in Appellant Kaman Corporation's ("Kaman") Opening Brief, even if the consequential damages were not contractually barred, they would still be subject to reversal for numerous other reasons, including the fact that they are not supported by substantial evidence. As a result, this Court should reverse the Judgment and prevent Central from obtaining a windfall.

# REPLY

## I. The district court erred by refusing to enforce the parties' contractual agreements to apply Connecticut law and limit damages.

Because the district court refused to enforce the parties' agreements to apply Connecticut law and prohibit the recovery of consequential damages, Central was awarded $16 million in consequential damages to which it was not entitled. (Br. at 18-32; 1-ER-64-65; 12-ER-2718 at § 7). Central's attempts to justify the district court's erroneous rulings lack merit. (Resp. at 13-36).

### A. Montana law does not prohibit the enforcement of agreed-upon contract terms in commercial cases simply because a strict liability claim is asserted.

Central relies upon the same four cases as the district court to support its argument that "Montana law…bars application of contractual limitations on liability by explicitly rejecting the UCC's application in products liability actions." (Resp. at 14-18 (emphasis orig.); 1-ER-84-86). Those cases do not support such a blanket statement.

In *Brandenburger*, the court adopted the doctrine of strict liability. *Brandenburger v. Toyota Motor Sales, U.S.A, Inc.*, 513 P.2d 268, 271-74 (Mont. 1973). In *Thompson*, the court held that strict product liability applies even if the only damage is to the product itself. *Thompson v. Nebraska Mobile Homes, Corp.*, 647 P.2d 334, 337-38 (Mont. 1982). In *Streich*, the court held a commercial entity could bring a strict liability claim. *Streich v. Hilton-Davis, a Div. of Sterling Drug,*

*Inc.*, 692 P.2d 440, 444-45 (Mont. 1984). And in *Jim's Excavating*, the court held that a party can maintain a tort action to recover purely economic damage even in the absence of contractual privity. *Jim's Excavating Serv., Inc. v. HKM Assocs.*, 878 P.2d 248, 502-504 (Mont. 1994).

None of these cases prohibit the enforcement of contractual damage limitation waivers in product liability cases.[1] That is not surprising given that "[i]n Montana, parties enjoy a broad freedom to contract around the terms of their private dealings so long as their agreements do not conflict with public policy." *Barber v. Bradford Aquatic Grp. LLC*, 539 P.3d 648, 651 (Mont. 2023). Nor is it unique to Montana law. Two federal district courts have enforced the very same damage limitation provision at issue in this case. *Black Tusk Helicopters v. Kaman Aerospace Corp.*, No. 24 Civ. 4259 (JHR), 2026 WL 607690, at *1 (S.D.N.Y. March 4, 2026); *Woody Contracting, Inc. v. Kaman Corporation*, Case No. 3:12-cv-1010-AVC, United States District Court, District of Connecticut.[2]

[1] In its response, Central adds two additional cases, neither of which is applicable. In *Teague*, the district court rejected the defendant's argument that it was entitled to summary judgment because "Plaintiffs failed to provide sufficient expert testimony on the issue of causation." *Teague v. Remington Arms, LLC*, No. CV 18-184-M-DLC, 2022 WL 16574241, at *5 (Dist. Mont. Nov. 1, 2022). In *Durden*, "[t]he sole issue raised on appeal" was whether a settlement extinguished a manufacturer's indemnity rights. *Durden v. Hydro Flame Corp.*, 983 P.2d 943, 944 (Mont. 1999).

[2] *Woody* is the subject of Appellant's pending Motion to Take Judicial Notice.

Kaman has not "minimize[d] the authoritative decisions by the Montana Supreme Court in *Brandenburger, Thompson, Streich*, and *Jim's Excavating*." (Resp. at 17). Those cases simply do not stand for the proposition that Montana law categorically prohibits the enforcement of contractual damage limitation provisions negotiated by sophisticated commercial parties like Central and Kaman.

Only *Thompson* involved an even remotely similar issue: it held a liability disclaimer as to the implied warranty of fitness for use did not apply to a strict liability claim. *Thompson*, 647 P.2d at 338. Montana, however, treats liability disclaimers differently than damage limitation provisions. Under Montana law, contract provisions that merely limit damages and do not seek to completely exculpate a party from liability are enforceable under Montana law. *See* MCA 28-2-702; *see also Zirkelbach Constr., Inc. v. DOWL, LLC*, 402 P.3d 1244, 1247 (Mont. 2017); *Keeney Constr. v. James Talcott Constr. Co.*, 45 P.3d 19, 23-24 (Mont. 2002); *Five U's, Inc. v. Burger King Corp.*, 962 P.2d 1218, 1222 (Mont. 1998).

Simply stated, contractual damage limitations negotiated between two sophisticated entities should be enforceable in a commercial lawsuit even if a strict liability claim is asserted. No Montana court has ever held otherwise. The judgment should be reversed as to all consequential damages.

### B. The district court erred in refusing to apply the parties' agreed-upon choice of Connecticut law.

Regardless, the district court should not have applied Montana law. Central and Kaman agreed to apply Connecticut law, and that law should have been applied unless all three of the following factors were met: (1) but for the choice of law provision, Montana law would apply under Restatement Section 188, (2) Montana has a materially greater interest in the particular issue than the parties' chosen state, and (3) application of the chosen state's law would contravene a Montana fundamental public policy. *Masters Group Int'l, Inc. v. Comerica Bank*, 352 P.3d 1101, 1113 (Mont. 2015); *see also Polzin v. Appleway Equip. Leasing, Inc.*, 191 P.3d 476, 512 (Mont. 2008). None of the factors were met. (Br. at 18-23).

Central attempts to distinguish *Masters* by claiming it did not assert any contract claims. (Resp. at 19-20). In *Masters*, however, the court expressly refused "to adopt a bright-line rule with respect to the scope of a choice-of-law provision." *Masters*, 352 P.3d at 1115. Instead, it held the provision extended to "tort claims arising out of the contract." *Id.* The court explained "[i]t cannot reasonably be argued that Masters' tort claims are purely coincidental to or independent of its breach of contract claims against Comerica. Without the contract that tied Masters and Comerica together, there would be no tort claims." *Id.*

The same holds true here. Central purchased the allegedly defective servo flap directly from Kaman pursuant to the terms of the Replacement Blade

Agreement. (12-ER-2694, 2723; 13-ER-3100). Without that agreement, which "tied" Kaman and Central together, there would be no tort claims. That fact is not changed simply because Central tried to avoid its contractual obligations by pleading only strict liability claims. The enforceability of an agreement should not turn on the artful pleading of a sophisticated commercial plaintiff with buyer's remorse.

### C. Under Montana's choice of law rules, Connecticut law should have been applied.

Central claims Kaman's argument is flawed because it relies upon the choice-of-law test applicable to contracts instead of torts. But under Montana law, the enforceability of a contractual choice of law provision is controlled by Sections 187 and 188 of Restatement (Second) of Conflicts of Laws ("Restatement")—the sections applicable to contracts. *See, e.g., Barber v. Bradford*, 539 P.3d 648, 651 (Mont. 2023); *see also Masters*, 352 P.3d at 1113.

In Montana, the law of the state chosen by the parties to govern their contractual rights will be applied unless all three of the following factors are met: (1) but for the choice of law provision, Montana law would apply under Restatement Section 188, (2) Montana has a materially greater interest in the particular issue than the parties' chosen state, and (3) application of the chosen state's law would contravene a Montana fundamental public policy. *Masters Group Int'l*, 352 P.3d at 1113; *Polzin*, 191 P.3d at 512.

Central focuses heavily upon the first two factors (Resp. at 27-31), but as the Montana Supreme Court has explained "if a clear choice of law provision does not violate Montana public policy, there is no reason to analyze" the first two factors. *Masters Group Int'l*, 352 P.3d at 1113. That is exactly the case here.

The choice of law provision would contravene Montana fundamental public policy only if "its application would occasion a result that is clearly forbidden by Montana law." *Dunluck v. Assicurazioni Generali S.P.A.-UK Branch*, 590 F.Supp.3d 1283, 1301-02 (D. Mont. 2022). Application here would result in Central being limited to recovering only for its property damage (the fair market value of the lost Accident Helicopter), and barred from recovering consequential damages. Far from being forbidden, such a result is <u>expressly authorized</u> by Montana law. MCA § 30-2-719(3).

Central takes issue with the fact that MCA Section 30-2-719(3) "is found in Montana's UCC." (Resp. at 30). Regardless of location, it clearly embodies Montana's fundamental policy of allowing commercial parties to agree to limit the types of recoverable damages. Equally important, the Montana Supreme Court has acknowledged on several occasions that contractual damage limitations which do not exempt a defendant from all liability <u>do not violate Montana public policy</u>. *Zirkelbach*, 402 P.3d at 1247; *Keeney*, 45 P.3d at 23-24; *Five U's*, 962 P.2d at

1222. The public policy those cases relied upon is MCA 28-2-702, which is not found in Montana's U.C.C.

**D. The Replacement Blade Agreement, which incorporated the Kaman Price Catalog, is not a contract of adhesion.**

Central also claims the agreement was unenforceable because: (1) it violates Montana public policy, and (2) is "an unconscionable contract of adhesion." (Resp. at 31-36). Neither is true.

**1. The agreement does not violate Montana public policy.**

Central claims the agreement violates public policy because its "object is to get around Montana's expressed policy provisions regarding strict liability". (Resp. at 32). As Central notes, "Montana's strict product liability doctrine was adopted to hold the manufacturer responsible for its defective products." (Resp. at 31) (citing *Brandenburger*, 513 P.2d at 273).

Enforcement would not have resulted in Kaman avoiding responsibility for any allegedy defective product—it merely limits Central's recoverable damages. Again, such agreements do not violate Montana public policy. *Zirkelbach*, 402 P.3d at 1247; *Keeney*, 45 P.3d at 23-24; *Five U's*, 962 P.2d at 1222.

**2. The agreement is not unconscionable.**

The agreement also is not an unconscionable contract of adhesion. A contract or included term is unconscionable if: (1) the contract or term is one of adhesion and (2) it unreasonably favors the stronger party or is unduly oppressive

to the weaker party. *Bucy v. Edward Jones & Co., L.P.*, 445 P.3d 812, 825 (Mont. 2019); *see also All-States Leasing Co. v. Top Hat Lounge, Inc.*, 649 P.2d 1250, 1252-53 (Mont. 1982). The Replacement Blade Agreement does not meet either element. (Br. at 27-28).

Central claims Kaman's argument "relies on the wrong law". (Resp. 32). But as Central recognizes, a contract is unconscionable "if it is a contract of adhesion and the contract or term unreasonably favors the stronger party or is unduly oppressive to the weaker party." (Resp. at 32) (quoting *Lenz v. FSC Securities Corp.*, 414 P.3d 1262, 1274 (Mont. 2018)). These are the same elements upon which Kaman's argument is based. (Br. at 27). Central's remaining arguments are equally baseless.

**i. The agreement is not an adhesion contract.**

"A contract of adhesion is a contract whose terms are dictated by one contracting party to another who has no voice in its formulation." *Denton v. First Interstate Bank of Commerce*, 142 P.3d 797, 803 (Mont. 2006). Central was hardly voiceless in the formulation of the Replacement Blade Agreement.

Central, a highly sophisticated operator, has purchased numerous helicopters made by virtually every manufacturer in the industry. (6-ER-1121-24). Over the years, Central "spent almost $40 million with [Kaman] buying blades and transmissions and parts," and had negotiated other terms with Kaman including

price and warranty provisions. (12-ER-2634; 12-ER-2675). The Replacement Blade Agreement was no different—it was "mutually agreed" upon as a result of "various telecoms between the parties." (13-ER-3100).

Central bases its adhesion argument on testimony that the provisions in the Commercial Price Catalog were not subject to negotiation. (Resp. at 33-34). The Commercial Price Catalog's terms and conditions applied only because they were incorporated into the Replacement Blade Agreement, which was the product of "various telecoms between the parties". (12-ER-2694-2695). Central was free to negotiate the extent to which the Commercial Price Catalog's terms were incorporated into the Replacement Blade Agreement, just as it had negotiated other terms. (12-ER-2634). It simply chose not to do so.

Central also references the testimony of owner Mark Duffy, that Kaman was the only manufacturer of the blades. (Resp. at 33). Duffy admitted Central was aware of that at the time it purchased its first K-MAX, and despite having considered a "spectrum of aircraft" from other manufacturers, still chose to purchase the K-MAX. (12-ER-2629-2630).

Central also claims it "did not know that the Price Catalog's limitations applied". (Resp. at 33-34). "[I]t is a basic tenant of [Montana] contract law that one who executes a written contract is presumed to know the contents of the contract and to assent to those specified terms." *Denton v. First Interstate Bank of*

*Commerce*, 142 P.3d 797, 803 (Mont. 2006) (internal quot. omitted). "Failure to read and understand a clear and unambiguous agreement, absent mistake, is not a defense to its enforcement." *Polzin*, 191 P.3d at 482.

Central also claims the fact it is a sophisticated entity is irrelevant. (Resp. at 34-35). In *Denton*, however, the court considered the fact that the plaintiff "was a sophisticated business person" who did not require "specific protection" and was otherwise "improvident in his business dealings." *Denton*, 142 P.3d at 803. Equally important, "[t]here was no evidence presented that [plaintiff] attempted to negotiate the terms of the contract nor was evidence presented that he would have been unsuccessful in such attempt." *Id*. The same is true here. Under clearly established Montana law the parties' agreement was not a contract of adhesion.

**ii. The agreement does not unreasonably favor Kaman or unduly oppress Central.**

Even terms in adhesion contracts are enforceable unless they are "unreasonably favorable to the drafter, which is generally determined by whether the provision was within the reasonable expectations of, or unduly oppressive to, the weaker party." *Highway Specialties, Inc. v. Department of Transp.*, 215 P.3d 667, 671 (Mont. 2009). Whether a contract term unreasonably favors the stronger party or unduly oppresses the weaker party is a mixed question of fact and law under the totality of circumstances surrounding it's the execution. *Bucy*, 445 P.3d at 825.

Even if Central is considered the "weaker party," the terms were neither unreasonably favorable to Kaman nor unduly oppressive to Central. Based upon the parties' long relationship, the inclusion of choice of law and consequential damage limitations were well within the reasonable expectations of Central. *See Bucy*, 445 P.3d at 825. Central had entered other agreements with Kaman containing those provisions. (12-ER-2671, 2673).

The choice of law and consequential damage limitation provisions were also not unduly oppressive to Central. They are standard terms in similar agreements. Central included them when it sold two of the Non-Accident Helicopters. (13-ER-3101-02; 13-ER-3106-07). Also, neither provision deprived Central of the ability to pursue its claims.

Central argues the agreement is unduly oppressive because it "purports to disclaim any and all liability in tort contract…and even purports to limit third party claims." (Resp. 35). This is a red herring. Kaman did not attempt to enforce a blanket waiver of liability, and the extent to which third party claims are limited is not at issue.

Even if those portions of the agreement were contrary to Montana law, it would still not change the fact that the district court erred in refusing to apply them. "To the extent any provision [of the agreement] is held invalid, such

provision shall be deemed to be deleted and the remaining provisions…shall remain in full force and effect." (12-ER-2723).

Central also claims that under *Lenz*, it is irrelevant that the existence of the choice of law and consequential damage provisions was within its reasonable expectations. (Resp. at 35-36). Under *Lenz*, the reasonable expectations of the weaker part is not "an independent ground for invalidating a standard-form arbitration agreement" that was not otherwise unconscionable. *Lenz*, 414 P.3d at 1274. But one of the relevant factors continues to be "whether the disputed term was common in prior dealings between the parties," i.e., whether Central could have reasonably expected the choice of law and consequential damage provisions to be part of the agreement based upon the parties' previous relationship. *Id*. Central's reliance upon *Kelker* is equally misplaced. This is commercial dispute among sophisticated parties—not a "payday" consumer loan case. *Kelker v. Geneva-Roth Ventures, Inc.*, 303 P.3d 777, 779 (Mont. 2013).

Finally, Central notes "Mark [Duffy] testified Kaman never told him parts were sold subject to the limitations in the Price Catalog." (Resp. at 36). Kaman had no duty to do so. *See Lenz*, 414 P.3d at 1276-77. Furthermore, "there is no evidence [Duffy] was incapable of understanding" the agreement. *Bucy*, 445 P.3d at 826.

***

In sum, the district court erred in refusing to enforce the choice of law and consequential damage limitation provisions. The Judgment should be reversed as to all damages except those awarded for the Accident Helicopter.

## II. The award of $6 million for lost value of the Non-Accident Helicopters should be reversed because it lacks sufficient evidentiary support.

The district court also erred by awarding $6 million for lost value of the Non-Accident Helicopters, because the award is not supported by substantial evidence. (Br. at 31-46). Contrary to Central's argument, this Court does not need to "step into the shoes of the jury to reach" this conclusion. (Resp. at 36).

### A. The "only evidence confirmed" that any damages Central sustained with respect to the Non-Accident Helicopters was caused by its own voluntary decisions.

Central claims "Kaman offered nothing to counter the proof that, but for Kaman's negligence, Central would still be flying the KMAX and the KMAX market would be strong." (Resp. 38). Central's argument is contrary to the record.

Central abandoned its attempt to prove the Non-Accident Helicopters were defective, and the jury rejected its design defect claim. For that reason alone, Central should be precluded from recovering any damages related to the Non-Accident Helicopters.

Even if a party could recover damages for lost value of a product based upon damage to a different product, Central was still required to prove the alleged lost

value of the Non-Accident Helicopters was caused by the manufacturing defect in, or any negligence with respect to, the Accident Helicopter. *Meyer v. Creative Nail Design, Inc.*, 975 P.2d, 1264, 1268 (Mont. 1999); *Riley v. American Honda Motor Co., Inc.*, 856 P.2d 196, 199 (Mont. 1993). There is no substantial evidence to support such a finding.

The record conclusively establishes that any diminished value resulted from voluntary decisions made by Central long after the accident, including evidence that:

- Central continued to operate the Non-Accident Helicopters for a year after the accident. (6-ER-1097-98);
- Central did not stop operating them until it allegedly discovered two alleged "anomalies" in servo flaps on two of them. (*Id.*);
- Central's decision was voluntary and not the result of a defect in the Accident Helicopter. (6-ER-1097-98; 7-ER-1382-83; 7-ER-1392; 9-ER-1946; *see also* Br. at 34-35).

Central claims the award is supported by Crick's testimony that "several fatal crashes of a particular helicopter model" can "have an impact on the value of helicopters." (Resp. at 39). That does not support a finding that a specific manufacturing defect in the Accident Helicopter did cause a loss of fair market value in the Non-Accident Helicopters.

Central also points to the district court's statement that it "proves illogical that Central would have sold the helicopters for less than they were allegedly worth if it had a willing buyer at the higher price as 'fair market value' suggest there should be." (Resp. at 39-40). It is not illogical at all given Crick's admission that Central sold two of the Non-Accident Helicopters at distress sale prices because it had a "compulsion to sell." (9-ER-2086). Mark Duffy admitted that "compulsion to sell" was because Central was "running out of money." (6-ER-1144). Thus, "the only evidence confirmed" that Central failed to prove causation.

**1. Kaman did challenge Crick's discounted value opinion, and challenged or not, his testimony is insufficient to support the damage award.**

Central regurgitates the district court's statement that Kaman provided "no other numbers to assess diminution in value other than those from the sales." (Resp. at 40). Repeating an incorrect statement does not make it true. While Kaman did not offer a valuation witness, it did offer other numbers to assess diminution in value: Crick's own fair market value numbers. (9-ER-2085-2089).

Central also falsely claims the "undisputed testimony showed the [Non-Accident Helicopters] lost value and could not be sold for what they were worth." (Resp. at 40). The "undisputed testimony" from Central's own expert "showed" the opposite: after the accident the fair market value of the Non-Accident Helicopters increased by $600,000. (6-ER-2081; 13-ER-3047).

Finally, Central accuses Kaman of personally attacking the Duffys because they took millions of dollars out of Central in the form of interest-free loans that they did not pay back. (Resp. at 42). As of June 2023, the Duffys had taken $6,653,630 out of Central in interest free loans that they had not paid back. (6-ER-1126; 8-ER-1821-24). That is not a personal attack—it is evidence that explains why, as Mark Duffy testified, Central was "running out of money" and chose to sell the Non-Accident Helicopters at what Crick admitted was distress sale prices. (6-ER-1144; 9-ER-2086).

### B. The evidence is insufficient to support the lost value damage award under the method of calculation Central chose to pursue.

Central claims its failure to offer evidence of the value of the three Non-Accident Helicopters immediately after the August 24, 2020, incident is not fatal because "there is not one sole method for calculating damages." (Resp. at 42). The issue is not whether Central could have pursued recovery under a different method, but if substantial evidence supports the damage award under the method it actually chose to pursue. It does not. (Br. at 32-46).

Central had to prove "the difference between the fair market value of [the Non-Accident Helicopters] immediately before and [their] fair market value immediately [after]" the accident. (2-ER-389); *see also* (2-ER-390); *Covey v. Brishka*, 445 P.3d 785, 796 (Mont. 2019); *Hoenstine v. Rose*, 312 P.2d 514, 518 (Mont. 1957). Central essentially admits it failed to do so. (Resp. at 36-41). The

record conclusively supports its admission.

Central attempts to justify its failure by arguing the jury was given a general instruction to "determine the amount of money which will reasonably and fairly compensate Plaintiff for all loss caused by the Defendant, regardless of whether such loss could have been anticipated." (Resp. at 43). That general instruction does not supplant the specific instruction the jury was given as to the specific element regarding lost value of the Non-Accident Helicopters. (2-ER-382-383).

Central also states "Kaman cite[d] no case law supporting its claim that the difference in fair market value represents the only proper measure of damages as compared to using fair market value and sale value." (Resp. at 43). Once again, whether it was the only proper measure or not is inapposite—it is the only measure Central chose to pursue.

It is Central, not Kaman, who "misunderstands" *Covey* and *Hoenstine*. Both cases unequivocally recognize that the measure of damages for the diminished value of property is the amount of the difference immediately before and immediately after the injury—which is exactly what the jury was instructed. (2-ER-382-383); *Covey*, 445 P.3d at 796; *Hoenstine*, 312 P.2d at 514.

Central also "disregards the main point of damage analysis: to make the plaintiff whole." In the context of the diminished value of a product such as a helicopter, the plaintiff is "made whole" by being awarded the difference in

reasonable market value immediately before and immediately after the accident. Awarding Central an additional "30 to 40%" on top of that amount did not make Central "whole"—it gave it a windfall in contravention of Montana law. "An injured party is to be made as nearly whole as possible—but not to realize a profit. Compensatory damages are designed to compensate the inured party for actual loss and injury—no more, no less." *Sunburst*, 165 P.3d at 1088.

Central's reliance upon *Semenza* is misplaced. *Semenza* is inapplicable for at least three reasons:

- it expressly addressed "the measure of damages <u>in a crop loss claim</u>";
- the damages sought were for the property that was damaged not to a different property, and as a result, there was no causation issue as there is here; and
- unlike this case, there was evidence that it "was common practice to delay selling crops for weeks or months [after harvest] *to enable farmers to achieve a higher price for their crop*."

*Semenza v. Bowman*, 885 P.2d 451, 453-56 (Mont. 1994) (emphasis added).

### C. Central's "softening the market" argument actually illustrates why the evidence is insufficient to support the damage award.

Central claims Crick's fair market value calculations are really what the Non-Accident Helicopters "*should have* been sold for had Kaman not acted negligently." (Resp. at 46-47) (emphasis orig.). Central's after-the-fact attempt to

distance itself from Crick's fair market value testimony illustrates exactly how defective the jury award of $6 million for alleged lost value is.

Central's argument ignores the dispositive undisputed facts: under Crick's own appraisals, the combined fair market value of the three Non-Accident Helicopters, increased after the accident by $600,000. (9-ER-2081–86; 13-ER-3047).

Central claims Crick's appraisals represented what the helicopters should have been worth absent Kaman's negligence, while the later sale prices reflected a softened market. (Resp. 46–48). But Crick described the later transactions as distressed sales undertaken because Central needed cash, and he agreed distressed prices do not reflect fair market value. (9-ER-2086–87). A cash-driven sale years later cannot substitute for fair market value immediately after the occurrence.

Central's argument also incorrectly assumes the market softened because of Kaman's negligence in other cases. The only other incident was the Black Tusk incident, and there was (and still has not been) any finding that Kaman was negligent with respect thereto.

Central also assumes general testimony that fatal crashes can soften a market is substantial evidence that the Non-Accident Helicopters in this case sustained a 30% to 40% loss as a result of a "softened market." It is not. Central refused to sell the Non-Accident Helicopters even though it received immediate interest from

multiple buyers, continued operating the helicopters for roughly a year, and later sold only because it needed funds.

Calling Crick "unrefuted" does not fix Central's evidentiary problem. While a jury may accept disputed testimony, testimony using the wrong measure, contradicting the claimed diminution, and failing to connect the amount to Kaman's conduct is not substantial evidence merely because Kaman did not present its own valuation expert.

Try as it might, Central cannot overcome the fact that the evidence is insufficient to support the award of $6 million for alleged lost value of the Non-Accident Helicopter. That portion of the Judgment should therefore be reversed.

## III. The $6 million lost profit award should be reversed because it is not supported by sufficient evidence.

The $6 million lost profit award is supported only by the unreliable testimony of two Central experts, which constitutes no evidence as a matter of law. (Br. at 46-52). As a result, that portion of the judgment should also be reversed. Central's arguments in response are underwhelming. (Resp. at 48-55).

### A. Kaman's argument goes to Abbott and Kober's defective methodology—not the weight of their testimony.

Central first claims Kaman "omitted" its argument that Abbott and Kober's testimony was unreliable and cannot support the verdict from its Rule 50 motion. (Resp. at 49). That is patently false. In both its Rule 50(a) and Rule 50(b) motions

Kaman made the same argument it makes on appeal: that Abbott's and Kober's testimony was based upon an unreliable methodology and is therefore insufficient to support the lost profits award. (2-ER-214-220; 3-ER-421-426). Central's remaining arguments are equally flawed.

Central spends much of its response defending the district court's gatekeeping discretion. (Resp. 49–52). Even expert opinions that are admitted cannot support a verdict when they are unsupported by sufficient facts, or are rendered unreasonable by indisputable record facts. *Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). That is the case here.

Abbott and Kober projected the same approximately $2.3 million annual loss for as many as fifteen years. Yet Abbott admitted that, under his own calculations, Central's losses had <u>decreased</u> every year since 2021 and that the model therefore <u>overstated</u> loss by an increasing amount each year. (8-ER-1773–74). Contrary to Central's argument, Abbott's admission does not simply go to the weight of the evidence—it renders it insufficient as a matter of law to support the damage award. *Brooke Group, Ltd.*, 509 U.S. at 242.

Central also acknowledges that there were things Abbott and Kober <u>did not</u> consider in reaching their unreliable opinions. That list includes:

- the effect of the COVID-19 pandemic;

- the effect of industry factors unrelated to the accident that negatively impacted Central's business, such as a U.S. Forest Service contract protest which caused Central to reduce its daily rate on those contracts from $24,500 to $15,000—a 40% drop;
- the effect of environmental factors, such as the impact of wildfires on Central's revenue; and
- the impact that factors related to Central's other product lines such as the tourism and fixed wing portions of Central's business had on Central's profitability.

(8-ER-1764-1766, 1808-1811, 1839-1840; Resp. at 51). Abbott and Kober also admitted they did not perform any specific profitability analysis for either the K-MAX or Black Hawk helicopters. (8-ER-1764, 1788).

Once again, this does not simply go to the weight of the evidence. Expert testimony failing to account for other factors that could have contributed to a decline in profits is not competent evidence and cannot support a lost profit award. *See, e.g., McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 806-807 (9th Cir. 1988); *Education Logistics, Inc. v. Laidlaw Transit, Inc.*, No. CV 07-06-M-DWM, 2012 WL 761950, at *8 (D. Mont. Mar. 8, 2012).

Central claims "the jury had substantial evidence to award $6 million in future lost profits," which it claims represents the "jury's conclusion that Central

would incur 2-3 years in future damages". (Resp. at 52). As Central admits, however, a jury's damage verdict cannot stand if it "is based only on speculation or guesswork." (Resp. at 52 (quoting *Harper v. City of Los Angeles*, 533 F.3d 1010, 1028 (9th Cir. 2008)). In light of the record, "speculation or guesswork" is all the jury's verdict could have been based upon. The lost future profit award should be reversed.

**B. Kaman's arguments regarding speculation are correct under Montana law.**

Central's argument that Kaman misapplied Montana law "regarding speculative damages" is meritless. (Resp. at 53-54). As an initial matter, although state law supplies the substantive elements of the claim and the applicable burden of proof, the sufficiency of the evidence to sustain a jury verdict is governed by federal law. *See, e.g., Freund v. Nycomed Amersham*, 347 F.3d 752, 761–63 (9th Cir. 2003); *Bank of Cal., N.A. v. Opie*, 663 F.2d 977, 979 (9th Cir. 1981).

In any event, Central mischaracterizes Kaman's argument as an objection merely to the mathematical precision of Abbott's and Kober's calculations. (Resp. Br. 53–54). The lack of evidence is more fundamental than that. Central failed to establish with reasonable certainty that the accident caused the projected future losses, that those losses would continue after trial, or that Central would otherwise have earned the profits awarded by the jury. As the cases upon which Central relies illustrate, Montana law distinguishes between permissible uncertainty about the

amount of a proven loss from impermissible speculation about the existence, cause, and duration of the loss.

That distinction was recognized in *Stensvad v. Miners and Merchants Bank of Roundup*, 640 P.2d 1303 (Mont. 1982):

> The rule that prohibits speculative profits does not apply to uncertainty as to the amount of such profits but to uncertainty or speculation as to whether the loss of profits is the result of the wrong and whether such profit would have been derived at all. Once liability is shown that is the certainty that the damages are caused by the breach, then loss of profits on a reasonable basis for compensation and the best evidence available under the circumstances will support a reasonably close estimate of the loss by a District Court. **But no damages are recoverable which are not clearly ascertainable both in nature and origin, and only profits which are reasonably certain may be awarded.**

*Id*. at 1310 (internal citations omitted, emphasis added). The court reversed the judgment because "clearly…the damages for lost profits are speculative." *Id*.

Since *Stensvad*, the Montana Supreme Court has reaffirmed on multiple occasions that a party may not recover lost profits if there is uncertainty or speculation as to whether the loss is attributable to the defendant's wrong or whether such profit would have been derived at all. *See, e.g., Lee v. Kane*, 893 P.2d 854, 857 (Mont. 1995); *Hostetter v. Donlan*, 719 P.2d 1243, 1245 (Mont. 1986).

Kaman's argument is that it is pure speculation as to whether Central would suffer future lost profits at all and if so whether they were attributable to Kaman. (Br. at 46-52). Thus, the future lost profit award is based upon what Montana

considers to be impermissible speculation: uncertainty as to the cause of any lost profits and whether any such lost profits would be derived at all.

Central relies upon *Lee* to argue that a lost profit award in Montana does not "require" proof from expert testimony. (Resp. at 53-54). But Central conveniently omits the key language from *Lee*, which recognizes that "expert testimony is not required to prove lost profits *in all cases*". *Lee*, 893 P.2d at 510 (emphasis added). Regardless, whether Central was required prove lost future profits through expert testimony is irrelevant, because it chose to do so. Having made that choice, Central is now stuck with the fact that its experts' testimony is insufficient to support the damage award.

Finally, Central's argument that the district court "correctly instructed the jury on Montana law" is inapposite. (Resp. at 54). As the jury was instructed, "[l]ost profits must be established by more than mere guess or speculation." (2-ER-384). Central failed to do so, and the $6 million future lost profit award should therefore be reversed.

### C. Contrary to Central's argument, Kaman does offer caselaw to support its argument that Abbott and Kober's methodology is invalid.

Central attempts to factually distinguish cases relied upon by Kaman. (Resp. At 54-55). But Central cannot dispute the proposition for which they stand: expert testimony that fails to account for other factors that could have contributed to a

decline in profits is not competent evidence and cannot support a lost profit damage award. *McGlinchy*, 845 F.2d at 806-807; *Education Logistics*, 2012 WL 761950, at *8.

Abbott's and Kober's opinions suffer from that fatal flaw: they failed to account for other factors that could have attributed to Central's alleged lost profits. (8-ER-1764-1766, 1808-1811, 1839-1840). So while the facts of the cases upon which Kaman relies may differ somewhat, the legal principles for which they stand are directly on point.

Finally, Central claims "Kaman offers no caselaw rejecting Abbott's/Kober's method of valuing lost future profits." (Resp. at 54). But Central's expert admitted he has never attempted to apply his defective theory to a case "where a business[']s losses are decreasing over time". (8-ER-1756-1758). More to the point, Central "offers no caselaw" showing its experts' novel, untested and obviously defective "holistic approach" has ever survived appellate scrutiny. Their defective theory should not survive scrutiny here. The judgment should be reversed as to the $6 million future lost profits award.

## IV. The prejudgment interest award should be reversed.

Central admits the district court erred by awarding prejudgment interest on the Non-Accident Helicopters. (Resp. at 56 n.6). Its attempt to salvage the defective award as to the Accident Helicopter should be rejected.

### A. The prejudgment interest award should be reversed because the lost value of the Accident Helicopter was uncertain and disputed.

"No interest can run until a fixed amount of damages has been arrived at, either by agreement, appraisal, or judgment." *Carriger v. Ballenger*, 628 P.2d 1106, 1110 (Mont. 1981); *see also Grosvold v. Neely*, 568 P.3d 525, 551 (Mont. 2025); *DeTienne v. Sandrock*, 431 P.3d 12, 20-21 (Mont. 2018). The amount of lost value for the Accident Helicopter was not arrived at by agreement or by appraisal. As a result, interest could not run until judgment was rendered. The award of prejudgment interest was therefore erroneous. (Br. at 55-60).

Central accuses Kaman of "attempt[ing] to rewrite the trial court record to suit its post-trial objectives" because it did not offer counter evidence on the Accident Helicopter's valuation. (Resp. at 56). Nonsense. Kaman "disputed the helicopter's value" throughout the case leading up to trial, as reflected in the Final Pretrial Order. (11-ER-2488). That order also does not contain reference to any valuation agreement. (11-ER-2482-2483).

Tellingly, Central does not cite to a shred of evidence to support its argument that Kaman failed to dispute the value of the Accident Helicopter before trial. (Resp. at 56-58). The best it can do is point to Kaman's decision not to offer a competing witness <u>at trial</u>, and its counsel's statement <u>during closing argument.</u> (Resp. at 56-57). That hardly supports a finding that the lost value of the Accident Helicopter was certain as of <u>August 24, 2020</u>. (1-ER-36-37).

Central's attempt to distinguish the caselaw upon which Kaman relies is flawed. (Resp. at 57-58). As those cases confirm, the relevant question is not whether Kaman offered a competing appraisal, but whether the amount was objectively fixed. *Grosvold*, 568 P.3d at 551; *DeTienne*, 431 P.3d at 20-21; *Ryffel Family Partnership, Ltd. v. Alpine Country Construction, Inc.*, 386 P.3d 971, 981 (Mont. 2016); *Northern Montana Hospital v. Knight*, 811 P.2d 1276, 1282 (Mont. 1991); *Carriger*, 628 P.2d at 1110. Even if Central's argument is accepted, the damages did not become "objectively fixed" until trial.

Because valuation of the Accident Helicopter required expert judgment and a jury determination, the amount was not capable of being made certain by calculation on the accident date. Thus, there evidence is insufficient to support the award of prejudgment interest from August 24, 2020.

### B. Central's reliance upon *New Hope* is misplaced.

Central's attempt to justify the district court's reliance upon *New Hope Lutheran Ministry v. Faith Lutheran Church of Great Falls, Inc.*, 328 P.3d 586 (Mont. 2014), should also be rejected. (Resp. at 59-60). As the court noted in that case, "New Hope [did] not contend that it [was] entitled to prejudgment interest on the value of the real property, merely on the monetary amounts held in bank accounts or certificates of deposit" to which it was entitled. *Id*. at 602. Prejudgment interest was only awarded on amounts "certain or capable of being made certain"

(bank accounts and certificates of deposit), and not awarded on amounts that were uncertain before trial (property value). *Id.*; *see also Warrington v. Great Falls Clinic, LLP*, 467 P.3d 567, 570 (Mont. 2020).

Thus, neither *New Hope* nor any other Montana case treats a disputed expert valuation as a fixed debt as of the date of loss. The district court's reliance upon *New Hope* was erroneous, as is Central's attempt to salvage that defective ruling. The Judgment should be reversed as to prejudgment interest.

### C. Even if Central's arguments were correct, the prejudgment interest award would still have to be reversed.

Even if Central's arguments were otherwise correct that a valuation is "certain" unless a party provides its own witness to controvert it (which is not the law), the evidence is still insufficient to support the prejudgment interest award.

Crick did not provide his valuation until September 2024. (9-ER-2081-2082; 13-ER-3033). Thus, even under Central's argument, the award did not become certain until then. The district court awarded prejudgment interest on the Accident Helicopter from August 24, 2020. (1-ER-36-37). The record is devoid of any evidence that could support a finding that the amount of damages was certain or capable of being made certain as of that date. Even Crick admitted that ascertaining the lost value of a helicopter is a "complex" process, and that the amount he came up with was his "assessment" of what he believed the fair market value was—not an amount that was "certain or capable of being made certain by

calculation." (9-ER-2075). The evidence is insufficient to support an award of prejudgment interest. That portion of the judgment should therefore be reversed.

## CONCLUSION

Appellant Kaman Aerospace Corporation respectfully requests that this Court reverse the portion of the judgment awarding Central $6 million for lost value of the Non-Accident Helicopters, $4 million for lost past profits, $6 million for lost future profits, and prejudgment interest, render judgment that Central take nothing on those damage elements, and grant it such other relief to which it is justly or equitably entitled.

By: *_/s/ Steven D. Sanfelippo_*
Steven D. Sanfelippo
CUNNINGHAM SWAIM, LLP

## CERTIFICATE OF COMPLIANCE

I certify that the total number of words in this brief, including footnotes is 6,983, as counted by Microsoft Word. This word count excludes any cover, tables, this certificate, and the proof of service.

By: *_/s/ Steven D. Sanfelippo_*
Steven D. Sanfelippo
CUNNINGHAM SWAIM, LLP

## CERTIFICATE OF SERVICE

I hereby certify that pursuant to the Appellate Rules of Civil Procedure a true and correct copy of the above and foregoing was served on all counsel of record on this the 17th day of August, 2026.

By: *//s/ Steven D. Sanfelippo*
Steven D. Sanfelippo
CUNNINGHAM SWAIM, LLP

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-7653

I am the attorney or self-represented party.

**This brief contains** 6,983 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- (●) complies with the word limit of Cir. R. 32-1.
- ( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- ( ) complies with the length limit designated by court order dated ______.
- ( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Steven D. Sanfelippo **Date** 08.17.26

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*